# **EXHIBIT A**

**THIS DOCUMENT IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. ALL OF THE INFORMATION IN THIS PROPOSED DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.*,[1] | Case No. 17-12560 (KJC) |
| | (Jointly Administered) |
| Debtors. | |

## DISCLOSURE STATEMENT FOR THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF WOODBRIDGE GROUP OF COMPANIES, LLC AND ITS AFFILIATED DEBTORS

Dated: Wilmington, Delaware
        August 21, 2018

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Sean M. Beach (No. 4070)
Edmon L. Morton (No. 3856)
Ian J. Bambrick (No. 5455)
Betsy L. Feldman (No. 6410)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253

KLEE, TUCHIN, BOGDANOFF & STERN LLP
Kenneth N. Klee (*pro hac vice*)
Michael L. Tuchin (*pro hac vice*)
David A. Fidler (*pro hac vice*)
Whitman L. Holt (*pro hac vice*)
Jonathan M. Weiss (*pro hac vice*)
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
Tel:    (310) 407-4000
Fax:    (310) 407-9090

*Counsel to the Debtors and Debtors in Possession*

---

[1]    The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3603. The mailing address for Woodbridge Group of Companies, LLC is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423. Due to the large number of debtors in these cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses is attached to the Plan as **Exhibit 1**.

## DISCLAIMER

THIS DISCLOSURE STATEMENT PROVIDES INFORMATION REGARDING THE *FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF WOODBRIDGE GROUP OF COMPANIES, LLC AND ITS AFFILIATED DEBTORS*, WHICH BANKRUPTCY PLAN THE DEBTORS ARE SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN DOCUMENTS RELATING TO THE PLAN. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

THE STATEMENTS CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN. ALTHOUGH THE DEBTORS HAVE MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERIES UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OR DO NOT OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR ANY OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER SUCH AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ALL PERSONS OR ENTITIES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE SPECIFIC PURPOSE FOR WHICH THE DOCUMENTS WERE PREPARED.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT MAY BE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER THE FEDERAL SECURITIES LAWS. STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES AND REPRESENT THE DEBTORS' ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE AND INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER UNKNOWN FACTORS THAT COULD IMPACT THE DEBTORS' PLAN OR DISTRIBUTIONS THEREUNDER. IN ADDITION TO STATEMENTS THAT EXPLICITLY DESCRIBE SUCH RISKS AND UNCERTAINTIES, READERS ARE URGED TO CONSIDER STATEMENTS LABELED WITH THE TERMS "BELIEVES," "BELIEF," "EXPECTS," "INTENDS," "ANTICIPATES," "PLANS," OR SIMILAR TERMS TO BE UNCERTAIN AND FORWARD-LOOKING. CREDITORS AND OTHER INTERESTED PARTIES SHOULD ALSO REVIEW THE SECTION OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT MAY AFFECT THE PLAN AND DISTRIBUTIONS THEREUNDER.

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 6 |
| | A. | Overview of the Plan | 6 |
| | B. | Plan Voting Instructions and Procedures | 11 |
| II. | BACKGROUND REGARDING THE FRAUDULENT ENTERPRISE | 16 |
| | A. | The Determination that Shapiro Operated the Prepetition Debtors as a Ponzi Scheme | 16 |
| | B. | Debtors' Organizational Structure | 18 |
| | C. | Shapiro's Fundraising Scheme | 19 |
| | D. | Investor Funds Were Commingled and Cannot Be Traced to Particular Properties | 22 |
| | E. | The Prepetition Debtors' Fraudulent Marketing and Sales Practices | 23 |
| | F. | Prepetition Investigations and Litigation | 28 |
| | G. | Events Leading to the Bankruptcy Filing and Shapiro's Prepetition Installation of New Management | 28 |
| | H. | The Debtors' Capital Structure | 30 |
| III. | THE CHAPTER 11 CASES | 32 |
| | A. | First Day Orders and Initial Employment Applications | 33 |
| | B. | DIP Financing Motion | 33 |
| | C. | Appointment of the Unsecured Creditors' Committee | 35 |
| | D. | United States Trustee | 35 |
| | E. | Meeting of Creditors | 35 |
| | F. | Schedules, Statements of Financial Affairs, Claims Bar Dates, and Filed Claims | 36 |
| | G. | Sierra Employment Motion | 36 |
| | H. | Motions for Appointment of Trustee and Official Committees and Consensual Resolution Thereof | 37 |
| | I. | Tintarella Motion for Relief From Stay | 40 |
| | J. | Sales of Real Property | 41 |
| | K. | Motion for Authority to Pay Third-Party Secured Debt | 46 |
| | L. | Rejection and Assumption of Executory Contracts and Unexpired Leases | 47 |
| | M. | Consent Orders | 48 |
| | N. | Extension of Exclusivity Periods | 49 |
| | O. | Additional Employment Orders | 50 |

|   | P. | Claims Trading | 51 |
|---|----|----|----|
|   | Q. | SEC Action | 52 |
|   | R. | Postpetition Litigation | 54 |
|   | S. | Plan Term Sheet | 59 |
| IV. | | SUMMARY OF THE JOINT CHAPTER 11 PLAN | 60 |
|   | A. | Purpose and Effect of the Plan | 61 |
|   | B. | Comprehensive Compromise and Settlement Under the Plan | 61 |
|   | C. | Substantive Consolidation and Its Relationship to the Plan Treatment of Claims | 71 |
|   | D. | The Liquidation Trust, the Wind-Down Entity, and the Liquidation Analysis | 72 |
|   | E. | Estimated Recoveries for Holders of Note Claims, Unit Claims, and General Unsecured Claims | 73 |
|   | F. | Treatment of Claims and Equity Interests | 79 |
|   | G. | Acceptance or Rejection of Plan | 87 |
|   | H. | Implementation of the Plan | 88 |
|   | I. | Executory Contracts and Unexpired Leases | 104 |
|   | J. | Conditions Precedent to the Effective Date | 106 |
|   | K. | Certain Miscellaneous Provisions | 107 |
| V. | | RISK FACTORS | 114 |
|   | A. | Parties May Object to the Plan's Classification of Claims and Equity Interests | 114 |
|   | B. | The Debtors May Not Be Able to Obtain Confirmation of the Plan | 114 |
|   | C. | The Conditions Precedent to the Effective Date of the Plan May Not Occur | 114 |
|   | D. | Claims Estimation and Allowance of Claims | 114 |
|   | E. | Potential Pursuit of Liquidation Trust Actions Against Creditors and Others | 115 |
|   | F. | Risks Regarding Real Estate | 116 |
|   | G. | Securities Law Considerations | 116 |
|   | H. | Tax Considerations | 117 |
| VI. | | CONFIRMATION OF THE PLAN | 118 |
|   | A. | The Confirmation Hearing | 118 |
|   | B. | Requirements for Confirmation of the Plan | 118 |

C.    Best Interests of Creditors.....................................................................119

D.    Feasibility...............................................................................................120

E.    Acceptance by Impaired Classes ...........................................................120

F.    Confirmation Without Acceptance by All Impaired Classes..............121

G.    Alternatives to Confirmation and Consummation of the Plan...........122

VII.    CERTAIN SECURITIES LAW CONSEQUENCES OF THE PLAN........................122

A.    General....................................................................................................122

B.    Exemption From Offer and Sale of Securities Act and Blue Sky Laws..............123

C.    Exchange Act and other securities law compliance............................124

VIII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES
        OF THE PLAN .............................................................................................126

A.    Certain U.S. Federal Income Tax Consequences of the Liquidation Trust ........128

B.    Consequences to Holders of Claims Generally ...................................129

C.    Consequences to Liquidation Trust Beneficiaries ..............................131

D.    Withholding on Distributions, and Information Reporting.................133

IX.     RECOMMENDATION ...................................................................................134

## EXHIBITS & SCHEDULES

EXHIBIT A          First Amended Joint Chapter 11 Plan of Liquidation

EXHIBIT B          Liquidation Analysis

EXHIBIT C          New Board of Managers Biographies

EXHIBIT D          Non-Exclusive Description of Preserved Liquidation Trust Actions

EXHIBIT E          Wind-Down Business Plan Summary

SCHEDULE 1         Schedule of Excluded Parties

SCHEDULE 2         Schedule of Non-Debtor Loan Note Claims

SCHEDULE 3         Schedule of Principal Amounts and Prepetition Distributions

THE EXHIBITS AND SCHEDULES ATTACHED TO THIS DISCLOSURE
STATEMENT
ARE INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN

## GENERAL OVERVIEW AND SUMMARY

This disclosure statement (the "Disclosure Statement") describes in detail the historical background that led to the bankruptcy cases of Woodbridge Group of Companies, LLC and its affiliated debtors and debtors in possession (collectively, "Woodbridge" or the "Debtors"), explains what has happened in the months since the Debtors commenced their bankruptcy cases, and sets forth the treatment of creditors in the Debtors' proposed plan of liquidation (the "Plan"). This overview and summary highlights the main points discussed in the Disclosure Statement, and should be read in conjunction with the remainder of the Disclosure Statement. This general overview and summary is qualified by the express terms of the Plan.

### 1. Historical Background of the Debtors

These bankruptcy cases arise out of a massive, multi-year fraudulent scheme perpetrated by Robert Shapiro between (at least) 2012 and 2017.[2] As part of this fraud, Shapiro, through the Woodbridge entities, raised over one billion dollars from approximately 10,000 investors—as either Noteholders or Unitholders—and used approximately $368 million of new investor funds to pay existing investors—a typical characteristic of Ponzi schemes. Importantly, Shapiro, as described more fully below, is **_no longer involved_** in any capacity with the control of the Debtors or of these bankruptcy cases.

While he was in control of the prepetition Debtors, Shapiro deceived investors in order to obtain their money. He told investors that their money would be used to make high-interest loans to unrelated, third-party borrowers and gave Noteholders documents referencing a specific property for which their funds were allegedly being used. Shapiro also told Noteholders that their notes were backed by mortgages on those specific properties, which, if true, would typically mean that investors could recover their investments from the proceeds of a sale of that property.

In reality, these were lies on a massive scale. Investors' money was nearly entirely *not* used to make high-interest loans to unrelated, third-party borrowers, and investors' money was *not* used for the specific property that may have been identified in any particular investor's documentation from the prepetition Debtors. Instead, Shapiro created disguised affiliates to which money was "loaned," which entities had no ability to service debt. Shapiro further took nearly all of the investors' money and commingled it into one central bank account. The funds used for property purchases from this central, pooled account generally cannot be traced to any particular  Woodbridge "fund" entity or its investors. Moreover and unfortunately, payments from that central, pooled account were not used only for property purchases. Shapiro also used investor money to pay approximately $64.5 million in commissions to sales agents who sold these fraudulent "investments" and used investor money to pay at least $21.2 million for Shapiro's personal benefit (including, for example, purchasing luxury items, travel, wine, and the

---

[2]    Pursuant to the Plan Term sheet, the Plan will acknowledge and admit that the Debtors operated as a Ponzi scheme since at least August 2012 , which scheme was discovered no later than December 2017 when the SEC unsealed its action against Robert Shapiro and others and alleged facts evidencing such Ponzi scheme. To the extent that the Bankruptcy Court does not confirm the Plan, the Debtors and each of the three "Committees" reserve all of their respective rights (and/or defenses) respecting the characterization and the ramifications  of the massive fraud upon investors and other creditors.

like). Additionally and critically, in the absence of any meaningful cash inflows into the prepetition Debtors from sources other than investors, Shapiro and the prepetition Debtors, which he controlled, used approximately $368 million of new investor funds to pay "interest" and "principal" to existing investors.

By late 2017, Shapiro was being investigated by the United States Securities and Exchange Commission (the "<u>SEC</u>") and numerous state regulatory agencies. As a result, Shapiro found it difficult to raise new investor money. As Shapiro's use of funds reflects, the prepetition Debtors were reliant on money from new investors to make the payments promised to existing investors. When new investments dried up, the prepetition Debtors could no longer make these payments to existing investors, and therefore Shapiro's web of deceit quickly unraveled.

## 2. **Debtors' Bankruptcy Cases**

Shapiro hired new outside managers for the prepetition Debtors on or about December 1, 2017, who commenced the many of the Debtors' bankruptcy cases on December 4, 2017. On December 14, 2017, the Office of the United States Trustee formed the Official Committee of Unsecured Creditors (the "<u>Unsecured Creditors' Committee</u>").

On December 20, 2017, the SEC filed a complaint in Florida federal court against Shapiro and his affiliates, including the Debtors, detailing much of the massive fraud perpetrated by Shapiro prepetition. The SEC asked the Florida court to appoint a receiver who would displace the Debtors' management in these bankruptcy cases, but the court declined to immediately act on this request in light of the Debtors' pending bankruptcy cases.

On December 28, 2017, the Unsecured Creditors' Committee filed a motion seeking appointment of a chapter 11 trustee to replace the Debtors' management team, arguing that the team was "hand-picked by Shapiro, and ha[d] done his bidding both before and after the filing of these cases." The SEC later made a similar request, arguing that the new "independent" management team was "completely aligned [with Shapiro] in controlling this bankruptcy."

Around this time, certain groups of Noteholders and a group of Unitholders sought appointment of official committees of Noteholders and Unitholders, respectively. One of the Noteholder groups actively opposed the trustee motions, expressing concern that such appointment, without official representation for Noteholders, could set in motion a series of events that could ultimately prove harmful to Noteholders' interests in the cases.

On January 23, 2018, following several days of evidentiary hearings on the trustee motions, the Debtors, the Unsecured Creditors' Committee, the SEC, as well as groups of Noteholders and Unitholders, reached a settlement of the trustee motions and the motions for appointment of official Noteholder and Unitholder committees. The settlement provided, among other things:

**I.** A new board of managers—with no ties whatsoever to Shapiro—was formed to govern the Debtors (the "<u>New Board</u>").

**II.** The New Board was empowered to select a chief executive officer or chief restructuring officer—and shortly thereafter selected and employed individuals for both of those positions.

**III.** The New Board was empowered to select new counsel for the Debtors—and, upon consultation with the SEC, in mid-February did select new bankruptcy co-counsel.

**IV.** Noteholders were permitted to form a single six-to-nine-member fiduciary Noteholder committee to advocate for the interests of Noteholders in the cases (the "<u>Noteholder Committee</u>"), with a professional fee budget, to be funded by the Debtors, through January 1, 2019.

**V.** Unitholders were permitted to form a single one-to-two-member fiduciary Unitholder committee to advocate for the interests of Unitholders in the cases (the "<u>Unitholder Committee</u>"), with a professional fee budget, to be funded by the Debtors, through January 1, 2019.

Beginning in at least late January 2018, Shapiro had and still has no control over the Debtors whatsoever. Instead, the Debtors were, and are, managed by a new and independent board of managers and new management, none of whom had any prior involvement with Shapiro.

The Debtors and their new management and advisors have worked diligently with all of the creditor representatives—the Unsecured Creditors' Committee, the Noteholder Committee, and the Unitholder Committee—to ensure that investors can recover as much money as possible, and that the Debtors' funds are not squandered by years of litigation between and among the Debtors' creditor constituencies.

Ultimately, the Debtors and all of these creditor constituencies reached a settlement—which settlement is fully described in the Disclosure Statement and is embodied in the accompanying Plan. The settlement recognizes certain unfortunate realities: that Shapiro ran a fraudulent scheme (which the Plan will acknowledge and admit was operated as a Ponzi scheme), that he did not use investor money as he claimed he would, that he misrepresented the nature of the security provided to Noteholders, and that he did not take appropriate legal steps to protect the Noteholders' interests with respect to any such security.

### 3. **Debtors' Proposed Bankruptcy Plan**

The Debtors deeply regret these realities, and they have worked diligently to maximize investor recoveries. To that end, the Plan provides for the creation of two entities: (i) a Wind-Down Entity, which will own many of the Debtors' assets (including the Debtors' real properties) and will sell those assets to generate cash, and (ii) a Liquidation Trust, which will own the Wind-Down Entity and receive cash generated by the Wind-Down Entity and will distribute that (and other) cash to creditors (including to investors). The Liquidation Trust will also own litigation claims against third parties and may generate cash through prosecution or settlement of those claims. However, the estimated recoveries to creditors set forth below and in the Disclosure Statement do not take into account potential proceeds of these litigation claims because they are unpredictable and highly contingent.

Critically, the Debtors have ensured that creditors have indirect control over the decisions that will be made by the Liquidation Trust. The proposed Liquidation Trustee, Mr. Michael Goldberg, was the SEC's designee to, and is a current member of, the Debtors' New Board of Managers, and he was unanimously selected to be the Liquidation Trustee by the Unsecured

Creditors' Committee, the Noteholder Committee, and the Unitholder Committee. In addition, the Liquidation Trust Supervisory Board will consist of five members—three selected by the Unsecured Creditors' Committee, and one each selected by the Noteholder Committee and the Unitholder Committee.

Cash will be distributed by the Liquidation Trust to Noteholders, Unitholders, and other creditors both up-front and over time (as the Wind-Down Entity sells properties). Noteholders, Holders of General Unsecured Claims, and Unitholders initially will be paid at the same time by each receiving Class A Liquidation Trust Interests that entitle them to cash distributions. But, the settlement addresses the disputes regarding whether the Units actually are "claims," or instead are "equity" (ownership interests) in the Debtors (in which case Unitholders could be entitled to be paid nothing), and whether the Notes are validly secured (either directly or indirectly) by the subject real properties. Rather than spend significant time and money litigating these very complicated issues, the parties negotiated and settled upon allowance of claims for Unitholders at a 27.5% discount as compared to Noteholders' claims. Thus, Unitholders will initially receive 72.5% of what Noteholders receive in terms of relative distributions against their respective net investments. This aspect of the settlement is accomplished by affording Noteholders Class A Liquidation Trust Interests for 100% of their Net Note Claims and affording Unitholders Class A Liquidation Trust Interests for only 72.5% of their Net Unit Claims. (Unitholders also get Class B Liquidation Trust Interests for the other 27.5% of their Net Unit Claims, so that if there is more money available after payment of the Net Note Claims, Allowed General Unsecured Claims, and Net Unit Claims represented by the Class A Liquidation Trust Interests, then Unitholders will receive cash distributions on their Class B Liquidation Trust Interests until the remaining Net Unit Claims are paid.)[3]

Further, the Plan provides for "substantive consolidation" of all Woodbridge Fund Debtors (*i.e.*, the ones that raised money from investors) into one entity and all other Debtors (including those that own the subject real properties) into a second entity in order to effectuate the distributions explained above. Substantive consolidation generally refers to the pooling of assets and liabilities of several entities. In other words, if Entity A holds $100 of assets and owes $0 of liabilities, and Entity B holds $0 of assets and owes $100 of liabilities, and if those two entities are substantively consolidated, the resulting entity will hold $100 of assets and owe $100 of liabilities.

The Plan also incorporates a "netting" mechanism where distributions of Liquidation Trust Interests will be made based on the Net Note Claim or the Net Unit Claim. These net amounts are calculated based on the Outstanding Principal Amount of a Note Claim or a Unit Claim, *minus* the aggregate amount of all Prepetition Distributions received by the claimholder. As discussed further in the Disclosure Statement, the Plan provides for this "netting" because of the conclusion that the Debtors operated as a Ponzi scheme (as acknowledged in the Plan and if approved by the Bankruptcy Court), in which case any Prepetition Distributions to Noteholders or Unitholders (representing, for example, purported interest) could be avoided and recovered for

---

[3] Noteholders and Unitholders also are afforded on their Ballots the opportunity to elect to become Contributing Claimants, and have such amounts increased by multiplying them by the Contributing Claimants Enhancement Multiplier (i.e., 105%), as more fully described in Section I.A.2 hereof.

the benefit of other investors under state and federal "fraudulent transfer" laws. Based on their books and records, the Debtors have prepared a "Schedule of Principal Amounts and Prepetition Distributions" (a copy of which is attached to the Disclosure Statement) that lists the Debtors' calculation of the Net Note Claims and the Net Unit Claims. The specific amounts applicable to you are set forth in your Ballot. If you agree with the net claim amounts set forth in your Ballot, then you do not need to take any action with respect to that item of the Ballot and will have agreed to (and have Allowed Claims based on) the amounts set forth in the Schedule of Principal Amounts and Prepetition Distribution. If you disagree with the net claim amounts set forth in the Schedule of Principal Amounts and Prepetition Distributions, then you have the option to check a box on your Ballot and dispute such amount. **If you check this box on your Ballot, this may significantly delay the timing of Distributions (if any) to you. The Debtors reserve all rights to object to the validity, amount, or any other aspect of any Claim held by a Disputing Claimant who disputes the amounts set forth on their Ballot. In addition, the Debtors reserve any Liquidation Trust Actions that may exist regarding the particular Disputing Claimant, all of which the Liquidation Trust may determine to pursue against the particular Disputing Claimant as part of post-confirmation litigation relating to the correct Net Note Claim or Net Unit Claim amounts and related matters.**

The Debtors estimate the following recoveries for Noteholders and Unitholders (and general unsecured creditors) under the Plan:

| Class 3 | Standard Note Claims | 60%-70% of Net Amounts |
|---|---|---|
| Class 4 | General Unsecured Claims | 60%-70% of Allowed Amounts |
| Class 5 | Unit Claims | 40%-50% of Net Amounts |
| Class 6 | Non-Debtor Loan Note Claims | 60%-70% of Net Amounts[4] |

\*   \*   \*

The Debtors deeply regret these circumstances, and understand the precarious financial position that many investors are in as a result of Shapiro's fraudulent scheme and its sudden collapse last December. However, the Debtors believe that the settlement described above and reflected in the Plan, which is the result of extensive negotiations with significant investor input, represents the best outcome of these unfortunate circumstances, and importantly, provides the best prospect for investors to receive distributions as soon as possible.

---

[4] Although a higher recovery is theoretically possible if the Bankruptcy Court ultimately finds that any of these Noteholders are secured by a properly perfected, unavoidable, and enforceable security interest, the Debtors do not believe such an outcome is likely. Instead, the Debtors believe that all Noteholders currently classified in Class 6 will ultimately be reclassified into Class 3, either on a consensual basis or after litigation.

01:23482975.4

# I.    INTRODUCTION

Woodbridge Group of Companies, LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby submit this disclosure statement (the "Disclosure Statement") pursuant to sections 1125 and 1126(b) of title 11 of the United States Code (the "Bankruptcy Code"), in connection with the solicitation of votes on the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors*, dated as of August 3, 2018 (as amended, modified, or supplemented from time to time pursuant to its terms, the "Plan"). A copy of the Plan is attached hereto as **Exhibit A**.[5]

The purpose of this Disclosure Statement is to enable Creditors whose Claims are Impaired under the Plan and who are entitled to vote on the Plan to make an informed decision when exercising their right to accept or reject the Plan. This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection under chapter 11 of the Bankruptcy Code, the course of these Chapter 11 Cases, and the anticipated orderly liquidation of the Estate Assets. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting and election procedures that Creditors entitled to vote under the Plan must follow for their votes to be counted.

## A.    Overview of the Plan

### 1.    General Structure of the Plan

A bankruptcy plan is a vehicle for satisfying the rights of holders of claims against and equity interests in a debtor. Consummation of a plan is the overriding purpose of a chapter 11 case. Upon confirmation and effectiveness, a plan becomes binding on the debtor and all of its creditors and equity interest holders.

In these Chapter 11 Cases, the Plan contemplates a liquidation of each of the Debtors and is therefore referred to as a "plan of liquidation." The Debtors' assets largely consist of 189 real properties (as of the date of this Disclosure Statement), Cash, and the Liquidation Trust Actions under the Plan.  The Liquidation Trust Actions include, but are not limited to, causes of action, claims, remedies, or rights that may be brought by or on behalf of the Debtors or the Estates under chapter 5 of the Bankruptcy Code and related statutes or common law, as well as any other claims, rights, or causes of action held by the Debtors' Estates.  The estimated recoveries to creditors set forth in this Disclosure Statement do not take into account potential proceeds of the Liquidation Trust Actions because they are unpredictable and highly contingent.  Among other things, although the Debtors believe that strong litigation claims may exist, the ability to collect any judgment on those claims remains unknown at this time.

---

[5]    All capitalized terms used but not defined herein shall have the meanings provided to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between the summary herein and the Plan, the Plan shall govern.

The Plan provides for the creation of a Liquidation Trust and a Wind-Down Entity, as well as the appointment of a Liquidation Trustee and a Wind-Down CEO, who will administer and liquidate all remaining property of the Debtors and their Estates, subject to the supervision and oversight of the Liquidation Trust Supervisory Board and the Wind-Down Board, respectively, all as described more fully in Section IV.D of this Disclosure Statement. The Plan also provides for Distributions to be made to certain Holders of Administrative Claims, Professional Fee Claims, Priority Tax Claims, DIP Claims, Other Secured Claims, Priority Claims, Note Claims (both Standard Note Claims and Non-Debtor Loan Note Claims), General Unsecured Claims, Unit Claims, and potentially Subordinated Claims, and for the funding of the Liquidation Trust and the Wind-Down Entity. The Plan also provides for two levels of substantive consolidation as of the Effective Date—(i) of all of the Fund Debtors into Woodbridge Mortgage Investment Fund 1, LLC ("Fund 1"), and (ii) of all of the Other Debtors into Woodbridge Group of Companies, LLC.  Finally, the Plan provides for the cancellation of all Equity Interests in the Debtors, the dissolution and wind-up of the affairs of the Debtors, and the administration of any remaining assets of the Debtors' Estates by the Liquidation Trustee or the Wind-Down CEO, as applicable.

**THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE RECOVERIES TO CREDITORS, AND IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CONSTITUENTS. FOR THESE REASONS, THE DEBTORS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO <u>ACCEPT</u> THE PLAN.**

**THE PLAN IS THE PRODUCT OF EXTENSIVE NEGOTIATION WITH, AND IS SUPPORTED BY, ALL THREE OF THE COMMITTEES APPOINTED IN THE CHAPTER 11 CASES, WHO WILL BE PROVIDING THEIR OWN STATEMENT SIMILARLY URGING HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO <u>ACCEPT</u> THE PLAN.**

### 2.    Material Terms of the Plan

The following is a general overview of certain material terms of the Plan:

- All Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed DIP Claims, Allowed Other Secured Claims, and Allowed Priority Claims will be paid or otherwise satisfied in full as required by the Bankruptcy Code, unless otherwise agreed to by the Holders of such Claims and the Liquidation Trustee or the Wind-Down Entity, as applicable.

- Holders of Allowed Standard Note Claims will receive one (1) Class A Liquidation Trust Interest for each $75.00 of Net Note Claims held by the applicable Noteholder with respect to its Allowed Note Claims. (If such calculation otherwise would result in such Holder receiving a fractional Class A Liquidation Trust Interest, the amount will be rounded to the nearest hundredth of such Liquidation Trust Interest with five thousandths thereof rounded up to the next hundredth). Distributions of Cash on account of the Class A Liquidation Trust Interests will be made in accordance with the Liquidation Trust Interests Waterfall, including an initial Distribution of Cash to Holders of Class A

Case 17-12560-BLS   Doc 2389   Filed 09/19/18   Page 15 of 141

Liquidation Trust Interests targeted to be made by December 31, 2018 (after the Plan Effective Date) from the Initial Distribution Fund, which is Cash in a range targeted at $42.5 to $85.0 million in the aggregate.

- Holders of Allowed General Unsecured Claims will receive one (1) Class A Liquidation Trust Interest for each $75.00 of Allowed General Unsecured Claims held by the applicable Creditor with respect to its Allowed General Unsecured Claims. (If such calculation otherwise would result in such Holder receiving a fractional Class A Liquidation Trust Interest, the amount will be rounded to the nearest hundredth of such Liquidation Trust Interest with five thousandths thereof rounded up to the next hundredth). Distributions of Cash on account of the Class A Liquidation Trust Interests will be made in accordance with the Liquidation Trust Interests Waterfall, including an initial Distribution of Cash to Holders of Class A Liquidation Trust Interests targeted to be made by December 31, 2018 (after the Plan Effective Date) from the Initial Distribution Fund, which is Cash in a range targeted at $42.5 to $85.0 million in the aggregate.

- Holders of Allowed Unit Claims will receive 72.5% of one (1) Class A Liquidation Trust Interests and 27.5% of one (1) Class B Liquidation Trust Interest for each $75.00 of Net Unit Claims held by the applicable Unitholder with respect to its Allowed Unit Claims. (If such calculation otherwise would result in such Holder receiving a fractional Liquidation Trust Interest any resulting fractional Liquidation Trust Interests will be rounded to the nearest hundredth of such Liquidation Trust Interest with five thousandths thereof rounded up to the next hundredth). Distributions of Cash on account of the Class A Liquidation Trust Interests and Class B Liquidation Trust Interests will be made in accordance with the Liquidation Trust Interests Waterfall, including an initial Distribution of Cash to Holders of Class A Liquidation Trust Interests targeted to be made by December 31, 2018 (after the Plan Effective Date) from the Initial Distribution Fund, which is Cash in a range targeted at $42.5 to $85.0 million in the aggregate.

- Holders of Allowed Non-Debtor Loan Note Claims[6] who prevail through litigation that they hold a valid and perfected Secured Claim will receive Cash from the Liquidation Trust in the amount of such Holder's Allowed Claim to the extent such Allowed Claim is a Secured Claim, with post-Confirmation interest thereon at the applicable contract rate, and any Holder of such Allowed Claim shall release (and by the Confirmation Order shall be deemed to release) all Liens against any Estate Assets. All other Holders of these Claims will be reclassified into Class 3 and their Claims will be treated as if such Claims had always been part of Class 3. **In order to avoid the need for significant litigation expense and delay, the Debtors encourage all recipients of a Class 6 Ballot to choose to have their Claims reclassified in Class 3 pursuant to the procedures set forth in the Disclosure Statement Order and Class 6 Ballot.**

- Holders of Allowed Subordinated Claims will retain a residual right to receive Cash that remains in the Liquidation Trust after the final administration of all Liquidation Trust

---

[6]    A Schedule of Non-Debtor Loan Note Claims is attached hereto as **Schedule 2**.

Assets and the complete satisfaction of all senior payment rights within the Liquidation Trust Interests Waterfall.

• As of the Effective Date, all Equity Interests in the Debtors shall be deemed void, cancelled, and of no further force and effect. On and after the Effective Date, Holders of Equity Interests shall not be entitled to, and shall not receive or retain any property or interest in property under the Plan on account of such Equity Interests.

• In accordance with sections 3.4, 3.6, and 3.7 of the Plan, each Noteholder and Unitholder may agree, by electing on its Ballot, to assign to the Liquidation Trust all Causes of Action that any Noteholder or Unitholder has against any Person that is not a Released Party and that are related in any way to the Debtors. The relative share of Liquidation Trust recoveries for any such electing Noteholder (to the extent its Claims are ultimately treated as part of Class 3) or Unitholder will be enhanced by having the amount that otherwise would be its Net Note Claim or Net Unit Claim increased by multiplying it by the Contributing Claimants Enhancement Multiplier (*i.e.*, 105%). Noteholders and Unitholders also may choose to make such election because aggregating all Contributed Claims and similar Liquidation Trust Actions may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner.

• In accordance with Section 5.8 of the Plan, subject to the rights of Allowed Other Secured Claims and the reservations set forth in such Section 5.8, the Fund Debtors will be substantively consolidated into Woodbridge Mortgage Investment Fund 1, LLC and the Other Debtors will be substantively consolidated into Woodbridge Group of Companies, LLC.

• Any Intercompany Claims that could be asserted by one Debtor against another Debtor will be extinguished immediately before the Effective Date with no separate recovery on account of any such Claims and any Intercompany Liens that could be asserted by one Debtor regarding any Estate Assets owned by another Debtor will be deemed released and discharged on the Effective Date; *provided, however*, that solely with respect to any Secured Claim of a non-debtor as to which the associated Lien would be junior to any Intercompany Lien, so as to retain the relative priority and seniority of such Intercompany Claim and associated Intercompany Lien, the otherwise released Intercompany Claim and associated Intercompany Lien will be preserved for the benefit of, and may be asserted by (a) the Liquidation Trust as to any Collateral that is Cash and (b) otherwise, the Wind-Down Entity.

• The Liquidation Trust will be created to (a) most effectively and efficiently pursue the Liquidation Trust Actions (including the Contributed Claims) for the collective benefit of all the Liquidation Trust Beneficiaries, (b) to own the Wind-Down Entity and receive the net proceeds of real estate sales, and (c) to pay Distributions, in accordance with the Plan, to Noteholders, Holders of General Unsecured Claims, and Unitholders in respect of their Liquidation Trust Interests.

01:23482975.4

### 3.      Summary of Treatment of Claims and Equity Interests Under the Plan

The table below summarizes the classification and treatment of Claims and Equity Interests under the Plan.

**THE PROJECTED RECOVERIES FOR NOTE CLAIMS, GENERAL UNSECURED CLAIMS, AND UNIT CLAIMS SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ACTUAL RECOVERIES MAY DIFFER. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE PLAN.**

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | PROJECTED RECOVERY |
|-------|-------------|----------------------|--------------------|
| None | Administrative Claims | Unimpaired | 100% |
| None | Professional Fee Claims | Unimpaired | 100% |
| None | Priority Tax Claims | Unimpaired | 100% |
| None | DIP Claims | Unimpaired | 100% |
| Class 1 | Other Secured Claims | Unimpaired | 100% |
| Class 2 | Priority Claims | Unimpaired | 100% |
| Class 3 | Standard Note Claims | Impaired | 60%-70%[7] |
| Class 4 | General Unsecured Claims | Impaired | 60%-70%[8] |
| Class 5 | Unit Claims | Impaired | 40%-50%[9] |

---

[7]  Estimated recoveries for Class 3, Class 4, and Class 5 were projected based on the Debtors' Wind-Down Business Plan and projections regarding anticipated disposition of assets, which were developed in consultation with the Committees and are based upon the total amount of Filed and Scheduled Claims to date (reduced as to Class 3 Standard Note Claims and Class 5 Unit Claims by the Prepetition Distributions). Estimated recoveries will be affected by, among other things, the ultimate pool of Allowed Claims in each such Class, including any potential decrease in each such pool as a result of any potential future objections to Filed or Scheduled Claims, resolutions of Claims of Disputing Claimants, the amount of Wind-Down Expenses and Liquidation Trust Expenses, and the recoveries realized from the Wind-Down Assets and the Liquidation Trust Assets. In estimating recoveries, the Debtors, based on consultation with the Committees, have not included projected recoveries, if any, that may be generated on account of Liquidation Trust Actions, as such recoveries are unpredictable and collectability is unknown at this time.

[8]  See footnote 7 above.

[9]  See footnote 7 above.

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | PROJECTED RECOVERY |
|---|---|---|---|
| Class 6 | Non-Debtor Loan Note Claims | Impaired | 60%-70%[10] |
| Class 7 | Subordinated Claims | Impaired (deemed to reject) | 0% |
| Class 8 | Equity Interests | Impaired (deemed to reject) | 0% |

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN. THE PLAN IS SUPPORTED BY THE UNSECURED CREDITORS' COMMITTEE, THE NOTEHOLDER COMMITTEE, AND THE UNITHOLDER COMMITTEE.**

**B.    Plan Voting Instructions and Procedures**

**1.    Voting Rights**

Under the Bankruptcy Code, only classes of claims or interests that are "impaired" and that are not deemed as a matter of law to have rejected a plan under Bankruptcy Code section 1126 are entitled to vote to accept or reject such plan. Any class that is "unimpaired" is not entitled to vote to accept or reject a plan and is conclusively presumed to have accepted such plan. As set forth in Bankruptcy Code section 1124, a class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified or altered by the proposed plan. Holders of claims or interests within an impaired class are entitled to vote to accept or reject a plan if such claims or interests are "allowed" under Bankruptcy Code section 502.

Under the Bankruptcy Code, acceptance of a plan by a class of claims is determined by calculating the number and the amount of allowed claims voting to accept such plan. Acceptance by a class of claims requires more than one-half of the number of total allowed claims voting in the class to vote in favor of the plan and at least two-thirds in dollar amount of the total allowed claims voting in the class to vote in favor of the plan; only those non-insider holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number that actually vote cast their Ballots in favor of acceptance.

---

[10]    See footnote 7 above. Although a higher recovery is theoretically possible if the Bankruptcy Court ultimately finds that any of these Noteholders are secured by a properly perfected, unavoidable, and enforceable security interest, the Debtors do not believe such an outcome is likely.  Instead, the Debtors believe that all Noteholders currently classified in Class 6 will ultimately be reclassified into Class 3, either on a consensual basis or after litigation.

Pursuant to the Plan, Claims in Class 3, Class 4, Class 5, and Class 6 are Impaired by, and entitled to receive a Distribution under, the Plan, and only the Holders of Claims in those Classes that are Allowed Claims or have been deemed allowed for voting purposes are entitled to vote to accept or reject the Plan. Only Holders of Claims in Class 3, Class 4, Class 5, or Class 6 as of the dates specific in the Disclosure Statement Order (the "Voting Record Date") may vote to accept or reject the Plan. For Holders of Claims in Classes 1, 2, 4, and 7, **August 21, 2018** shall be the Voting Record Date. For Holders of Claims in Classes 3, 5, and 6, **December 4, 2017** shall be the Voting Record Date.

Pursuant to the Plan, Claims in Class 1 and Class 2 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

The Debtors have determined not to solicit the votes of Holders of any Subordinated Claims in Class 7, and such Holders shall be deemed to have rejected the Plan and, therefore, such Holders are not entitled to vote on the Plan. Pursuant to the Plan, Equity Interests in Class 8 will not receive or retain any property under the Plan on account of such Equity Interests, and are therefore deemed to reject the Plan and are not entitled to vote on the Plan.

### 2.    Solicitation Materials

The Debtors, with the approval of the Bankruptcy Court, have engaged Garden City Group, LLC (the "Voting Agent") to serve as the voting agent to process and tabulate Ballots and to generally oversee the voting process. The following materials constitute the solicitation package (the "Solicitation Package"):

- This Disclosure Statement, including the Plan and all other Exhibits and Schedules thereto;

- The Bankruptcy Court order approving this Disclosure Statement (the "Disclosure Statement Order") (excluding exhibits);

- The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan (the "Confirmation Hearing Notice");

- One or more Ballots, to be used in voting to accept or to reject the Plan and, in the case of holders of Notes and Units, to elect to contribute claims to the Liquidation Trust, and applicable instructions with respect thereto (the "Voting Instructions");

- A pre-addressed, postage pre-paid return envelope;

- The Schedule of Principal Amounts and Prepetition Distributions (only for Creditors in Class 3, Class 5, or, potentially, Class 6), which is attached hereto as **Schedule 3**, which sets forth the Principal Amounts and Prepetition Distributions that, absent timely objection properly made as described in the Ballot, will drive the specific Distributions that Noteholders or Unitholders will receive pursuant to the Class 3 and Class 5 treatment provisions of the Plan; and

01:23482975.4

• Such other materials as the Bankruptcy Court may direct or approve.

The Debtors, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order. The Solicitation Package is also available without charge at the Debtors' restructuring website at http://cases.gardencitygroup.com/wgc/.

On or before the date that is seven (7) days prior to the Voting Deadline (defined below), the Debtors will File a Plan Supplement. As the Plan Supplement is updated or otherwise modified, it will be made available without charge at the Debtors' restructuring website at http://cases.gardencitygroup.com/wgc/.

If you are the Holder of a Claim and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by writing to:

Woodbridge Group of Companies, LLC
c/o Garden City Group
P.O. Box 10545
Dublin, Ohio 43017-0208
Toll Free: 1-888-735-7613
Email: WGCInfo@choosegcg.com

If your Claim is subject to a pending claim objection and you wish to vote on the Plan, you must File a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes and your Claim or portion thereof, as applicable, must be temporarily allowed by the Bankruptcy Court for voting purposes by the Voting Deadline or you will not be entitled to vote to accept or reject the Plan.

**THE DEBTORS AND THE LIQUIDATION TRUST, AS APPLICABLE, RESERVE THE RIGHT, THROUGH THE CLAIM OBJECTION PROCESS, TO OBJECT TO OR SEEK TO DISALLOW OR SUBORDINATE ANY CLAIM FOR DISTRIBUTION PURPOSES, EXCEPT AS MAY BE EXPRESSLY PROVIDED OTHERWISE IN THE PLAN OR CONFIRMATION ORDER.**

### 3.    Voting Instructions and Procedures

As set forth in the Disclosure Statement Order, all votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages or otherwise provided by the Debtors or the Voting Agent. No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise. The Bankruptcy Court has fixed the Voting Record Date for the determination of the Holders of Claims who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

**The deadline to vote on the Plan is October 8, 2018 at 4:00 p.m. (prevailing Eastern Time) (the "Voting Deadline").** In order for your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot, and actually received no later than the Voting Deadline at the following address:

      **By Regular Mail:**

Woodbridge Group of Companies, LLC
c/o Garden City Group
P.O. Box 10545
    Dublin, Ohio 43017-0208
**Overnight Courier, or Hand Delivery, to:**

Woodbridge Group of Companies, LLC
c/o Garden City Group
5151 Blazer Parkway, Suite A
Dublin, Ohio 43017

Only the Holders of Allowed Claims or Claims that are deemed allowed for purposes of voting on the Plan in Class 3, Class 4, Class 5, or Class 6 as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning those Ballots in the envelope provided to the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline. Each Holder of a Claim must vote its entire Claim either to accept or to reject the Plan and may not split such vote. The Ballots will clearly indicate the appropriate return address. It is important to follow the specific Voting Instructions provided on each Ballot.

Unless otherwise provided in the Voting Instructions accompanying the Ballots, the following Ballots will not be counted in determining whether the Plan has been accepted or rejected:

• Any Ballot that fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection, of the Plan;

• Any Ballot received after the Voting Deadline, except if the Debtors have granted an extension of the Voting Deadline with respect to such Ballot in writing, or by order of the Bankruptcy Court;

• Any Ballot containing a vote that the Bankruptcy Court determines was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;

• Any Ballot that is illegible or contains insufficient information to permit the identification of the Claim Holder;

• Any Ballot cast by a Person that does not hold a Claim in the voting Class; and

• Any Ballot that is not signed or does not contain an original signature.

01:23482975.4

171456.4                                            14

The Ballots also permit each Holder of a Class 3 Claim, Class 5 Claim, or a Class 6 Claim to elect to assign its Contributed Claims to the Liquidation Trust. By electing such option on its Ballot, the applicable Noteholder or Unitholder agrees that, subject to the occurrence of the Effective Date and the formation of the Liquidation Trust, it will be deemed to have, among other things, assigned its Contributed Claims to the Liquidation Trust. Pursuant to the Plan, "Contributed Claims" are all Causes of Action of any Noteholder or Unitholder that is a Contributing Claimant (a) against any Person that is not a Released Party and (b) related in any way to the Debtors, their predecessors, their respective affiliates, or any Excluded Parties. For the avoidance of doubt, "Contributed Claims" do not include the Note Claims or Unit Claims being asserted against any Debtor that are held, respectively, by Noteholders and Unitholders. The relative share of Liquidation Trust recoveries for any such electing Class 3 Noteholder or Class 5 Unitholder (or Holder of a Class 6 Non-Debtor Note Claim that has its Claim reclassified into Class 3 under the Plan) will be enhanced by having the amount that otherwise would be its Net Note Claim or Net Unit Claim increased by multiplying it by the Contributing Claimants Enhancement Multiplier (*i.e.*, 105%). Noteholders and Unitholders also may choose to make such election because aggregating all Contributed Claims and similar Liquidation Trust Actions may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote or elections by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. Any party who has delivered a properly completed Ballot for the acceptance or rejection of the Plan that wishes to withdraw such acceptance or rejection rather than changing its vote may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claims to which it relates and the aggregate principal amount represented by such Claims, (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claims and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be actually received by the Voting Agent prior to the Voting Deadline.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS. IT IS IMPORTANT THAT THE HOLDER OF A CLAIM ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

If you have any questions about (a) the procedure for voting your Claim or making elections on your Ballot, (b) the Solicitation Package that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy of the Plan, this Disclosure Statement, or any appendices, schedules, or exhibits to such documents, please contact the Voting Agent at the address specified above. Copies of the Plan, Disclosure Statement, and other documents Filed in these Chapter 11 Cases may be obtained free of charge at the Debtors' restructuring website at http://cases.gardencitygroup.com/wgc/. Documents Filed in these Chapter 11 Cases may also be

examined between the hours of 8:00 a.m. and 4:00 p.m., prevailing Eastern Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Plan and will File a voting report (the "Voting Report") on or before October 19, 2018. The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE DEBTORS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO <u>ACCEPT</u> THE PLAN BY THE VOTING DEADLINE.**

### 4.    Confirmation Hearing and Deadline for Objections to Confirmation

Objections to Confirmation of the Plan must be Filed and served on the Debtors and certain other entities, all in accordance with the Confirmation Hearing Notice, so that such objections are actually received by no later than **October 8, 2018 at 4:00 p.m.** (prevailing Eastern Time). Unless objections to Confirmation of the Plan are timely served and Filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court. For further information, refer to Section VI of this Disclosure Statement, "Confirmation of the Plan."

## II.    <u>BACKGROUND REGARDING THE FRAUDULENT ENTERPRISE</u>

### A.    The Determination that Shapiro Operated the Prepetition Debtors as a Ponzi Scheme

The Debtors are part of a group of affiliated entities (collectively, the "Woodbridge Entities") formed by, and formerly controlled by, Robert Shapiro ("Shapiro"). The Debtors believe that Shapiro used the prepetition Debtors to perpetrate a massive Ponzi scheme.[11] Specifically, the Debtors believe[12] that:

---

[11]  The description of the Ponzi scheme set forth in this section is drawn almost exclusively from the factual background set forth in the SEC's *Motion by the U.S. Securities and Exchange Commission for Order Directing the Appointment of a Chapter 11 Trustee* [Docket No. 157] (the "SEC Trustee Motion") and the SEC's *Memorandum of Law in Support of* Ex Parte *Emergency Motion for Asset Freeze and Other Relief*, filed in the Florida District Court in the lawsuit *Securities and Exchange Commission v. Robert Shapiro, et al.*, Case No. 17-24624 (S.D. Fl. 2017), which were prepared and filed based on the SEC's extensive factual investigation and forensic analysis of the Debtors.

[12]  Pursuant to the Plan Term sheet, the Plan will acknowledge and admit that the Debtors operated as a Ponzi scheme since at least August 2012 , which scheme was discovered no later than December 2017 when the SEC unsealed its action against Robert Shapiro and others and alleged facts evidencing such Ponzi scheme. To the extent that the Bankruptcy Court does not confirm the Plan, the Debtors and each of the three "Committees" reserve all of their respective rights (and/or defenses) respecting the characterization and the ramifications of the massive fraud upon investors and other creditors.

(i) beginning no later than July 2012 through December 1, 2017, Shapiro used his web of more than 275 limited liability companies, including the prepetition Debtors, to conduct a massive Ponzi scheme raising more than $1.22 billion from over 10,000 unsuspecting investors nationwide,

(ii) because Shapiro had no other significant sources of cash inflows to pay interest and principal to existing investors, he used $368 million of new investor funds to pay false "returns" to existing investors, and

(iii) Shapiro also used investor money to pay approximately $64.5 million in commissions to sales agents that sold these fraudulent "investments" to Noteholders and Unitholders, and used approximately $21.2 million of investor money for Shapiro's personal benefit and the benefit of his related entities or family members. For example, Shapiro charged at least approximately $9 million dollars on credit cards which were paid for nearly entirely by one or more prepetition Debtor. In fact, about 99% of the payments made toward those credit cards were derived from the prepetition Debtors.  Shapiro charged personal items, including extravagant travel expenses, luxury brand items, and furnishings. For example, Shapiro used investor funds on at least the following: (i) $200,000 at Four Seasons Hotels and Ritz Carlton Hotels, (ii) $34,000 on limousine services, (iii) $1.6 million on home furnishings, (iv) $1.4 million on luxury retail purchases like Louis Vuitton and Chanel, (v) $600,000 on political contributions, (vi) $400,000 on jewelry purchases, and (vii) $308,000 on wine. In addition to the credit card charges, Shapiro spent additional investor funds as follows: (i) $3.1 million for chartering private planes, (ii) $1.2 million in alimony to his ex-wife, (iii) $340,000 in luxury automobiles, and (iv) $130,000 on country club fees. The prepetition Debtors and Shapiro also paid nearly $1 million to a rare coin and precious metal firm, purportedly for client gifts.

Shapiro's scheme involved outright deception of Noteholders and Unitholders.  Shapiro raised money from Noteholders and Unitholders under the false premise that such funds would be used to make real estate-related loans to unrelated third-party borrowers at favorable loan-to-value ratios, with such unrelated third-party borrowers being required to make regular monthly interest payments to the prepetition Debtors—which monthly interest payments were the supposed source of monthly returns to the prepetition Debtors' investors.  In reality, however, Shapiro overwhelmingly did not use investors' funds to make loans to unrelated third-party borrowers.  Instead, Shapiro created disguised affiliates—the PropCos and MezzCos—to whom money was "loaned" (i.e., evidenced by documents, but without any ability to trace particular funds to a particular PropCo or MezzCo).  Having no cash or source of cash (other than the projected proceeds of sale of properties of the PropCos), the PropCos and MezzCos had no ability to service their debts' contractual periodic interest obligations, and only uncertain means to redeem principal or pay interest in arrears.

Because the prepetition Debtors loaned money overwhelmingly to affiliates with no ability to service debt, the prepetition Debtors generated nearly no cash flows from any operations.  From July 11, 2012 through September 30, 2017, the prepetition Debtors generated only approximately $13.7 million in interest payments from unaffiliated third-party borrowers.  As early as the third quarter of 2012 (the first quarter in which there were funds received from

investors), WGC did not generate sufficient income for operating expenses, investor interest payments, and investor redemptions. Until the first quarter of 2013, WGC utilized a cash balance carried over from the activities of Woodbridge Structured Funding, LLC ("WSF") and funds received from other Shapiro-related entities to fund the cash flow deficits.[13] Beginning in the second quarter of 2013, WGC had continuing deficits in each quarter and the only source of funds available to fund the deficits was new investor funds. This deficit grew to more than $250 million as of September 2017. As of April 28, 2017, out of $736 million in loans outstanding, $718 million (98%) were due from prepetition Debtor-affiliated entities. These "borrowers" were not making interest payments and the prepetition Fund Debtors simply recorded interest income for book purposes only.

Importantly, as noted above, Shapiro is no longer in control of the Debtors and no longer has any involvement whatsoever with the Debtors. The Plan described by this Disclosure Statement has been formulated by the Debtors' new management and advisors, all of whom are completely independent of Shapiro, and has been developed in close consultation with numerous creditor and investor constituencies, as described below.

### B.   Debtors' Organizational Structure

The Woodbridge Entities are all directly or indirectly owned by RS Protection Trust ("RS Trust"), an irrevocable trust settled under Nevada law, of which Shapiro is the trustee. Members of Shapiro's family are the sole beneficiaries of RS Trust. An organization chart of the Woodbridge Entities is attached as Exhibit A to the *Declaration of Lawrence R. Perkins in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* [Docket No. 12].

The Debtors organizational structure broadly consisted of three "silos."

- First, Woodbridge Group of Companies, LLC ("WGC") was the principal operating company of the enterprise and held the primary distributing bank account for the Woodbridge Entities. WGC managed contractual relationships with the architects, contractors, and construction companies engaged in the development of the Woodbridge Entities' real properties.

- Second, WMF Management, LLC ("WMF") managed the Debtors' retail fundraising operation. WMF directly owned seven fund entities (collectively, the "Fund Debtors"[14]). As described in more detail below, the Fund Debtors, prepetition, fraudulently raised money from thousands of retail investors by selling Notes and Units.

---

[13]   WSF was in the business of purchasing structured settlements, annuity, and lottery payments, and it raised money from investors to buy the annuity streams at a discount. The investor would then purportedly receive the payment stream.

[14]   The Fund Debtors are the following Debtors: (i) Woodbridge Mortgage Investment Fund 1, LLC ("Fund 1"); (ii) Woodbridge Mortgage Investment Fund 2, LLC ("Fund 2"); (iii) Woodbridge Mortgage Investment Fund 3, LLC ("Fund 3"); (iv) Woodbridge Mortgage Investment Fund 3A, LLC ("Fund 3A"); (v) Woodbridge Mortgage Investment Fund 4, LLC ("Fund 4"); (vi) Woodbridge Commercial Bridge Loan Fund 1, LLC ("Bridge Loan Fund 1"); and (vii) Woodbridge Commercial Bridge Loan Fund 2, LLC ("Bridge Loan Fund 2").

- Third, the Woodbridge Entities include a network of over 200 special purpose vehicle entities that hold real properties (the "PropCos"), 152 of which are Debtors, nearly all of which hold an individual real property asset. Most of the PropCos are, in turn, wholly owned by related special purpose vehicle entities (the "MezzCos"), the sole assets of which are the equity of the PropCos; a total of 138 MezzCos are Debtors.

Shapiro was formerly, but is no longer, the president of WGC. Shapiro previously maintained sole operational control over WGC and its affiliated entities—most, but not all, of which are Debtors. Historically, there was no board of directors or any other executives with decision-making authority, and Shapiro maintained absolute control over the entities' day-to-day operations. WGC was the principal operating company of Shapiro's businesses and employed over 140 people in offices in six states. Shapiro identified the properties underlying the entities' investments, approved every real estate purchase, selected the amount and type of investments sold, determined sales agents' commissions, and calculated the company's potential profits. Shapiro had sole signature authority over all of the Debtors' bank accounts.

### C.    Shapiro's Fundraising Scheme

The prepetition Debtors sold investors two primary products, a five-year private placement security (*i.e.*, Units) and a twelve to eighteen month promissory note security called First Position Commercial Mortgages or "FPCMs" (*i.e.*, Notes),[15] which, the prepetition Debtors claimed, were based on the purported revenues the prepetition Debtors purportedly would receive from issuing short-term loans to unrelated third-party property owners. As explained herein, none of this was remotely true—the prepetition Debtors did not make these short-term loans to third-party property owners, and instead created disguised affiliates to whom money was "loaned," which had no ability to service debt.

### 1.    Units

During the period from August 2012 through December 1, 2017, prepetition Debtor WMF offered Units (the "Unit Offerings") through the prepetition Fund Debtors, which were purported mortgage investment funds and bridge loan funds, pursuant to purported exemptions under Rules 506(b) and (c) of Regulation D of the Securities Act, collectively seeking to raise at least $435 million from investors. WMF admits it ultimately raised at least $226 million from nearly 1,583 Unitholders.

The prepetition Debtors purportedly limited each of the Unit Offerings to accredited investors with a $50,000 minimum subscription and provided for a five-year term with a 6% to 10% aggregate annual return paid monthly and a 2% "accrued preferred dividend." At the end of the five-year term, Unitholders would also be entitled to a distribution based on the prepetition Debtors' profits. In the offering memoranda for each of the Unit Offerings, the prepetition

---

[15] The prepetition Debtors also sold "acquisition and development" (or "A&D") and "mezzanine" promissory note securities, which were similar in structure to FPCMs but with different maturities, interest, and collateral. For purposes of the Plan and this Disclosure Statement, all of these promissory note securities are referred to as "Notes."

Debtors represented to investors that their funds would be used for real estate acquisitions and investments. The Unit Offerings, in effect, were purported to be investments into pooled notes. For example, the offering memoranda stated, "[t]he Company plans to use the net proceeds from this offering to invest in first mortgages." The prepetition Debtors and Shapiro used Unitholders' funds to purchase at least 193 residential and commercial properties located primarily in Los Angeles, California, and Aspen, Colorado.

## 2.    Notes

During the period from August 2012 through December 1, 2017, the prepetition Debtors issued Notes to pools of private investors who each contributed at least $25,000.[16] Many of these pools contained 40 or more investors. As described in more detail below, the prepetition Debtors had a double-barreled placement strategy, including a sizeable direct sales force, and a national network of purportedly independent sales agents; the direct salespeople and members of the agent network received rates of compensation for the placement of Notes far in excess of the compensation typically offered for placing (legitimate) low-risk fixed income securities. The prepetition Debtors and sales agents told investors that the prepetition Debtors were making short-term loans, between $1 million and $100 million, to bona-fide third-party commercial property borrowers at high rates of interest, approximately 11%-15%, secured by a first-position mortgage on the property. The prepetition Debtors and sales agents promised Noteholders 5% to 8% annual interest paid monthly with a return of their principal at the end of their note's term and assigned each investor a pro rata portion of the applicable prepetition Fund Debtor's putative first-position lien interest in the underlying property. The prepetition Debtors (and intentionally or not, the sales agents) misled investors by stating that the prepetition Debtors would receive the spread between what the underlying borrowers paid the prepetition Debtors and what the prepetition Debtors were paying the investors. The prepetition Debtors falsely represented on their website and in sales materials (delivered onward, in the case of sales agent placements) that they provided loan-to-value ratios of approximately 60-70%, ensuring that the "properties that secure the mortgages are worth considerably more than the loans themselves at closing." The prepetition Debtors also falsely assured investors that, at the end of the one-year term, the underlying borrower was obligated to repay the applicable prepetition Fund Debtor the principal amount of the loan and, if it defaulted, the prepetition Fund Debtor could (and would) foreclose on the property to recover the amount owed.

Each of the Notes was evidenced by an individual promissory note issued pursuant to a loan agreement (individually, a "Noteholder Loan Agreement"). Pursuant to the terms of each Noteholder Loan Agreement, each Noteholder lent a fixed amount to an individual prepetition Fund Debtor for the stated purpose of partially funding a single one of three types of secured loans from such prepetition Fund Debtor to an unrelated third-party borrower. According to the documents created by or at the direction of Shapiro, with respect to each real property (which were actually owned not by unrelated third-party borrowers, but by disguised affiliates—the PropCos), up to three purportedly secured loans were created: (i) a loan from a prepetition Fund Debtor to a PropCo purportedly secured by a first lien mortgage on such property (referred to as

---

[16]    In some cases it appears certain "brokers" of Notes created special purpose vehicles to permit private investors of less than $25,000 to aggregate their investments to attain minimum purchase levels.

"senior" loans or "FPCMs"), (ii) a loan from the same prepetition Fund Debtor to the same PropCo purportedly secured by a second lien mortgage on such property (referred to as "development" or "acquisition and development" loans), and (iii) a mezzanine loan from the same prepetition Fund Debtor to the MezzCo that owns the sole membership interest in such PropCo, purportedly secured by a pledge of that MezzCo's ownership interest in the PropCo.

Under each Noteholder Loan Agreement, the applicable prepetition Fund Debtor effected a putative assignment in favor of the applicable Noteholders of the prepetition Fund Debtor's right, title, and interest in and to (i) the indebtedness held by the prepetition Fund Debtor issued by a particular MezzCo or PropCo, (ii) the promissory note evidencing such indebtedness, (iii) the mortgage or deed of trust securing such indebtedness (in the case of PropCo loans) or the pledge and security agreement securing the mezzanine loan (in the case of a MezzCo loan), and (iv) related title insurance policies in connection with such loan (collectively, the "Purported Noteholder Collateral"). Further, in connection with each Note, the applicable prepetition Fund Debtor entered into two related putative assignment documents: *first*, an assignment of promissory note, pursuant to which the prepetition Fund Debtor assigned to the Noteholder (without negotiating or delivering physical possession of the underlying documents) the prepetition Fund Debtor's right, title, interest, claims, or rights in (i) the promissory note reflecting its loan to the applicable PropCo or MezzCo, and (ii) the related mortgage or deed of trust held by the applicable PropCo, or the related pledge and security agreement held by the applicable MezzCo, together with related rights, documents, accounts, and proceeds thereto; and *second*, a collateral assignment, pursuant to which the prepetition Fund Debtor assigned to the Noteholder its right, title, and interest in and to the same underlying documents, proceeds therefrom, rights thereunder, and documents related thereto. The effect of these documents, the prepetition Debtors asserted at that time, was to ensure that Noteholders were secured by the property purportedly backing their loan.

However, the Debtors believe that the transactions described in the Notes and the related loan documents are vastly different than the transactions that actually occurred. The documents generated by or at the direction of Shapiro are based on the fiction that the prepetition Fund Debtors actually loaned specific funds to unrelated third parties at favorable loan-to-value ratios and that those third parties would pay interest and principal to the prepetition Fund Debtors (or else the prepetition Fund Debtors would foreclose on the properties). In reality, almost no money at all flowed directly from the prepetition Fund Debtors to unrelated third parties. Rather, Shapiro created disguised affiliates (the PropCos and MezzCos) to which money was loaned with no ability to service debt. The PropCos and MezzCos purchased real properties, but had no source of cash to make monthly interest payments—thus leaving the prepetition Debtors without any significant source of revenue to pay investors' periodic interest, and relying upon proceeds of property sales (inherently uncertain as to both time and amount) to pay principal or arrears of interest. Shapiro also directed the prepetition Debtors to use the funds raised from the investors for a variety of other purposes—including, but not limited to, overhead, commissions to brokers, personal expenses, and repayment of old investors using funds invested by new investors.

The prepetition Debtors did have one segment, known as "Riverdale," which originated loans to unrelated third parties. Riverdale described itself as offering private money commercial financing to borrowers in need of alternative financing for real property purchases and refinances. Riverdale's model was to lend up to 65% of appraised value, and typically priced

loans at 4%-6% origination fees plus interest of 12% per annum for a 12-month term with such loans secured by the underlying real property. The loans were funded by a prepetition Fund Debtor and then sometimes sold to third parties shortly after origination. For loans retained by the prepetition Debtors that were non-performing, the lending prepetition Debtor (a prepetition Fund Debtor) generally assigned the right to foreclose on the particular property to a different prepetition Debtor, and any foreclosures were thus brought in the name of the assignee prepetition Debtor (rather than the lending prepetition Fund Debtor). Currently, the portfolio of loans originated by Riverdale consist of the following four categories: (i) performing loans, consisting of one (1) loan with a balance of $373,989 as of July 31, 2018; (ii) non-performing (defaulted) loans, consisting of one (1) loan with a balance of $236,223 as of July 31, 2018; (iii) loans that are in default where the Debtors have commenced foreclosure proceedings on the subject property, consisting of 17 loans with a balance of $17,993,655 as of July 31, 2018; and (iv) loans where the Debtors have completed foreclosing on the subject property, which properties are now owned by Debtors, consisting of 18 properties with an estimated value ranging between $6,805,000 and $11,267,500. Unless the Holders of such Claims elect otherwise during the balloting process, Claims of Noteholders arising from the "Riverdale" segment are initially classified under the Plan in Class 6 (Non-Debtor Loan Note Claims) to the extent set forth in the Schedule of Non-Debtor Loan Note Claims (attached hereto as **Schedule 2**).

### D.   Investor Funds Were Commingled and Cannot Be Traced to Particular Properties

The funds that were invested by Noteholders and Unitholders were almost immediately commingled with funds of the various other prepetition Debtors. Even though the underlying loan documents reference a loan by a specific prepetition Fund Debtor to the applicable PropCo, the funds for property purchases typically originated from a commingled account and generally cannot be traced to any particular prepetition Debtor. In almost every single case, WGC—rather than any prepetition Fund Debtor or PropCo—was the only source of funds used to purchase or develop a property. Moreover, in many instances the price to purchase or develop a property had little or no relationship to the amount of money that was nominally received by the particular PropCo or to the amount of money that same PropCo promised to repay. For example, with respect to the prepetition Debtors' property known as the "Owlwood Property," one of the prepetition Debtors purchased such property in September 2016 for $90 million. Prepetition Fund Debtors made three loans nominally in respect of the Owlwood Property, in the aggregate amount of $112 million—well above the purchase price of the property. In other words, had this been a (structurally) legitimate financing of the Owlwood Property, it would have been almost 125% financed, which is contrary to the favorable loan-to-value ratios touted by Shapiro. In addition, there is evidence that, on certain occasions, Shapiro issued Notes in respect of properties that the prepetition Debtors never actually acquired, including properties at 778 Sarbonne Road in Los Angeles and 53 Huron Street in Brooklyn. Nevertheless, the PropCos and MezzCos purported to grant liens and security interests to the prepetition Fund Debtors to secure "loans" that the prepetition Fund Debtors did not actually make. Another example concerns the property at 800 Stradella Road in Los Angeles, where Shapiro issued about $24.7 million in "first-lien" Notes for the stated purpose of funding a $26 million prepetition Fund Debtor-to-PropCo loan that was never made (the PropCo instead took a $26 million loan from the third-party seller of the property at the time of acquisition).

E.    **The Prepetition Debtors' Fraudulent Marketing and Sales Practices**

Investors often received a one-page description of the key terms of the Notes, a list of FAQs, and perfunctory examples of the supposed collateral properties, including a graphic that summarized the Notes as follows:



The core premise of this pitch—that there would be "property owner[s] mak[ing] payments to Woodbridge"—was false. Virtually all the loans were made to WGC affiliates (*i.e.*, the PropCos and MezzCos), who earned no revenue and made no (and were unable to make any) payments.

The Noteholders played no role in selecting or analyzing the underlying properties and, unless requested, were not provided the prepetition Debtors' purported due diligence regarding the property. Shapiro instructed WGC's Managing Director of Investments ("Head of Sales") to fund certain Noteholders' securities prior to any underlying property actually being purchased.[17] Many of the Noteholders were retired and approximately 2,600 investors used their Individual Retirement Accounts ("IRAs") to fund their investments. And to work around the exclusion of assets such as Notes by many custodians of conventional IRAs, the prepetition Debtors

---

[17]    When questioned by the SEC staff during the course of its investigation, the Head of Sales refused to answer any questions, asserting his rights under the Fifth Amendment to the Constitution.

developed and executed a strategy for investors to create and fund IRAs with more liberal custodians, or to create "self-directed" IRAs which would in turn fund limited liability companies that could buy Notes without any custodial oversight. Recognizing this, the Head of Sales told Shapiro that "most people are placing their life savings and retirement funds into these investments."

WGC maintained an internal team of approximately 30 sales agents, led by the Head of Sales, responsible for soliciting Unitholders. Shapiro provided frequent, often daily, requirements to the Head of Sales of the number ("we need to raise 45 million in the next 39 days") and type ("I need $5 million in [Unitholders] in the next 2 weeks") of investments that needed to be sold. To ensure compliance with these demands, Shapiro would either threaten his employees with termination or promise bonuses. Shapiro called for daily sales updates from the Head of Sales, who in turn requested additional amounts and types of securities to sell from Shapiro.

The prepetition Debtors also relied on a nationwide network of hundreds of purportedly "independent" external sales agents to solicit prospective Noteholders. These sales agents were typically very-small-firm or solo-practitioner wealth managers or investment consultants, some with state or SEC registration as investment advisers, some without any registration. It does not appear that any firm of broker-dealers or any larger wealth management firm was involved in placing Notes, though there appear to be instances where individuals associated with such firms may have done so.

Rather than facilitating these external sales agents' independent scrutiny of the investment opportunity and development of materials regarding the investment opportunity suitable to their specific needs, the prepetition Debtors required the sales agents to provide prospective Noteholders only the information and sales materials that the prepetition Debtors provided them for dissemination to Noteholders. As such, the external sales agents solicited the general public through marketing materials created, and in many cases paid for, by the prepetition Debtors, which were disseminated via television commercials, radio ads and talk shows, newspaper ads, social media, newsletters, internet websites, YouTube videos, and in-person gatherings.

The prepetition Debtors did not require or evaluate whether the Noteholders were "sophisticated," "accredited," or otherwise had any particular financial acumen. Indeed, instructions from a company providing the prepetition Debtors with leads on potential investors remarked that leads that are followed up within 20 minutes of generation are "where your sales team will find the majority of low hanging, easiest to harvest fruit."

In numerous marketing materials sent to Noteholders, the prepetition Debtors described this investment as "low risk," "simpler," "safe," and "conservative" and stated that investor returns were generated by underlying borrowers' interest payments. The prepetition Debtors also posted these documents online and instructed external sales agents to direct their clients to the company's website to view them. As an example of a sales pitch, in August 2017, a WGC salesperson pitched a husband and wife over the telephone for more than 45 minutes to invest and stated:

It's a very good vehicle. ***One of the—the greatest things about it is that we're lending and not purchasing the properties*** and that we're lending at low loan to value ratios so there's enough equity in those properties to protect us against a market downturn or protect us from a property owner defaulting, so that if we do have to foreclose, there's enough equity there for us to be able to profit.

(emphasis added). The salesperson was attempting to convince this husband and wife to invest $500,000.

The prepetition Debtors did not disclose or inform investors that several of their in-house sales agents had been previously censured or barred by the SEC, FINRA, or state securities regulators, and that they put external sales agents on their network without regard for any disciplinary history or current state or federal registration. None of the prepetition Debtors' in-house sales force had a current SEC or FINRA registration in effect.

The prepetition Debtors compensated their external sales agents at a 9% wholesale rate, and the agents in turn offered the Notes to their investor clients at 5% to 8% annual interest—the sales agent received a commission equivalent to the difference. The prepetition Debtors paid external sales agents at least $64.5 million in commissions through this arrangement for soliciting funding for these sham investments. This compensation vastly exceeded the commissions payable for placement of the same face amount of legitimate low-risk fixed-income securities. External sales agents may also have collected "wrap" or other asset-based fees *in addition* to the compensation paid by the prepetition Debtors.

The solicitation of Unit purchases as a victim's first Woodbridge investment generally followed the lines of the solicitation of a Note investment described above, including false disclosures, absence of suitability determinations, and excessive sales compensation. In addition, the prepetition Debtors maintained a very active program for investors to convert, or "roll," their investments *from* Notes *to* Units, which benefited Shapiro's fraudulent scheme because Units had a much longer term and thus extended the time frame for soliciting new investments from victims to handle the notional maturity of an investment.

Shapiro demanded that the Head of Sales and his internal sales team continuously seek to move Noteholders into one of the Unit Offerings. The prepetition Debtors' internal sales team solicited each Noteholder approximately 90 days after they invested to "move your loan from the First Position Mortgage . . . even if your term hasn't expired yet—to our higher-return Mortgage Investment Fund." The prepetition Debtors threatened to terminate their relationship with external sales agents who would not permit them to contact the sales agents' clients about moving from the Notes to the Units. Aggressive solicitation was encouraged, as for example, on March 4, 2016, the Head of Sales celebrated with his sales team that "even without being able to fund due to lack of inventory we funded over 37 million in [Notes] and 6 million in [Units]!!!!!!! By far our biggest month to date!!!!!" and congratulated his sales team, stating "WE ARE WINNERS!!!!" The prepetition Debtors successfully convinced 90% of the Noteholders to re-enroll when terms became due, thus avoiding having to pay large returns of principal.

The prepetition Debtors persisted in their issuance of fraudulent securities despite extensive pre-bankruptcy regulatory action. Despite being barred from soliciting and selling

Notes in numerous states (a result of the investigations described in Section II.F below), the prepetition Debtors continued to do so at an alarming rate. After cease and desist orders were entered in Massachusetts, Pennsylvania, Texas, and Arizona, the prepetition Debtors nonetheless raised approximately $3.2 million, $2.6 million, $2.3 million, and $900,000, respectively, from investors in those states. WGC's internal sales agents misrepresented the dispositions of these regulatory actions to external sales agents, claiming the prepetition Debtors were "exonerated of any wrongdoing or fraudulent activity." Moreover, on a sales-pitch call in July 2017 (during the course of the SEC's ongoing investigation), a WGC salesperson falsely told a financial planner, "The SEC looked into us. We passed with flying colors," touting that the product the prepetition Debtors were offering had a "zero default rate in anything we've had to offer."

Shapiro hired a public relations firm to manipulate internet search engine results so that investors who looked up the prepetition Debtors would not see the state regulatory orders filed against the companies. Also, at Shapiro's specific instructions, WGC made a series of negligible charitable donations with the sole purpose of generating a stream of positive press releases to push these regulatory actions off the front page of internet search results relating to the prepetition Debtors.

Indeed, prior to their bankruptcy filings, the prepetition Debtors created two new private placement offerings, "Fund 5" and "Bridge Loan Fund 3," and the website promised "New Product Coming Soon!" The prepetition Debtors were attempting to transition investors into a new product called a Co-Lending Opportunity ("CLO"). The CLO mirrors the Notes in every material respect save one—the CLO's term is for 9 months. In email communications, Shapiro and the Head of Sales contended that this small change ensured that the CLO was not a security and that the prepetition Debtors could circumvent the states' regulatory agencies. Instead of disclosing this product to state regulators and ensuring that the terms of the new offering allayed their legitimate concerns, Shapiro and the Head of Sales decided to "switch first then settle quietly [with Colorado and California]."

Despite the prepetition Debtors representing that the claimed interest payments in the Notes emanated from bona-fide third party borrowers, almost all of the purported "borrowers" were PropCos and MezzCos—prepetition Debtors ultimately owned and controlled by the RS Trust. In practice, Shapiro directed the prepetition Debtors to use the funds raised from the Unit Offerings to purchase residential real estate, create a self-owned PropCo to hold title to each property, and then issue Notes to investors based on the value of the underlying property. The prepetition Debtors further falsely reassured investors, telling them not to worry about the risk of a (non-existent) third-party borrower failing to make its loan payments because the prepetition Debtors would continue to pay the investor their interest payments. For example, in a Frequently Asked Question brochure for the Notes, WGC stated the following:

Q: If the borrower does not make their payments to Woodbridge will I be informed?

A: This question is actually irrelevant, because Woodbridge would continue to make monthly payments to you . . . and may or may not inform you of the underlying non-payment. As long as Woodbridge continues to make regular payments to you, there would be no reason to be concerned.

Assertions such as these by the prepetition Debtors led investors to believe their investments were safe no matter how the "borrower" performed. To support the misrepresentations, the prepetition Debtors and Shapiro provided Noteholders with the promissory notes between the underlying borrowers and the prepetition Fund Debtors. However, the prepetition Debtors did not disclose that the "borrowers" were in virtually all cases affiliated PropCos that earned no revenue—and did not even have bank accounts—and had no ability to make the interest or other payments the prepetition Fund Debtors needed to receive so they could, in turn, make payments to the Noteholders. Hence, in reality, the claimed interest "payments to Woodbridge" demonstrated in the prepetition Debtors' "three circles" brochure, referenced above, did not exist.

Shapiro and RS Trust made every effort to hide the fact that most of the third-party borrowers and owners of the underlying properties were actually Shapiro and his family. None of the publicly available documentation indicated that RS Trust was the ultimate owner of the PropCos and MezzCos purportedly doing the borrowing. Indeed, as early as 2014, a high-ranking WGC employee under Shapiro's direction specifically instructed WGC's Registered Agent to not include any member/manager information on the Certificates of Formation for certain LLCs.[18] And when an investor asked Shapiro point blank for the name of the borrower his investment was being lent to, Shapiro responded that the prepetition Debtors do not provide borrowers' names because it is "not the way to do business" and "we don't want people pestering them."

In April 2017, when one potential financial planner being pitched by a WGC salesperson pointed out his suspicion of this incestuous structure on a recorded sales pitch call, a WGC "quality assurance personnel" member alerted the Head of Sales stating that, "[External Sales Agent] seems to know an awful lot about our business model . . . .  He also knows Bob [Shapiro] owns Sturmer Pippin,[19] stating Woodbridge is loaning money to ourselves."

Similarly, Unitholders were told that their returns were generated by these "loans" as well as the prepetition Debtors' property development. First, as with Noteholders, the prepetition Debtors did not disclose to Unitholders that the purported interest payments required by the promissory notes underlying the Notes were non-existent. Second, the prepetition Debtors failed to tell Unitholders that the profits from the development of properties were wholly inadequate to generate the promised returns. Indeed, there was no material source of cash inflows in the prepetition Debtors' entire enterprise to pay interest and maturing Units and Notes.

---

[18]   Given that the corporate filings were predominantly in Delaware, with extremely limited public information, the SEC was forced to subpoena over two-hundred individual LLCs controlled by Shapiro, and then was forced to file a subpoena enforcement action in district court to obtain these documents after the LLCs did not respond to those subpoenas. The SEC received these formation documents pursuant to stipulated Court Order. *See SEC v. 235 Limited Liability Companies*, 17-mc-23986 (S.D. Fla.). In addition, the SEC was forced to file a separate subpoena enforcement action to obtain, among other items, the company emails of Shapiro and Woodbridge's Controller. *See SEC v. Woodbridge Group of Companies, LLC*, 17- mc-22665 (S.D. Fla.).

[19]   Sturmer Pippin, LLC is the PropCo which owns the Owlwood Property in Beverly Hills, California. The prepetition Debtors touted Owlwood in Note investor promotions.  Owlwood is further discussed above.

F.    **Prepetition Investigations and Litigation**

In the years leading up to the Initial Petition Date, the prepetition Debtors faced a variety of inquiries from state and federal regulators. In particular, in or around September of 2016, the SEC began investigating certain of the prepetition Debtors (and certain non-debtor affiliates) in connection with possible securities law violations, including the alleged offer and sale of unregistered securities, the sale of securities by unregistered brokers, and the commission of fraud in connection with the offer, purchase, and sale of securities. As of the Initial Petition Date, certain discovery-related disputes regarding administrative subpoenas issued by the SEC were proceeding before the District Court for the Southern District of Florida, but the SEC had not yet asserted any claims against any of the prepetition Debtors or their affiliates. Subsequent to the Initial Petition Date, the SEC commenced the SEC Action (as defined below) against, among other defendants, Shapiro, RS Trust, and the Debtors. The SEC Action is discussed further in Section III.Q below.

In addition to the SEC investigation, certain of the prepetition Debtors received information requests from state securities regulators in approximately 25 states. As of the Initial Petition Date, regulators in eight states had filed civil or administrative actions against one or more of the prepetition Debtors and certain of their sales agents, alleging they have engaged in the unregistered offering of securities in their respective jurisdictions and have unlawfully acted as unregistered investment advisors or broker-dealers. Five states—Massachusetts, Texas, Arizona, Pennsylvania, and Michigan—entered permanent cease and desist orders against one or more of the prepetition Debtors related to their alleged unregistered sale of securities. Several of these inquiries were resolved prior to the Initial Petition Date through settlements, which included the entry of consent orders. As discussed in more detail in Section III.M.1 below, certain of the Debtors entered into a consent order with California during the Chapter 11 Cases, and the Debtors also obtained Bankruptcy Court approval of an expedited process for seeking approval of consent orders going forward, resulting in entry into certain additional consent orders.

One or more Debtors are also defendants in several prepetition lawsuits not involving securities regulation, including, but not limited to, an employment discrimination lawsuit titled *Kaila Alana Loyola v. Woodbridge Structured Funding LLC, Robert Shapiro, Lianna Balayan, Diana Balayan, Does 1-25*, pending in Los Angeles Superior Court, which lawsuit is currently in the discovery phase.

G.    **Events Leading to the Bankruptcy Filing and Shapiro's Prepetition Installation of New Management**

In late 2017, Shapiro's fraudulent scheme unraveled. As federal and state investigations intensified and unfavorable press reports began to emerge, the prepetition Debtors found it increasingly difficult to raise new capital from investors. As noted above, in classic Ponzi scheme fashion, the prepetition Debtors were reliant on funds from new investors to make the payments promised to existing Unitholders and Noteholders. When new investment dried up, the inability to make required Notes and Units servicing payments became inevitable; indeed, the prepetition Debtors were unable to make the December 1, 2017 interest and principal payments due on the Notes.

With the securities investigations ramping up and a bankruptcy filing imminent, Shapiro installed a new team to commence the Chapter 11 Cases and manage the Debtors during their pendency. To accomplish this, on December 1, 2017, Shapiro, acting as trustee of RS Trust, directly or indirectly owned each of the prepetition Debtors, removed himself (and his affiliates) as manager of all the Initial Debtors and appointed Beilinson Advisory Group, LLC ("BAG"). Shapiro was also removed as an officer of each of the prepetition Debtors for which he previously served in such capacity.

To effectuate the prepetition transfer of management authority, Shapiro created a new entity, WGC Independent Manager, LLC ("WGCIM"), of which RS Trust was made the sole member. RS Trust appointed BAG as the sole manager of WGCIM. BAG is a financial restructuring and hospitality advisory group that specializes in assisting distressed companies. The terms of BAG's appointment as manager of WGCIM were set forth in an engagement letter dated as of December 1, 2017. *See* Docket No. 12, Exh. F. The engagement letter provides, among other things, that WGC would pay BAG no less than $40,000 per month for an initial 12-month term regardless of whether WGC uses the services of BAG during the entire period. *See id.*

Shapiro, acting in his capacity as trustee of RS Trust, then exercised RS Trust's ownership rights over certain of the prepetition Debtors to execute a written consent (the "Management Consent") removing himself and his affiliates as manager of certain such Debtors and appointing WGCIM as replacement manager. Following the execution of the Management Consent, a second consent was executed removing Shapiro from his capacity as an officer of each entity controlled by WGCIM. Also on December 1, 2017, BAG, following its appointment as manager of WGCIM, engaged SierraConstellation Partners LLC ("Sierra") to provide the services of Lawrence Perkins, the founder and Chief Executive Officer of Sierra, as Chief Restructuring Officer for WGCIM (the "Initial CRO").

Although WGCIM was established to be an "independent" manager of the Debtors, WGCIM's organizational documents provided that Shapiro, through RS Trust, had the ability to remove BAG (or any subsequent manager of WGCIM) with or without cause, subject to certain notice periods. *See* Docket No. 12, Exh. F. After the Initial Petition Date, the SEC expressed concern about Shapiro's control over WGCIM, and the Debtors modified the provision to allow Shapiro to remove the manager of WGCIM only for cause. *See* Docket No. 84.

On the same day they were appointed, BAG and the Initial CRO, on behalf of the Debtors entered into the following agreements with Shapiro or entities controlled by him (copies of which are available at Docket No. 12):

- Transition Services Agreement: Pursuant to a *Transition Services Agreement* (the "Transition Services Agreement"), WGC agreed to pay WFS Holding Co., LLC ("WFS Holding"), an entity then controlled by Shapiro, $175,000 for consulting services. The Transition Services Agreement purports to provide for, among other things, certain consulting services to be provided by Shapiro, "as an agent of Consultant." As described below, following the appointment of the New Board, the Bankruptcy Court entered an order authorizing the Debtors to reject the Transition Services Agreement.  The Debtors, under prior management, paid

$175,000 to WFS Holding prepetition under the Transition Services Agreement. No other amounts were paid.

- Forbearance Agreement: The Debtors entered into a *Forbearance Agreement*, pursuant to which, among other things, Shapiro was permitted to continue to occupy certain of the Debtors' real properties during the Chapter 11 Cases.

- Contribution Agreement: Shapiro, through RS Trust, and WGC entered into a *Membership Interest Contribution Agreement*, pursuant to which, among other things, Shapiro purportedly ceded legal authority over certain Woodbridge Entities while obtaining the right to recover certain proceeds from each sale of certain assets "as an advance on distributions." The Debtors believe this agreement is not enforceable.

- Residential Lease Agreements: Shapiro's wife, as tenant, and certain Debtors, as landlord, entered into four *Residential Lease Agreements* on December 1, 2017 in respect of several real properties in California and Colorado. The Debtors and Ms. Shapiro have executed a stipulation terminating such leases, which has been approved by the Bankruptcy Court. *See* Docket No. 1690.

On the next business day, December 4, 2017, the 279 Initial Debtors (as defined below) filed their voluntary chapter 11 bankruptcy petitions.

**H.      The Debtors' Capital Structure**

**1.      Assets**

The Debtors' principal assets consist of a portfolio of 189 real properties, ranging in estimated value from approximately $50,000 to over $100,000,000 per property. These properties are in various stages of development or renovation. The Debtors' assets also include Cash on hand of approximately $24.7 million (as of July 31, 2018). The Debtors also own a portfolio of third party loans and real estate owned (or "REO") properties in various jurisdictions, with an estimated book value of approximately $10 million to $20 million.

In addition, the Debtors believe they possess Causes of Action against, among others, Shapiro, Shapiro's affiliates, and others related to, among other things, their prepetition conduct or receipt of funds from the Debtors prior to the Petition Date. Under the Plan, all such Causes of Action (and other Causes of Action, including any Contributed Claims), as well as Avoidance Actions, will be preserved and vest in the Liquidation Trust as Liquidation Trust Actions. Attached hereto as **Exhibit D** is a non-exclusive analysis of the Liquidation Trust Actions that are being preserved under the Plan.

Aside from the foregoing, the Debtors are unaware of any other material assets.

01:23482975.4

171456.4

## 2.    Liabilities

### (a)    Secured Debt

As discussed in greater detail in Section III(b) below, certain Debtors borrowed a debtor-in-possession loan from Hankey Capital, LLC, secured by first-position priming liens in real property owned by certain of the Debtors.  As of July 31, 2018, the balance owed on this loan was approximately $49 million.

The Internal Revenue Service (the "IRS") has imposed a lien on the Debtors' real property located at 4030 Longridge Avenue, Sherman Oaks, California, purportedly to secure an approximately $6 million tax liability owed to the IRS by Robert Shapiro.  Although the liability is owed by Mr. Shapiro (not the Debtors) and the property is owned by the Debtors (and not Mr. Shapiro), the IRS has alleged that the Debtors are liable for Mr. Shapiro's tax debt on an alter ego basis and/or a nominee theory.  The Debtors are investigating the legal bases for the IRS's position, and reserve all rights in connection therewith.

As discussed above, in connection with the fraudulent scheme, certain of the PropCos and MezzCos granted purported liens and security interests to the Fund Debtors to secure the repayment of funds purportedly loaned by the Fund Debtors to such PropCos and MezzCos for the purchase of particular properties (which liens and security interests were putatively assigned to Noteholders as part of the Purported Noteholder Collateral). In reality, due to the commingling discussed above, the Debtors believe they have no ability to trace the funds for property purchases to any particular Fund Debtor. Accordingly, as an integral component of the global settlement embodied in the Plan, any Intercompany Claims that could be asserted by one Debtor against another Debtor will be extinguished immediately before the Effective Date with no separate recovery on account of any such Claims and any Intercompany Liens that could be asserted by one Debtor regarding any Estate Assets owned by another Debtor will be deemed released and discharged on the Effective Date.

Certain Noteholders assert or have asserted that they hold valid, perfected security interests in (i) certain of the Debtors' real properties, or (ii) the Purported Noteholder Collateral. As an initial matter, the Debtors believe the extinguishment of Intercompany Claims and Intercompany Liens between the Fund Debtors, on the one hand, and PropCos and MezzCos, on the other hand, renders this argument moot, as any assertion by Noteholders to security interests is premised on the existence and enforceability of the Intercompany Liens.

However, even were such Intercompany Liens not extinguished, the Debtors believe that a Noteholder's particular funds cannot be traced to the purchase of a particular Fund Debtor's indebtedness and that none of the Noteholders' security interests in the Purported Noteholder Collateral are properly perfected under applicable state law, which the Debtors believe is Article 9 of the Delaware Commercial Code.  Specifically, (i) the Debtors have confirmed that no Noteholder is in physical possession of any Purported Noteholder Collateral, *see* DEL. CODE ANN. tit. 6, § 9-313(a), and (ii) based on the Debtors' investigation, no UCC-1 financing statement was filed in Delaware on behalf of any Noteholder with respect to any of the Purported Noteholder Collateral, *see id.* § 9-312(a).  Pursuant to the settlement embodied in the *Summary Plan Term Sheet*, dated as of March 22, 2018 [Docket No. 828] (the "Plan Term Sheet") and in

the Plan, both the Noteholder Committee and the Unsecured Creditors' Committee agreed to support the terms of the Plan, pursuant to which the Standard Note Claims will receive treatment reflecting a compromise of the foregoing issues.

The Debtors are unaware of any other material secured indebtedness.[20]

### (b)   Unsecured Debt

As of the Petition Date, the Debtors were collectively indebted to (i) approximately 9,331 Noteholders, with a cumulative total Outstanding Principal Amount of Notes of approximately $750 million and (ii) approximately 1,583 Unitholders, with a cumulative total Outstanding Principal Amount of Units of $226 million.[21]

The Debtors generally estimate that Allowed General Unsecured Claims against the Debtors should total between approximately $5 million and approximately $30 million. This estimate, however, does not account for the fact that certain Creditors have asserted amounts in their proofs of claim that exceed the amounts that the Debtors believe should be Allowed. Thus, the total amount of Allowed General Unsecured Claims may greatly exceed or fall short of the estimates set forth herein.

Creditors and interested parties should review the Debtors' Schedules (defined below) Filed with the Bankruptcy Court for more complete information concerning the nature and amount of the Debtors' liabilities as of the Petition Date.

### (c)   Equity Interests

The Debtors' organization structure is described in Section II.A above. As noted, all of the Debtors are directly or indirectly owned by RS Trust. Under the Plan, as of the Effective Date, all Equity Interests shall be deemed void, cancelled, and of no further force and effect. On and after the Effective Date, Holders of Equity Interests shall not be entitled to, and shall not receive or retain any property or interest in property under the Plan on account of such Equity Interests.

### III.   THE CHAPTER 11 CASES

On December 4, 2017 (the "Initial Petition Date"), 279 of the Debtors (the "Initial Debtors") commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. Subsequently, a total of 27 additional Debtors (the "Additional Debtors") filed voluntary chapter 11 petitions on the following dates: (i) February 9, 2018 (14 Additional Debtors); (ii) March 9, 2018 (two Additional Debtors);

---

[20]   As discussed in section III.K below, the Debtors previously owed secured indebtedness to three third-party lenders in connection with three of their properties—805 Nimes Place, 25085 Ashley Ridge Road, and 800 Stradella Road.  As discussed below, that indebtedness has been fully repaid during these Cases.

[21]   In the event the Plan is not confirmed, all parties' rights are reserved, including, without limitation, (i) as to Noteholders, the proper characterization of any asserted security interests, and (ii) as to Unitholders, the proper characterization of the Units.

(iii) March 23, 2018 (seven Additional Debtors); and (iv) March 27, 2018 (four Additional Debtors). The Chapter 11 Cases are being jointly administered under the case caption *In re Woodbridge Group of Companies, LLC, et al.*, Case No. 17-12560 (KJC) (Bankr. D. Del.). An immediate effect of commencement of the Chapter 11 Cases was the imposition of the automatic stay under Bankruptcy Code section 362(a), which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors during the pendency of the Chapter 11 Cases. The automatic stay will remain in effect, unless modified by the Bankruptcy Court, until the Effective Date.

### A.  First Day Orders and Initial Employment Applications

On or about the Initial Petition Date, the Debtors Filed certain "first day" motions and applications with the Bankruptcy Court seeking certain immediate relief to aid in the efficient administration of these Chapter 11 Cases and to facilitate the Debtors' transition to debtor-in-possession status. The Bankruptcy Court held a hearing on these first-day motions on December 5, 2017, with a subsequent hearing scheduled for January 10, 2018, with respect to certain of the "first day" motions. In connection with these hearings, the Bankruptcy Court entered a series of customary "first day" and "second day" orders. *See* Docket Nos. 46, 47, 48, 49, 50, 51, 53, 54, 259, 261, 275, 295, 296 & 723.

Shortly after the Initial Petition Date, the Debtors filed applications to employ Gibson, Dunn & Crutcher ("Gibson Dunn") and Young Conaway Stargatt & Taylor, LLP ("Young Conaway") as bankruptcy co-counsel. *See* Docket Nos. 119 & 122. The Debtors also filed an application to employ Homer Bonner Jacobs PA as special litigation counsel in connection with the SEC Action (as defined below). The Bankruptcy Court entered orders for each of the applications. *See* Docket Nos. 358, 359 & 361. As discussed below, following the appointment of the New Board (as defined below), the Debtors retained Klee, Tuchin, Bogdanoff & Stern LLP ("KTBS") to replace Gibson Dunn as bankruptcy co-counsel, although Gibson Dunn agreed to continue to provide services to the Debtors for a transition period of approximately sixty (60) days with respect to discrete pressing matters on which Gibson Dunn had already expended substantial efforts and about which Gibson Dunn had significant institutional knowledge. That transition period has since ended, and Gibson Dunn is no longer providing any services to the Debtors.

### B.  DIP Financing Motion

On the Initial Petition Date, the Debtors Filed a motion (the "DIP Motion") seeking interim and final orders authorizing the Debtors to, among other things, (i) borrow up to $100 million (with $25 million to be available on an interim basis) (the "DIP Loan") in postpetition financing from Hankey Capital, LLC (the "DIP Lender"); (ii) grant priming liens and security interests to the DIP Lender to secure the applicable Debtors' obligations under the DIP Loan; (iii) subject to the terms and conditions set forth in the DIP Motion, use the DIP Lender's cash collateral; and (iv) provide adequate protection to the holders of alleged prepetition liens. *See* Docket No. 22.

On December 6, 2017, the Bankruptcy Court entered its first interim order on the DIP Motion, authorizing the Debtors to, among other things, borrow up to $6 million for the period from the Initial Petition Date through the date of the further interim hearing set for December 21, 2017. *See* Docket No. 59. On December 21, 2017, the Bankruptcy Court entered its second interim order on the DIP Motion, which, among other things, increased the interim borrowing limit to $25 million for the period from the Initial Petition Date through the date of the further hearing set for January 10, 2018, which hearing was subsequently adjourned to January 18, 2018. *See* Docket Nos. 130 & 246. On January 23, 2018, the Bankruptcy Court entered its third interim order on the DIP Motion, which, among other things, increased the interim borrowing limit to $44 million for the period from the Initial Petition Date through the date of the further hearing set for February 13, 2018. *See* Docket No. 363. On February 13, 2018, the Bankruptcy Court entered its fourth interim order on the DIP Motion, which, among other things, increased the interim borrowing limit to $56 million for the period from the Initial Petition Date through the date of the final hearing set for March 7, 2018 (the "Final DIP Hearing"). *See* Docket No. 572.

In advance of the Final DIP Hearing and following months of extensive negotiations with the Unsecured Creditors' Committee, the Noteholder Committee, the Unitholder Committee, the SEC, and the United States Trustee, the Debtors Filed a form of proposed final order that resolved the concerns of all major constituencies with respect to the DIP Motion. Following the Final DIP Hearing, the Bankruptcy Court entered an order overruling the objections to the DIP Motion filed by various noteholders and granting the DIP Motion on a final basis. *See* Docket No. 724 (the "Final DIP Order").

The Final DIP Order entered by the Bankruptcy Court contains various important features, including:[22]

- Authorization for the Debtors to borrow up to $100 million from the DIP Lender;

- Approval of the DIP Loan Documents between the Debtors and the DIP Lender;

- The grant of a priming security interest and lien on the Collateral, which includes 28 parcels of real estate owned by 27 obligors set forth in the DIP Loan Agreement;

- Authorization for the Debtors to use the DIP Lender's Cash Collateral (as defined in the Final DIP Order), subject to the conditions set forth in the Final DIP Order;

- The grant of "conditional" adequate protection to the Noteholders believed to assert liens or interests in the DIP Lender's Collateral, including, among other forms of adequate protection: (i) conditional adequate protection liens on 12 Adequate Protection Properties not included within the DIP Lender's Collateral; and (ii) the establishment of an adequate protection reserve to be funded with a specified percentage of the net proceeds from the sale, if any, of any property that constitutes an Adequate Protection Property;

---

[22] Capitalized terms used but not otherwise defined in this summary of the Final DIP Order shall have the meanings ascribed to them in the Final DIP Order.

- Carve-outs providing for the payment of certain expenses incurred during the Chapter 11 Cases, including amounts that may be payable to professionals retained by the Debtors and the Committees;

- Certain Events of Default provisions setting forth the DIP Lender's rights upon the occurrence thereof; and

- Standard waivers of certain provisions of the Bankruptcy Code, including under Bankruptcy Code sections 506(c) and 552, as well as adequate protection liens granted to the DIP Lender on certain Estate Assets.

On May 14, 2018, the Debtors and the DIP Lender entered into that certain *Amendment Number One to Senior Secured Debtor in Possession Loan and Security Agreement* (the "First DIP Amendment"), by which the Debtors and the DIP Lender agreed to amend the DIP Loan Agreement to (i) permit the Debtors to re-pay and re-borrow from the DIP Loan and (ii) clarify provisions regarding mechanics' liens.  Notice of the amendment was filed with the Bankruptcy Court on May 21, 2018, and an order approving the First DIP Amendment was entered by the Bankruptcy Court on May 31, 2018.  *See* Docket No. 1892.

### C.    Appointment of the Unsecured Creditors' Committee

On December 14, 2017, the U.S. Trustee appointed the Unsecured Creditors' Committee in these Chapter 11 Cases. *See* Docket No. 79. The initial members of the Unsecured Creditors' Committee were G3 Group LA, Inc., Ronald E. Myrick Sr., and John J. O'Neill. Unfortunately, Mr. Myrick passed away on March 27, 2018. On April 3, 2018, Mr. Myrick's widow, Lynn Myrick, was appointed as Mr. Myrick's replacement on the Unsecured Creditors' Committee. *See* Docket No. 883. Counsel to the Unsecured Creditors' Committee is Pachulski Stang Ziehl & Jones LLP, and the financial advisor to the Unsecured Creditors' Committee is FTI Consulting, Inc. In addition, the Unsecured Creditors' Committee retained Berger Singerman LLP to serve as special counsel for any and all matters related to the SEC Action (as defined below). *See* Docket No. 322.

### D.    United States Trustee

Timothy J. Fox, Esq. is the trial attorney for the Office of the United States Trustee in connection with these Chapter 11 Cases. The Debtors and the Committees have worked cooperatively to address concerns and comments from the U.S. Trustee's office during these Chapter 11 Cases.

### E.    Meeting of Creditors

The initial meeting of creditors under Bankruptcy Code section 341(a) was held on January 11, 2018, at the J. Caleb Boggs Federal Building, 844 King St., Room 2112, Wilmington, Delaware 19801. At the initial meeting of creditors, the U.S. Trustee and creditors asked questions of a representative of the Debtors. At the conclusion of the initial meeting, the U.S. Trustee announced that a further meeting of creditors under Bankruptcy Code section 341(a) shall be held after the Filing of the Debtors' Schedules (as defined and described below). A continued meeting of creditors took place on May 10, 2018 at 9:00 a.m.

01:23482975.4

### F.     Schedules, Statements of Financial Affairs, Claims Bar Dates, and Filed Claims

On December 14, 2017, the Debtors Filed the *Debtors' Motion for an Order Extending the Time Within Which the Debtors Must File Their Schedules of Assets and Liabilities and Statement of Financial Affairs* [Docket No. 80] (the "Initial Extension Motion"). On January 9, 2018, the Bankruptcy Court entered an order granting the Initial Extension Motion and setting a deadline of February 15, 2018 for the Debtors to File their Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "Schedules"). *See* Docket No. 260. In light of, among other things, the appointment of the New Board (as defined below), on February 14, 2018, the Debtors Filed a motion for a further extension of the deadline to File their Schedules and their first periodic report required under Bankruptcy Rule 2015.3 (together with the Schedules, the "Financial Reports"). *See* Docket No. 582 (the "Second Extension Motion"). On March 5, 2018, the Bankruptcy Court entered an order granting the Second Extension Motion and, among other things, extending the deadline for the Debtors to File their Financial Reports to April 16, 2018. *See* Docket No. 700.

On April 15 and 16, 2018, the Debtors Filed their Schedules. A Creditor whose Claim is set forth in the Schedules and not identified as contingent, unliquidated, or disputed may, but need not, file a proof of claim to be entitled to participate in the Chapter 11 Cases or to receive a Distribution under the Plan.[23]

The Bankruptcy Court established (i) June 19, 2018 at 5:00 p.m. (prevailing Eastern Time) as the deadline (or "bar date") for Creditors (other than governmental units) to File proofs of claim against the Debtors (including Claims arising under section 503(b)(9) of the Bankruptcy Code); and (ii) as to each Debtor, 5:00 p.m. (prevailing Eastern Time) on the date that is 180 days after such Debtor's Petition Date as the deadline for any governmental unit (as such term is defined in Bankruptcy Code section 101(27)) to File proofs of claim against the Debtors. *See* Docket No. 911.

As of July 9, 2018, approximately 9,611 proofs of claim appear on the official claims register, although some of those claims have been withdrawn or superseded by other claims. The Debtors have not completed claim reconciliation work and do not anticipate doing so before the Effective Date of the Plan.

### G.     Sierra Employment Motion

On December 19, 2017, the Debtors Filed the *Debtors' Motion for Entry of an Order Pursuant to Section 363 of the Bankruptcy Code Authorizing (I) the Engagement Letter Between the Debtors and SierraConstellation Partners LLC and (II) Debtors' Employment of Lawrence R. Perkins as Chief Restructuring Officer Nunc Pro Tunc to the Petition Date* [Docket No. 102] (the "Sierra Employment Motion"), pursuant to which the Debtors sought, among other things,

---

[23]     A Creditor claiming to hold a prepetition Claim who neither files a proof of claim nor has its Claim set forth in the Schedules as being other than contingent, unliquidated or disputed, and whose Claim is not expressly Allowed under the Plan or in the Confirmation Order, has no right to payment or Distribution under the Plan.

approval of the engagement letter with Sierra and authority to employ Mr. Perkins as the Initial CRO.

On January 23, 2018, the Bankruptcy Court held a hearing to consider, among other things, the Sierra Employment Motion. The Bankruptcy Court stated that it was prepared to enter an order approving the Sierra Employment Motion, but on modified terms, as set forth on the record at the hearing. On that same date, the Bankruptcy Court entered its order granting the Sierra Employment Motion. *See* Docket No. 367.

As discussed in more detail in Section III.H below, pursuant to the Joint Resolution the New Board selected a new CEO and CRO to replace Sierra and the Initial CRO, and Sierra subsequently transitioned out of its role in the Chapter 11 Cases.

## H.    Motions for Appointment of Trustee and Official Committees and Consensual Resolution Thereof

On December 28, 2017, the Unsecured Creditors' Committee Filed the *Emergency Motion of Official Committee of Unsecured Creditors for Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104* [Docket No. 150] (the "Committee Trustee Motion"), through which it sought the appointment of a chapter 11 trustee pursuant to Bankruptcy Code section 1104. The Unsecured Creditors' Committee asserted in the Committee Trustee Motion that "cause" existed for the appointment of a trustee because, among other reasons, the Initial CRO and BAG were "hand-picked by Shapiro, and have done his bidding both before and after the filing of these cases." The Unsecured Creditors' Committee asserted that "any appearance of independence is illusory" and "these so-called 'independent' parties have not shown that they are acting in the best interest of creditors." The Unsecured Creditors' Committee further argued that appointment of a chapter 11 trustee was "critically urgent" because the SEC was, at that time, seeking appointment of a receiver over the Debtors in the SEC Action; the Unsecured Creditors' Committee asserted that, in contrast to a receiver, appointment of a chapter 11 trustee would better enable the Debtors to fully realize the value of their real estate assets.

On January 2, 2018, the SEC Filed the SEC Trustee Motion (together with the Committee Trustee Motion, the "Trustee Motions"). Similar to the Unsecured Creditors' Committee, the SEC argued in the SEC Trustee Motion that the Initial CRO and new "independent" management team were "completely aligned [with Shapiro] in controlling this bankruptcy." The SEC argued that "[a]s the architect of this billion-dollar fraud, Robert Shapiro should not have any voice – let alone be the sole voice – of who serves as fiduciary" and that "he should be barred, per se, from selecting the team to run these debtors-in-possession."

Separate from the Trustee Motions, on December 18, 2017, the Ad Hoc Committee of Holders of Promissory Notes of Woodbridge Mortgage Investment Fund Entities and Affiliates (the "Ad Hoc Noteholder Committee") Filed a motion seeking appointment of an official committee of holders of Notes pursuant to Bankruptcy Code section 1102(a)(2). *See* Docket No. 85 (the "Noteholder Committee Appointment Motion"). Additionally, on January 8, 2018, the Ad Hoc Committee of Unitholders (the "Ad Hoc Unitholder Committee") Filed a motion seeking appointment of an official committee of holders of Units pursuant to Bankruptcy Code section

1102(a)(2). *See* Docket No. 250 (the "Unitholder Committee Appointment Motion" and, together with the Noteholder Committee Appointment Motion, the "Committee Appointment Motions").

On January 8, 2018, the Debtors and the Ad Hoc Noteholder Committee objected to both of the Trustee Motions. *See* Docket Nos. 240 & 245. On January 10, 2018 and January 18, 2018, the Bankruptcy Court held an evidentiary hearing on the Trustee Motions.

On or about January 23, 2018, prior to any ruling by the Bankruptcy Court on the Trustee Motions, and following extensive negotiations, the Debtors, the Unsecured Creditors' Committee, the SEC, the Ad Hoc Noteholder Committee, and the Ad Hoc Unitholder Committee entered into a term sheet that resolved, among other things, the Trustee Motions and the Committee Appointment Motions. *See* Docket No. 357-1 (the "Joint Resolution"). On January 23, 2018, the Bankruptcy Court entered an order approving the Joint Resolution. *See* Docket No. 357 (the "Joint Resolution Order"). The Joint Resolution and the Joint Resolution Order include, among other provisions, the following key provisions:

- The Debtors' board of managers was reconstituted as a three-person board (the "New Board"), consisting of Richard Nevins, M. Freddie Reiss, and Michael Goldberg, biographies of whom are attached hereto as **Exhibit C**.

- Shapiro shall not have any removal rights with respect to New Board members, unless otherwise ordered by the Bankruptcy Court.

- The New Board was empowered to select as soon as practicable a CEO or CRO, subject to the consent of the Unsecured Creditors' Committee and the SEC.

- The New Board was given a seven-day period within which to notify the SEC of its intent to select new counsel for the Debtors or to continue to retain Gibson Dunn and Young Conaway, subject to the SEC's consent, which was not to be unreasonably withheld.

- The parties agreed that employees of Sierra were to transition out of their roles in Debtor matters unless the New Board and newly appointed CEO/CRO concluded that some or all of the Sierra personnel should continue working on such matters, subject to the Unsecured Creditors' Committee's and the SEC's reasonable consent as to any continuing role of Sierra personnel.

- Subject to the SEC staff's ability to obtain authorization from the SEC Commissioner (which has since been obtained), the SEC agreed to dismiss the pending request for a receiver (in the SEC Action) over any entity under the control of the New Board, as discussed in more detail in Section III.Q below.

- Again subject to the SEC Commissioner's authorization, the Debtors and the SEC agreed to request entry of certain orders in the SEC Action, as discussed in more detail in Section III.Q below.

- In settlement of the Unitholder Committee Appointment Motion, the holders of Units were permitted to form a single 1-2 member Unitholder committee (*i.e.*, the

Unitholder Committee), with an all-in professional budget not to exceed $1.5 million (since increased to $2.1 million) through January 1, 2019. The Unitholder Committee was tasked with, not to duplicate the efforts of the Unsecured Creditors Committee or the Noteholder Committee, among other things, litigating or negotiating (a) whether the Unitholders should be treated as creditors or equity security holders in the Chapter 11 Cases; and (b) whether substantive consolidation is in the best interests of the Unitholders.

- In settlement of the Noteholder Committee Appointment Motion, the holders of Notes were permitted to form a single 6-9 member Noteholder committee (*i.e.*, the Noteholder Committee), with an all-in professional budget not to exceed $2.25 million through January 1, 2019. The Noteholder Committee was tasked with, not to duplicate the efforts of the Unsecured Creditors' Committee or the Unitholder Committee, among other things, litigating or negotiating any aspects of Noteholder treatment in the Chapter 11 Cases, focused primarily on (i) whether Noteholders are secured, and, if so, whether substantive consolidation of the Debtors' estates is in the best interests of the Noteholders; and (ii) traditional secured creditor protections such as adequate protection for the Noteholders upon sales of properties and the use of sale proceeds.

- The Noteholder Committee and the Unitholder Committee shall, among other things, (i) be considered fiduciaries of their respective constituencies, (ii) have the rights to participate in the formulation of a chapter 11 plan, (iii) retain professionals pursuant to Bankruptcy Court order and such professionals shall file fee applications with the Bankruptcy Court, and (iv) be granted regular access to the Debtors' advisors in a manner consistent with that typically granted to official statutory committees.

On February 2, 2018, the Noteholder Committee filed its *Notice of Formation of Ad Hoc Noteholder Group Pursuant to January 23, 2018, Order [D.I. 357]* [Docket No. 470]. The current members of the Noteholder Committee are Dr. Michael Weiner, Jane & Harry Breyer, Richard Carli, Jay Beynon, Kathleen Washko, Ali Heidari Saeid, Marc Fruchter, David Ellingson, and Richard Doss. [*See* Docket No. 1707]. The Bankruptcy Court granted the Noteholder Committee's applications to retain Drinker Biddle & Reath LLP as its counsel and Conway MacKenzie, Inc. and Dundon Advisers LLC as its financial advisors. *See* Docket Nos. 914, 915 & 1699.

The Unitholder Committee is comprised of two members: Dr. Raymond C. Blackburn and Dr. Chris C. Pinney. The Bankruptcy Court granted the Unitholder Committee's application to retain Venable LLP as its counsel. *See* Docket No. 719.

As authorized by the Joint Resolution, the New Board selected Frederick Chin to serve as the Chief Executive Officer of WGC Independent Manager LLC, manager of the Debtors. On February 7, 2018, the Debtors Filed a motion to employ Mr. Chin pursuant to Bankruptcy Code sections 105(a) and 363(b). *See* Docket No. 514 (the "CEO Employment Motion"). As set forth in greater detail in the CEO Employment Motion, Mr. Chin has extensive consulting and restructuring experience and has led, operated, and advised underperforming and high-growth

real estate companies. Mr. Chin's employment letter provides for, among other things, a base salary of $110,000 per month, less applicable tax withholdings. On March 8, 2018, the Bankruptcy Court entered an order granting the CEO Employment Motion.

Under the direction of the New Board, on February 7, 2018, the Debtors Filed a motion to retain and employ Development Specialists, Inc. ("DSI") as the Debtors' restructuring advisor and to designate Bradley D. Sharp as their Chief Restructuring Officer ("CRO"). *See* Docket No. 512 (the "DSI Employment Motion"). As set forth in greater detail in the DSI Employment Motion, DSI is a well-established provider of management consulting and financial advisory services, including turnaround consulting and financial restructuring, and Mr. Sharp has over 20 years of experience in providing crisis management and consulting services. DSI shall be compensated on an hourly basis, subject to the terms and conditions of the engagement letter between DSI and the Debtors and the Bankruptcy Court's order authorizing the Debtors to employ DSI. *See* Docket No. 573.

Additionally, the Debtors, under the direction of the New Board, elected to retain new bankruptcy counsel to represent them in the Chapter 11 Cases with Young Conaway Stargatt & Taylor LLP. The Debtors retained KTBS, a boutique Los-Angeles-based firm focusing on corporate finance, mergers and acquisitions, and corporate and municipal restructurings. Greater detail regarding KTBS's qualifications and the terms of its retention are set forth in the Debtors' application to employ KTBS [Docket No. 657], which was granted by the Bankruptcy Court on March 16, 2018 [Docket No. 767]. Gibson Dunn continued to represent the Debtors as bankruptcy counsel during the period in which KTBS transitioned into this role. Gibson Dunn's transition role has since ended and Gibson Dunn is no longer rendering services to the Debtors.

After the appointment of the New Board, the Debtors also filed applications to retain Province, Inc. as operational and financial advisors [Docket No. 692], Berkeley Research Group, LLC as tax advisors [Docket No. 717], and Glaser Weil Fink Howard Avchen & Shapiro LLP as special real estate and land use counsel [Docket No. 1604]. Each of those applications was granted by the Bankruptcy Court. *See* Docket Nos. 835, 836 & 1738.

## I.    Tintarella Motion for Relief From Stay

On February 8, 2018, Tintarella LLC ("Tintarella") filed a motion for stay relief [Docket No. 529], alleging that its interests in property located at 800 Stradella Road, Los Angeles, California 90077 (the "Stradella Property") were not adequately protected such that cause existed to lift the automatic stay. After negotiations, the Debtors and Tintarella reached an agreement, whereby Tintarella agreed to allow the Debtors to commence certain work on the Stradella Property so that the Debtors may work toward preservation of certain entitlements, and the Debtors agreed to make certain payments to Tintarella as adequate protection, including a one-time "cure payment" of $901,866.68, and monthly interest payments, beginning April 1, 2018, of $260,000 per month. *See* Docket No. 720. The Debtors subsequently satisfied all amounts owing to Tintarella pursuant to the Bankruptcy Court's order authorizing the Debtors to pay third-party secured debt (*see* section III.K below). Accordingly, on May 31, 2018, Tintarella withdrew its motion for relief from stay as moot. *See* Docket No. 1890.

### J.    Sales of Real Property

During the Chapter 11 Cases, the Debtors have sought to maximize the value of their Estates by methodically and opportunistically selling several parcels of real property owned by the Estates, in each case subject to Bankruptcy Court approval. As of the date hereof, the Debtors have filed the following motions to sell real property pursuant to Bankruptcy Code section 363:

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 8692 Franklin Avenue, Los Angeles, California Property Owned by the Debtors in Fee Simple Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 458]. The Bankruptcy Court granted this motion on February 13, 2018. *See* Docket No. 574;

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 11541 Blucher Avenue, Granada Hills, California Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 713]. The Bankruptcy Court granted this motion on March 28, 2018. *See* Docket No. 844.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 180 Saddleback Lane, Snowmass Village, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 760]. The Bankruptcy Court granted this motion on April 3, 2018. *See* Docket No. 893.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 24025 Hidden Ridge Road, Calabasas, California Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 762]. The Bankruptcy Court granted this motion on April 3, 2018. *See* Docket No. 894.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 810 Sarbonne Road, Los Angeles, California Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 929]. The Bankruptcy Court granted this motion on May 1, 2018. *See* Docket No. 1700.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 2362 Apollo Drive, Los Angeles, California Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 931]. The Bankruptcy Court granted this motion on April 27, 2018. *See* Docket No. 1669.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 432 Crystal Canyon Drive, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the*

01:23482975.4

*Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 933]. The Bankruptcy Court granted this motion on April 27, 2018. *See* Docket No. 1670.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 883 Perry Ridge Road, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 935]. The Bankruptcy Court granted this motion on April 27, 2018. *See* Docket No. 1671.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 158A Seeburg Circle, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 937]. The Bankruptcy Court granted this motion on April 27, 2018. *See* Docket No. 1672.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 171 Sopris Mesa Drive, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 939]. The Bankruptcy Court granted this motion on April 27, 2018. *See* Docket No. 1673.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 238 Sundance Trail, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 941]. The Bankruptcy Court granted this motion on April 27, 2018. *See* Docket No. 1674.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 1061 Two Creeks Drive, Snowmass Village, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 943]. The Bankruptcy Court granted this motion on May 1, 2018. *See* Docket No. 1701.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 25085 Ashley Ridge Road, Hidden Hills, California Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 1262]. The Bankruptcy Court granted this motion on May 2, 2018. *See* Docket No. 1708.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 215 N. 12th Street, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related*

*Purchase Agreement; and (III) Granting Related Relief* [Docket No. 1770]. The Bankruptcy Court granted this motion on June 1, 2018. *See* Docket No. 1906.

•   *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 995 & 981 Cowen Drive, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 1772]. The Bankruptcy Court granted this motion on June 4, 2018. *See* Docket No. 1911.

•   *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of Lot C-1 and 446 Diamond A Ranch Road, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 1774]. The Bankruptcy Court granted this motion on June 4, 2018. *See* Docket No. 1912.

•   *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 809 Grand Avenue, Glenwood Springs, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 1776]. The Bankruptcy Court granted this motion on June 4, 2018. *See* Docket No. 1913.

•   *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 747 Davis Road, Stockbridge, Georgia Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 1778]. The Bankruptcy Court granted this motion on June 4, 2018. *See* Docket No. 1914.

•   *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 403 and 417 Crystal Canyon Drive, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 1780]. The Bankruptcy Court granted this motion on June 4, 2018. *See* Docket No. 1915.

•   *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 302 Wildflower Road, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 1785]. The Bankruptcy Court granted this motion on June 4, 2018. *See* Docket No. 1916.

•   *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 14115 Moorpark Street #212, Sherman Oaks, California Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief*

[Docket No. 1788]. The Bankruptcy Court granted this motion on June 4, 2018. *See* Docket No. 1917.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 780 E. Valley Road, Unit C-126, Basalt, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 1790]. The Bankruptcy Court granted this motion on June 4, 2018. *See* Docket No. 1918.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 342 and 368 River Bend Way, Glenwood Springs, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 1792]. The Bankruptcy Court granted this motion on June 4, 2018. *See* Docket No. 1919.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 63 Sweetgrass Drive, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 1794]. The Bankruptcy Court granted this motion on June 4, 2018. *See* Docket No. 1920.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 26 Saddlehorn Court, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 1996]. The Bankruptcy Court granted this motion on July 6, 2018. *See* Docket No. 2111.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 180 A Seeburg Circle, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 1998]. The Bankruptcy Court granted this motion on July 6, 2018. *See* Docket No. 2112.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 108 W. Diamond A Ranch Road, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 2001]. The Bankruptcy Court granted this motion on July 6, 2018. *See* Docket No. 2113.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 15655 Woodvale Road, Encino, California Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No.

2008]. The Bankruptcy Court granted this motion on July 6, 2018. *See* Docket No. 2114.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 800 Stradella Road, Los Angeles, California Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 2010]. The Bankruptcy Court granted this motion on July 6, 2018. *See* Docket No. 2115.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 14112 Roscoe Blvd., Panorama City, California Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 2012]. The Bankruptcy Court granted this motion on July 6, 2018. *See* Docket No. 2116.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 201 Main Street, Carbondale, Colorado Property (Units 101, 102, 202, 203, 204, 303)Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 2071]. The Bankruptcy Court granted this motion on July 19, 2018. *See* Docket No. 2201.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 90 Primrose Road, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 2196]. The Bankruptcy Court granted this motion on July 24, 2018. *See* Docket No. 2225.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 328 Crystal Canyon Drive, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 2135]. The Bankruptcy Court granted this motion on July 26, 2018. *See* Docket No. 2242.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 831 Grand Avenue, Glenwood Springs, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 2169]. The Bankruptcy Court granted this motion on August 2, 2018. *See* Docket No. 2274.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 32 Fenwick Court, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 2189]. The Bankruptcy Court granted this motion on August 6, 2018. *See* Docket No. 2294.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 350 Market Street, #301-312, Basalt, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 2192].  The Bankruptcy Court granted this motion on August 6, 2018. *See* Docket No. 2295.

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 59 Rivers Bend, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 2256].

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 67 Aspen Glo Lane, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 2258].

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 345 Branding Lane, Snowmass, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 2260].

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of 360 Rivers Bend, Carbondale, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 2262].

- *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of Lot 26, Spur Ridge Road, Snowmass Village, Colorado Property Owned by the Debtors Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving the Related Purchase Agreement; and (III) Granting Related Relief* [Docket No. 2264].

The Debtors intend to continue marketing certain of the real properties owned by the Estates and may sell additional properties prior to the Effective Date, subject to Bankruptcy Court approval.

## K.    Motion for Authority to Pay Third-Party Secured Debt

On April 10, 2018, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing Payment of Third-Party Secured Debt and (II) Granting Related Relief* [Docket No. 924] (the "Third-Party Secured Debt Motion"), pursuant to which the Debtors sought entry of an order authorizing, but not directing, them to pay in full the secured indebtedness (the "Third-Party Secured Debt") owed to three third-party lenders in connection with three of their properties. Specifically, three of the PropCos—Bishop White Investments, LLC, Craven Investments, LLC, and Grand Midway Investments, LLC—were obligated on third-party notes issued by those PropCos to 805 Nimes Place, LLC (a $20 million note secured by real property at 805 Nimes Place—the "Nimes Place Note"), Ashley Land, LLC (a $4 million note secured by

real property at 25085 Ashley Ridge Road—the "Ashley Ridge Note"), and Tintarella, LLC (a $26 million note secured by real property at 800 Stradella Road—the "Stradella Road Note"), respectively.  The Debtors believe that payment of the Third-Party Secured Debt was an exercise of sound business judgment in light of, among other things, the potential savings to the Estates in interest payments (including possible default interest), legal fees, late fees, or other charges potentially accruing postpetition in connection with such obligations.  The Third-Party Secured Debt Motion was approved by the Bankruptcy Court on April 27, 2018.  *See* Docket No. 1668. The Debtors subsequently paid in full the Stradella Road Note and the Ashley Ridge Note, and, after Court approval of a stipulation with the lender in respect of 805 Nimes Place (*see* Motion at Docket No. 1751 and Order at Docket No 1903), paid in full the Nimes Place Note.

## L.       Rejection and Assumption of Executory Contracts and Unexpired Leases

### 1.       Rejection of Transition Services Agreement

On February 28, 2018, the Debtors Filed a motion to reject the Transition Services Agreement between WGC and WFS Holding, an entity then controlled by Shapiro. *See* Docket No. 673. Following the appointment of the New Board, the Debtors determined that Shapiro's consulting services were not necessary, beneficial, or appropriate, and that there was no justification for paying him any consulting fees, much less the $175,000 per month called for under the Transition Services Agreement. On March 19, 2018, the Bankruptcy Court entered an order granting the motion to reject the TSA. *See* Docket No. 778.

### 2.       Rejection of Other Executory Contracts and Unexpired Leases

During the Chapter 11 Cases, the Debtors have rejected certain executory contracts and unexpired leases pursuant to Bankruptcy Code section 365:

- On January 31, 2018, the Debtors Filed a motion to reject the lease relating to their former headquarters at 14225 Ventura Boulevard, Suite 100, Sherman Oaks, California. *See* Docket No. 448. On February 20, 2018, the Bankruptcy Court entered an order granting the motion. *See* Docket No. 621.

- On February 28, 2018, the Debtors Filed their first omnibus motion to reject certain executory contracts and unexpired leases that the Debtors determined, in their sound business judgment, did not provide value to the Estates. *See* Docket No. 674. On March 27, 2018, the Bankruptcy Court entered an order granting the motion. *See* Docket No. 834 (the "First Omnibus Rejection Order"). A schedule of the contracts and leases that were rejected pursuant to the First Omnibus Rejection Order is annexed as Schedule 1 to the First Omnibus Rejection Order.

- On March 7, 2018, the Debtors Filed a motion, pursuant to Bankruptcy Code section 365(d)(4), to extend the deadline to assume or reject unexpired leases of nonresidential property under which any of the Debtors is a lessee by 90 days, through and including July 2, 2018. *See* Docket No. 712. On March 27, 2018, the Bankruptcy Court entered an order granting the motion and extending such deadline through and including July 2, 2018. *See* Docket No. 831.

- On March 28, 2018, the Debtors Filed their second omnibus motion to reject certain executory contracts and unexpired leases that the Debtors determined, in their sound business judgment, did not provide value to the Estates. *See* Docket No. 853. On April 23, 2018, the Bankruptcy Court entered an order granting the motion. *See* Docket No. 1608 (the "Second Omnibus Rejection Order"). A schedule of the contracts and leases that were rejected pursuant to the Second Omnibus Rejection Order is annexed as Schedule 1 to the Second Omnibus Rejection Order.

- On April 27, 2018, the Debtors Filed their third omnibus motion to reject certain executory contracts and unexpired leases that the Debtors determined, in their sound business judgment, did not provide value to the Estates. *See* Docket No. 1681. On May 15, 2018, the Bankruptcy Court entered an order granting the motion. *See* Docket No. 1784 (the "Third Omnibus Rejection Order"). A schedule of the contracts and leases that were rejected pursuant to the Third Omnibus Rejection Order is annexed as Schedule 1 to the Third Omnibus Rejection Order.

- On June 15, 2018, the Debtors Filed their fourth omnibus motion to reject certain executory contracts and unexpired leases that the Debtors determined, in their sound business judgment, did not provide value to the Estates. *See* Docket No. 1986. On July 6, 2018, the Bankruptcy Court entered an order granting the motion. *See* Docket No. 2110 (the "Fourth Omnibus Rejection Order"). A schedule of the contracts and leases that were rejected pursuant to the Third Omnibus Rejection Order is annexed as Schedule 1 to the Fourth Omnibus Rejection Order.

- On July 31, 2018, the Debtors Filed their fifth omnibus motion to reject certain executory contracts and unexpired leases that the Debtors determined, in their sound business judgment, did not provide value to the Estates. *See* Docket No. 2272.

## M. Consent Orders

### 1. Motion for Approval of California Consent Order

On February 21, 2018, the Debtors Filed the *Debtors' Motion for Entry of an Order, Pursuant to Section 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, Authorizing and Approving the Debtors' Entry into a Consent Order with California with Respect to the Offer or Sale of Securities* [Docket No. 639] (the "California Consent Order Motion"). Pursuant to the California Consent Order Motion, the Debtors sought Bankruptcy Court authorization for certain of the Debtors (the "Woodbridge Respondents," as more specifically defined in the California Consent Order Motion) to enter into a proposed consent order (the "California Consent Order") with the Department of Business Oversight of the State of California ("California"). Shapiro and one of his non-debtor affiliates are also parties to the California Consent Order. The California Consent Order provides, among other things, that the Woodbridge Respondents (and the other respondents) are ordered to, among other things, desist and refrain from offering or selling securities in California unless and until qualification has been made under applicable law. The

California Consent Order also contains numerous recitals setting forth California's allegations regarding alleged violations of California corporate and securities law, which allegations were neither admitted nor denied by the Woodbridge Respondents in the California Consent Order. On March 8, 2018, the Bankruptcy Court entered an order granting the California Consent Order Motion. *See* Docket No. 721.

## 2.    Motion for Expedited Procedures Regarding Consent Orders

On March 15, 2018, the Debtors Filed the *Debtors' Motion for Entry of an Order Setting Expedited Procedures for the Approval of Certain Consent Orders* [Docket No. 753] (the "Consent Order Procedures Motion"), pursuant to which the Debtors sought entry of an order setting expedited procedures for the approval of consent orders with certain state regulatory agencies so long as the consent orders meet certain parameters, thereby avoiding the need for the Debtors to seek to shorten notice with respect to each individual motion for approval of a future consent order. Among other parameters, any consent order subject to the Consent Order Procedures Motion shall not provide for the payment by the Debtors of monetary penalties, disgorgement, or restitution. As a general matter, the consent orders that are anticipated to be agreed to via the expedited procedures will prohibit the Debtors from unlawfully offering or selling securities—something that the Debtors have no intention of doing anyway.

On April 3, 2018, the Bankruptcy Court entered an order granting the Consent Order Procedures Motion [Docket No. 888] (the "Consent Order Procedures Order"). The Consent Order Procedures Order provides that after the Debtors, the Committees, and the applicable agency have agreed to a consent order, the Debtors shall file such consent order and serve it on certain notice parties. If no objection is received within five days of such filing, the Debtors are authorized to submit an order to the Bankruptcy Court under certification of counsel approving the Debtors' entry into the applicable consent order.

As of the date hereof, the Debtors have entered into consent orders with regulatory agencies for the States of Colorado, Idaho, Oregon, and Michigan pursuant to the procedures set forth in the Consent Order Procedures Order. *See* Docket Nos. 1782, 1783, 1851 & 2253.

## N.    Extension of Exclusivity Periods

On March 15, 2018, the Debtors Filed the *Debtors' Motion for Entry of an Order, Pursuant to Section 1121(d) of the Bankruptcy Code, Extending the Exclusive Periods for the Filing of a Chapter 11 Plan and Solicitation of Acceptances Thereof* [Docket No. 754] (the "Exclusivity Motion"). In light of, among other things, the change in the Debtors' management pursuant to the Joint Resolution, the Debtors requested 90-day extensions of the Debtors' exclusive periods to (i) file a proposed chapter 11 plan (the "Plan Period"), and (ii) solicit acceptances of the plan without competing plan filings (the "Solicitation Period"). On April 3, 2018, the Bankruptcy Court entered an order granting the Exclusivity Motion and extending (i) the Plan Period for each Debtor to July 2, 2018, and (ii) the Solicitation Period for each Debtor to September 4, 2018. *See* Docket No. 889.

On May 18, 2018, the Dissident Plaintiffs (as defined below) filed a motion seeking to terminate the Debtors' exclusive periods (the "Exclusivity Termination Motion") and filed an

accompanying motion to shorten notice with respect to the Exclusivity Termination Motion in order to set the Exclusivity Termination Motion for hearing on June 5, 2018. *See* Docket Nos. 1833 & 1834. The Bankruptcy Court denied the motion to shorten notice, instead setting the Exclusivity Termination Motion for hearing on July 10, 2018. *See* Docket No. 1849.

On June 29, 2018, the Debtors filed the *Debtors' Motion for Entry of an Order, Pursuant to Section 1121(d) of the Bankruptcy Code, Extending the Exclusive Periods for the Filing of a Chapter 11 Plan and Solicitation of Acceptances Thereof* [Docket No. 2065] (the "Second Exclusivity Motion"), seeking to further extend the Plan Period and the Solicitation Period, each by approximately 120 days. On July 17, 2018, the Bankruptcy Court entered an order granting the Second Exclusivity Motion and extending (i) the Plan Period for each Debtor to October 30, 2018, and (ii) the Solicitation Period for each Debtor to January 2, 2019. *See* Docket No. 2180.

## O.    Additional Employment Orders

On and after the Initial Petition Date, the Debtors Filed various motions and applications to retain professionals and to streamline the administration of the Chapter 11 Cases. The Bankruptcy Court entered the following orders granting the foregoing motions and applications:

- *Order Authorizing the Retention and Employment of Garden City Group, LLC as Administrative Advisor for the Debtors and Debtors in Possession Pursuant to 11 U.S.C. §§ 327(a) and 330,* Nunc Pro Tunc *to the Petition Date* [Docket No. 274];

- *Order Authorizing the Employment and Payment of Professionals Used in the Ordinary Course of Business* [Docket No. 296];

- *Order Pursuant to 11 U.S.C. §§ 105 and 363 Authorizing the Debtors to Retain Expert Consultant* Nunc Pro Tunc *as of December 18, 2017* [Docket No. 360];

- *Order Authorizing the Employment and Retention of Homer Bonner Jacobs PA as Special Litigation Counsel to the Debtors and Debtors in Possession* Nunc Pro Tunc *to Petition Date* [Docket No. 361];

- *Order, Pursuant to Section 327(a) of the Bankruptcy Code, Authorizing the Employment and Retention of Province, Inc. as Operational and Financial Advisors to the Debtors* Nunc Pro Tunc *to February 1, 2018* [Docket No. 835];

- *Order Authorizing the Retention and Employment of Berkeley Research Group, LLC as Tax Advisors to the Debtors and Debtors in Possession,* Nunc Pro Tunc *to February 15, 2018* [Docket No. 836];

- *Order Authorizing the Debtors to Retain and Employ Glaser Weil Fink Howard Avchen & Shapiro LLP as Special Real Estate and Land Use Counsel* Nunc Pro Tunc *to March 22, 2018* [Docket No. 1738].

In addition, the Committees Filed applications to retain professionals and the Bankruptcy Court entered the following orders granting such applications:

- *Order Authorizing and Approving the Retention of Pachulski Stang Ziehl & Jones LLP as Counsel to the Official Committee of Unsecured Creditors* Nunc Pro Tunc *to December 14, 2017* [Docket No. 320];

- *Order Authorizing Retention of FTI Consulting, Inc. as Financial Advisor for the Official Committee of Unsecured Creditors* [Docket No. 321];

- *Order Pursuant to Sections 328(a) and 1103 of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014-1 Authorizing the Employment and Retention of Berger Singerman LLP as Special Counsel for the Official Committee of Unsecured Creditors,* Nunc Pro Tunc *to December 26, 2017* [Docket No. 322];

- *Order Authorizing and Approving the Retention of Venable LLP as Counsel to the Fiduciary Committee of Unitholders* Nunc Pro Tunc *to January 23, 2018* [Docket No. 719];

- *Order Authorizing the Employment and Retention of Conway Mackenzie, Inc. as Financial Advisor for the Ad Hoc Noteholder Group* [Docket No. 914];

- *Order Authorizing the Employment and Retention of Drinker Biddle & Reath LLP as Counsel for the Ad Hoc Noteholder Group* [Docket No. 915];

- *Order Authorizing the Employment and Retention of Dundon Advisers LLC as Financial Advisor for the Ad Hoc Noteholder Group* [Docket No. 1699];

## P.     Claims Trading

On April 3, 2018, Contrarian Funds, LLC ("Contrarian") filed a *Motion for Authority to Acquire Promissory Notes Against the Debtors* [Docket No. 890] (the "Trading Motion").  By the Trading Motion, Contrarian sought authority to acquire all rights, title, and interest in the Notes against the Debtors without further order of the Bankruptcy Court and without obtaining prior consent from the Debtors.  Approximately two weeks, later, on April 16, 2018, the Debtors filed their *Objection to Proof of Claim No. 1216 Asserted by Putative Transferee Contrarian Funds, LLC, etc.* [Docket No. 1563] (the "Contrarian Objection"), pursuant to which the Debtors sought entry of an order disallowing and expunging a proof of claim filed by Contrarian, which claim was based on Notes that Contrarian had purportedly acquired from Noteholders Elissa and Joseph Berlinger, on account of anti-assignment language in the underlying Notes.  The Contrarian Objection was heard on June 5, 2018, and, on June 20, 2018, the Bankruptcy Court entered an order sustaining the Contrarian Objection [Docket No. 2016] and issued an opinion and order finding that, among other things, the anti-assignment language in the Notes is legally valid [Docket Nos. 2014 & 2016].  Contrarian filed a notice of appeal on July 3, 2018 [Docket No. 2078].

## Q.    SEC Action

On December 20, 2017, the SEC filed a complaint (the "SEC Complaint") against, among other parties, Shapiro, WGC, WMF, Woodbridge Structured Funding, LLC ("WSF"), the Fund Debtors, and hundreds of PropCo and MezzCo Debtors. The case is pending in the U.S. District Court for the Southern District of Florida (the "District Court") as Case No. 1:17-cv-24624-MGC (the "SEC Action").

The SEC alleges that Shapiro and his affiliates, including the Debtor defendants, committed numerous securities law violations. The SEC Complaint contains 10 counts. Count I alleges sales of unregistered securities in violation of Section 5 of the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.* (the "Securities Act"), against Shapiro, WGC, WMF, WSF, and the Fund Debtors. Counts III and VI allege that Shapiro, WGC, WMF, WSF, and the Fund Debtors made material misstatements or omissions in connection with the sale of securities in violation of Section 17(a)(2) of the Securities Act and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* (the "Exchange Act"). Counts II, IV, V, and VII are against all defendants, alleging participation in a "scheme" to defraud investors in violation of Sections 17(a)(1) and (a)(2) of the Securities Act and Section 10(b) of the Exchange Act. Count VIII seeks to hold Shapiro and RS Trust liable under Section 20(a) of the Exchange Act as "control persons" for the alleged Exchange Act fraud violations of the various entities under their control. Count IX asserts broker-dealer registration violations against WGC and WSF under Section 15(a)(1) of the Exchange Act, and Count X asserts that Shapiro "aided and abetted" WGC's and WSF's broker-dealer registration violations.

The SEC Complaint prays for the following relief:

(i)     A permanent injunction enjoining all defendants from further violations of the securities laws they are alleged to have violated;

(ii)    An asset freeze of the assets of Shapiro, RS Trust, and other non-debtor entities until further order of the District Court;

(iii)   Appointment of a receiver over the corporate defendants (including the Debtors);

(iv)    Issuance of an order enjoining and restraining Shapiro and RS Trust from destroying, concealing, or otherwise rendering illegible any of the books, records, documents, correspondence, accounts, statements, files and other property of or pertaining to any defendant that refer or relate to the acts or courses of conduct alleged in the SEC Complaint;

(v)     Issuance of an order directing Shapiro and RS Trust to provide an accounting of all assets and liabilities, including all monies and real properties directly or indirectly received from investors and all uses of investor funds;

(vi)    Disgorgement by all defendants of "all ill-gotten gains or proceeds received from investors as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest;" and

(vii)    Civil money penalties pursuant to Section 20(d) of Securities Act and 21(d) of Exchange Act against all defendants.

Concurrently with the filing of the SEC Complaint, the SEC filed an emergency *ex parte* motion (the "Asset Freeze Motion") to freeze temporarily and, after a hearing, for the duration of the SEC Action, the assets of Shapiro, RS Trust, and the (then) non-debtor corporate defendants. The Asset Freeze Motion also sought an order requiring Shapiro and RS Trust to provide a sworn accounting and prohibiting them from destroying records. The day the Asset Freeze Motion was filed, the District Court entered an order (the "Asset Freeze Order") setting a "show cause" hearing for December 29, 2017, and temporarily freezing the assets of Shapiro, RS Trust, and the (then) non-debtor corporate defendants. The Asset Freeze Order was subsequently extended by the District Court. As of the date hereof, the Asset Freeze Order remains in effect, although none of the Debtors are subject to the Asset Freeze Order.

On the same date it filed the SEC Complaint and the Asset Freeze Motion, the SEC filed a motion to appoint a receiver over all defendants in the SEC Action except Shapiro (the "Receivership Motion"). The SEC argued that the appointment of a receiver over the debtor entities was not barred by the automatic stay because the SEC was enforcing its police and regulatory powers, as permitted under Bankruptcy Code section 362(b)(4). On December 28, 2017, the Debtors initiated an adversary proceeding in the Bankruptcy Court, Adv. Proc. No. 17-51891-KJC (the "Receivership Adversary"), seeking, among other things, a declaratory judgment that the SEC Action and the Receivership Motion should be and are subject to the automatic stay, as well as a preliminary injunction barring the continued prosecution of the SEC Action. As part of the Joint Resolution, the SEC withdrew the Receivership Motion without prejudice and the Debtors voluntarily dismissed the Receivership Adversary. The SEC has indicated that it will re-file the Receivership Motion as against RS Trust and certain non-debtor entities, but not against the Debtors.

Pursuant to the Joint Resolution, on February 16, 2018, the Debtor defendants filed an unopposed motion to extend the deadline to file their answer or motion to dismiss the SEC Complaint to April 23, 2018. The Bankruptcy Court granted the unopposed extension motion.

On April 16, 2018, the Debtor defendants entered into that certain *Consent of Debtor Defendants* (the "SEC Consent") with the SEC and consented to the entry of that certain *Judgment as to Debtor Defendants* (the "SEC Judgment"). Pursuant to the SEC Consent and SEC Judgment, without admitting or denying the allegations of the SEC Complaint, the Debtor defendants agree to the entry of the SEC Judgment, which provides that, among other things: (i) the Debtor defendants will be permanently enjoined from violations of certain sections of the Securities Act and the Exchange Act; (ii) upon motion of the SEC, the District Court will determine whether it is appropriate to order disgorgement and/or a civil penalty against the Debtor defendants and, if so, the amount of any such disgorgement and/or civil penalty; and (iii) in connection with any hearing regarding disgorgement and/or a civil penalty, *inter alia*, the Debtor defendants will be precluded from arguing that they did not violate the federal securities laws as alleged in the SEC Complaint and the Debtor defendants may not challenge the validity of the SEC Consent or SEC Judgment. The SEC Consent and SEC Judgment also provide that the Debtor defendants agree that the District Court will retain jurisdiction over the matter for the purpose of enforcing the terms of the SEC Judgment, and that the Bankruptcy Court will

continue to maintain jurisdiction over all such matters to which the Bankruptcy Court has jurisdiction over in the Chapter 11 Cases. On May 1, 2018, the Bankruptcy Court approved the Debtors' entry into the SEC Consent and SEC Judgment. *See* Docket No. 1702. Accordingly, on May 21, 2018, the District Court entered the SEC Judgment against the Debtor defendants in the SEC Action.

The Debtors have reached an agreement in principle with the SEC staff to resolve the disgorgement and civil penalty claims asserted by the SEC against the Debtors in the SEC Action. The agreement remains subject to Commission and Bankruptcy Court approvals, but the Debtors and SEC staff will submit the agreement for consideration in an effort to obtain those approvals prior to the Confirmation Hearing. If the agreement is approved, the SEC will dismiss its civil penalty claims against the Debtors. In addition, the Debtors will consent to a final judgment in the SEC Action, which sets disgorgement in the amount of $892,173,765, but the disgorgement will be deemed satisfied by the Liquidation Trust formed pursuant to the Debtors' Plan becoming obligated to make distributions of substantially all of the net proceeds (taking into account the costs of administration of the Liquidation Trust and the Wind-Down Entity) from the disposition of the Estates' assets (distributions of net proceeds to general unsecured creditors shall be permitted) to investors pursuant to a confirmed Chapter 11 plan, provided that the SEC did not file a timely objection to the plan. The Debtors and SEC staff have been working to resolve any issues that the staff may have with the Plan, and the Debtors do not anticipate the SEC filing any objection to the Plan. To provide sufficient time for the proposed agreement to be approved, the Debtors, Unsecured Creditors' Committee, Noteholder Committee, and Unitholder Committee have agreed to extend the SEC Bar Date to October 26, 2018. If the agreement is approved and the conditions to disgorgement satisfaction occur, then the SEC will not file any proofs of claim against the Debtors or their Estates. Further, the agreement would moot any issues concerning treatment of the SEC's claims in the Chapter 11 Cases. In light of the agreement in principle, the SEC will not be voting on the Plan.

At a status conference in the SEC Action on May 16, 2018, the SEC announced that it had reached terms of settlement with the non-debtor defendants (but did not, at that time, disclose those terms). Accordingly, on May 21, 2018, the District Court entered an order administratively closing the SEC Action, and instructing the parties to file settlement documentation on or before August 17, 2018.

### R.    Postpetition Litigation

The Debtors and other parties in interest have commenced four adversary proceedings related to the Chapter 11 Cases and the Unsecured Creditors' Committee has sought to commence a fifth, each of which are described below.

### 1.    Receivership Adversary

As noted in Section III.Q above, the Debtors initiated the Receivership Adversary to, among other things, enjoin the SEC from prosecuting the SEC Action and the Receivership Motion. Pursuant to the Joint Resolution, the Debtors voluntarily dismissed the Receivership Adversary on February 2, 2018.

### 2.    Dissident Noteholder Declaratory Relief Adversary

On March 27, 2018, a group of so-called "Dissident" Noteholders (the "Dissident Plaintiffs") filed an adversary proceeding in the Bankruptcy Court, Adv. Proc. No. 18-50371-KJC (the "Dissident Declaratory Relief Adversary"), seeking a declaratory judgment that they hold valid, perfected, first-priority liens against the real property located at 141 South Carolwood Drive, Holmby Hills, California (the "Owlwood Property"), or against the proceeds of any sale of the Owlwood Property via a security interest in a note secured by the Owlwood Property, or, alternatively, that the Dissident Plaintiffs hold a constructive trust over or equitable lien against the Owlwood Property or the proceeds of any sale of the Owlwood Property or the note secured by the Owlwood Property.  On June 18, 2018, the Debtors filed a motion to dismiss the Dissident Declaratory Relief Adversary.  On July 17, 2018, the Dissident Plaintiffs, in response to the Debtors' motion to dismiss, requested and were granted permission to file a First Amended Complaint (the "Complaint").  On August 14, 2018, the Debtors again moved to dismiss the Complaint.

The Debtors believe that the positions taken by the Dissident Plaintiffs are meritless and will all be resolved in favor of the Debtors either via the pending motion to dismiss or via confirmation of the Plan or, if necessary, on summary judgment or after an evidentiary hearing.

More specifically, as detailed more fully in the Debtors' motion to dismiss, the counts asserted in the Dissident Plaintiffs' Complaint fail for the following reasons:

- Count I of the Complaint seeks a declaration that the Dissident Plaintiffs have a security interest in the Owlwood Property, *i.e.*, in real property.  As a matter of black letter California law, "recordation of the mortgage . . . is one of the necessary and indispensable requisites to" a security interest.  *Hopper v. Keys*, 92 P. 1017, 1020 (Cal. 1907).  There is no mortgage—or deed of trust—recorded in favor of any of the Dissident Plaintiffs.  Fund 3A, a Debtor, does have a recorded deed of trust against the Owlwood Property (executed by the Owlwood Property's owner, Sturmer Pippin Investments, LLC, also a Debtor), but at no time did Fund 3A purport to transfer ownership of that deed of trust or any note purportedly secured by the deed of trust to any Dissident Plaintiff except as security (which is defective for reasons set forth in the next paragraph).  Any transfer of ownership of a note would have to comply with Article 3 of the Delaware UCC, which in pertinent part (*see* Del. Code Ann. tit. 6, § 3-102) requires that to be effective, such a transfer would have to involve both the endorsement and delivery of the note to a Dissident Plaintiff.  That is not even alleged to have occurred and it did not.  Therefore, even if the Dissident Plaintiffs had a colorable claim to having a security interest in the Owlwood Property (and they do not), it would be an unperfected security interest.  As a deemed bona fide purchaser of the Owlwood Property by reason of Bankruptcy Code section 544(a)(3), Debtor Sturmer Pippin Investments, LLC, holds the Owlwood Property free and clear of any unperfected security interest of the Dissident Plaintiffs.[24]

---

[24]  Under section 544(a), "a trustee obtains a *status* as well as an avoiding power as a hypothetical judicial lien creditor, unsatisfied execution creditor, or bona fide purchaser as of the commencement of a bankruptcy case." *In re Alexander*, No. 11-74515-SCS, 2014 WL 3511499, at *9 (Bankr. E.D. Va. July 16, 2014)  (emphasis in original;

*(FOOTNOTE CONTINUED)*

- Count II of the Complaint is a variant of Count I, asserting not an interest in the Owlwood Property but rather in the proceeds of any sale of the Owlwood Property, with the Dissident Plaintiffs having a security interest in Fund 3A's note secured by a deed of trust on the Owlwood Property.  A basic conceptual and threshold problem is that this Count relies on the incorrect notion that the note and deed of trust held by Fund 3A on the Owlwood Property is valid.  They are not valid, and the Plan, if approved, will definitively so declare, as discussed below.  But even if the note and deeds of trust held by Fund 3A were valid, the Dissident Plaintiffs would, at most, have an unperfected— and hence invalid in bankruptcy—security interest in those instruments because the Dissident Plaintiffs did not perfect their security interests as required under Delaware law by either possession or filing a financing statement.  Del. Code Ann. tit. 6, § 9-312(a) & 9-313(a).  Delaware law applies because Fund 3A is a Delaware LLC.  Del. Code Ann. tit. 6, §§ 9-301(1), 9-307(e) & 9-102(a)(71); *see also* Cal. Comm. Code §§ 9301(1), 9307(e) & 9102(a)(71) (same).  Additionally, agreements between the Dissident Plaintiffs and Fund 3A clearly specify that Delaware law applies.  The Dissident Plaintiffs argue that a very idiosyncratic provision of California law, Cal. Business & Professions Code § 10233.2, provides an exception to the perfection requirements of the Delaware UCC, but that section is inapplicable for multiple reasons.  First, that section only provides an exception to California law not Delaware law, and only Delaware governs.  That section of the California statute is also inapplicable on its own terms because the special conditions required under Business & Professions Code section 10233.2 are not present.  As the Dissident Plaintiffs have, at most, an unperfected security interest in the Fund 3A note and deed of trust, their interest is junior to the deemed perfected lien creditor rights held by Fund 3A pursuant to Bankruptcy Code section 544(a)(1) & (2).  *See also* note 24, *supra*.

- Count III of the Complaint abandons formality entirely and seeks to assert a constructive trust or equitable lien in the Owlwood Property or in its proceeds or in Fund 3A's secured note.  This Count is invalid under both state law and bankruptcy law.  It fails under state law because under both California and Delaware law (and American law generally), the party asserting such a claim "bears the burden of tracing the alleged trust property specifically and directly back to the act that created the trust."  *True Traditions, LC v. Wu*, 552 B.R. 826, 840 (N.D. Cal. 2015); *see also, e.g.*, *Pell v. E.I. DuPont de Nemours & Co. Inc.*, 539 F.3d 292, 309 (3d Cir. 2008) (same tracing requirement for both constructive trust and equitable lien under ERISA in case filed in Delaware); *Rollins v. Neilson (In re Cedar Funding, Inc.)*, 408 B.R. 299, 313 (Bankr. N.D. Cal. 2009) (same tracing requirement—equitable lien, California law); *B.A.S.S. Grp., LLC v. Coastal Supply Co.*, 2009 WL 1743730, at *7 (Del. Ch. June 19, 2009) (same tracing requirement—constructive trust, Delaware law); *Pike v. Commodore Motel Corp.*, 1986 WL 13007, at *5 (Del. Ch. Nov. 14, 1986) (same); *Fowler v. Fowler*, 39 Cal. Rptr. 101,

---

citation and internal quotation marks omitted), *aff'd*, 524 B.R. 82 (E.D. Va. 2014); *In re Don Williams Constr. Co.*, 143 B.R. 865, 868-69 (Bankr. E.D. Tenn. 1992).  To the extent that anyone asserts that perfection must be challenged by way of an adversary proceeding, the case law is clear that non-perfection may be raised in a contested matter.  *See, e.g.*, *S. Bank & Tr. Co. v. Alexander (In re Alexander)*, 524 B.R. 82, 93 (E.D. Va. 2014); *In re Loewen Grp. Int'l, Inc.*, 292 B.R. 522, 528 (Bankr. D. Del. 2003); *In re Ballard*, 100 B.R. 526, 527 (Bankr. D. Nev. 1989).

01:23482975.4

171456.4

105 (Ct. App. 1964) (same tracing requirement—California law, constructive trust); *Holder v. Williams*, 334 P.2d 291, 292 (Cal. Ct. App. 1959) (same tracing requirement—equitable lien, California law); *Walsh v. Majors*, 49 P.2d 598, 606 (Cal. 1935) (same tracing requirement—constructive trust and equitable lien, California law); Restatement of the Law 3d, Restitution and Unjust Enrichment, § 55 cmt. g (3rd 2011) (same tracing requirement constructive trust); id. § 58 cmt. e (same tracing requirement for both constructive trust and equitable lien). Notably, although granted leave to amend—following review of the June 18 motion to dismiss which clearly set forth the tracing requirement—the Dissident Plaintiffs have never alleged that tracing is possible. There is good reason for this: tracing is not possible. But even if the Dissident Plaintiffs could sustain either a constructive trust or an equitable lien under state law, the remedy would fail as a matter of bankruptcy law because "under the unique rules of bankruptcy, a debtor's estate is deemed to include fraudulently obtained property, so long as the property was not impressed with a constructive trust prior to the commencement of the bankruptcy proceeding." *Singh v. Att'y Gen. of the United States*, 677 F.3d 503, 516 n.16 (3d Cir. 2012). The reason for this holding is significant: "The inclusion of fraudulently obtained property in the debtor's estate is not for the debtor's benefit. . . . It is designed, instead, to ensure equal treatment of creditors, each of whom has suffered disappointed expectations at the hands of the debtor." *Id.* Additionally, as a bona fide purchaser of the Owlwood Property or a perfected lien creditor of the note and deed of trust held by Fund 3A, *see* note 24 *supra*, Sturmer Pippin Investments, LLC (as to the real property) and Fund 3A (as to the note and deed of trust) would take the real or personal property (including any sale proceeds arising therefrom) free and clear of any unrecorded constructive trust or equitable lien interest. *In re Tleel*, 876 F.2d 769, 771-72 (9th Cir. 1989) (California real property); *Mullins v. Burtch (In re Paul J. Paradise & Assocs.)*, 249 B.R. 360, 372 (D. Del. 2000) (Delaware real property); *Wallace v. Bonner (In re Bonner)*, 2014 WL 890477, at *6 (B.A.P. 9th Cir. Mar. 6, 2014) (California personal property); *In re Charlton*, 389 B.R. 97, 104 (Bankr. N.D. Cal. 2008) (same); *see also* Del. Code Ann. tit. 6, § 9-317(a)(2) (unperfected security interest is subordinate to the rights of a judicial lien creditor).

- Count IV asserts claims under California's Elder Abuse Law. The claim is meritless, but even if valid, it would not result in an interest in real or personal property of any Debtor, merely in an unsecured subordinated claim. First, the Elder Abuse claim was asserted in an untimely and procedurally improper manner as "the only appropriate way to assert a claim against a debtor's estate is through the timely filing of a properly executed proof of claim and not through an adversary proceeding." *In re Ephedra Prods. Liab. Litig.*, 329 B.R. 1 (S.D.N.Y. 2005); *accord Dade County Sch. Dist. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 53 B.R. 346, 352-53 (Bankr. S.D.N.Y. 1985); 10 Collier on Bankruptcy ¶ 7001.02 (Richard Levin & Henry J. Sommer, eds., 16th ed. 2018) ("an adversary proceeding may not be used as a substitute for a proof of claim"). Second, were it asserted as a proof of claim, it would be time-barred as being asserted after the Bankruptcy Court-imposed bar date. Neither may it be asserted as an amendment to an existing proof of claim because a "claimant may not, however, through the guise of an amendment, circumvent the bar date by asserting a new claim." *In re Asia Glob. Crossing, Ltd.*, 324 B.R. 503, 507 (Bankr. S.D.N.Y. 2005) (collecting authorities). Finally, to the extent such a claim would otherwise be allowed, it would be subject to

automatic subordination under Bankruptcy Code section 510(b) as it would be for "damages arising from the purchase or sale of . . . a security." In sum, the Elder Abuse claims are not tenable and should not be allowed, and thus have no implications on plan confirmation.

Based on the foregoing points, the Debtors believe that the Bankruptcy Court should dismiss the Complaint in its entirety, regardless whether the counts therein assert a direct security interest in real property or an indirect interest in real property via Intercompany Claims (notes) and Intercompany Liens (deeds of trust) between the Fund Debtors, on the one hand, and PropCos and MezzCos, on the other hand.

In addition to the defects in the Complaint, any theory of the Dissident Plaintiffs that relies on obtaining or asserting a security interest on the Intercompany Claims and Intercompany Liens between the Fund Debtors, on the one hand, and PropCos and MezzCos, on the other hand, will be rendered moot by the extinguishment of those Intercompany Claims and Intercompany Liens as part of the Plan. Assuming the Plan is confirmed by the Bankruptcy Court, it is simply irrelevant whether any Noteholder has a perfected, enforceable security interest on the intercompany rights (because a security interest on a non-existent item is the same as a non-existent security interest on the same non-existent item).

If the Bankruptcy Court determines that the Dissident Plaintiffs have legitimate, enforceable property rights directly in specific real property, the Plan may need to be modified, revised or withdrawn. The Debtors anticipate that this issue will be resolved at or before the Confirmation Hearing and that the Bankruptcy Court will determine that the Dissident Plaintiffs have no such property rights. Please see Section VI.G. below for a discussion of alternatives to confirmation and consummation of the Plan. The Dissident Noteholders recommend a vote against confirmation.

### 3.     Comerica Declaratory Relief Adversary

On April 4, 2018, Comerica Bank ("Comerica") filed an adversary proceeding in the Bankruptcy Court, Adv. Proc. No. 18-50382-KJC (the "Comerica Adversary") against five parties who are currently plaintiffs in pending class action lawsuits (the "Class Action Plaintiffs") against Comerica related to the Debtors' Ponzi scheme. Comerica seeks, among other things, a declaratory judgment that the claims brought by the Class Action Plaintiffs are derivative claims that belong to the Debtors. Comerica filed a motion for a preliminary injunction to enjoin the class actions from moving forward. *See* Adv. Docket No. 3. After a hearing on May 15, 2018, the Bankruptcy Court entered an order that, among other things, enjoined and stayed the continued prosecution of the class actions. *See* Adv. Docket No. 21.

### 4.     Committee Lien Avoidance Adversary

On April 9, 2018, the Unsecured Creditors' Committee Filed the *Motion of Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. §§ 105(a), 1103(c), and 1109(b) for Entry of an Order Granting Leave, Standing, and Authority to Prosecute Certain Causes of Action on Behalf of Certain Debtors and Their Estates* [Docket No. 920] (the "Committee Standing Motion"), pursuant to which it sought entry of an order granting the Unsecured

Creditors' Committee leave and standing to initiate an adversary proceeding (the "Lien Avoidance Adversary") seeking to avoid the liens and security interests purportedly granted to the Fund Debtors by the MezzCo and PropCo Debtors. The potential bases for avoidance of such liens and security interests are described in more detail in Section IV.B.1 below. The Unsecured Creditors' Committee asserted that it was the proper party to bring such causes of action because they involve intercompany liens and obligations among the Debtors, and thus the Unsecured Creditors' Committee's pursuit of such causes of action would avoid any actual or potential conflict of interest.  On April 24, 2018, the Dissident Plaintiffs filed an opposition to the Committee Standing Motion. *See* Docket No. 1625.

### 5.    Comerica WFS Adversary

On April 26, 2018, Comerica filed an adversary proceeding in the Bankruptcy Court, Adv. Proc. No. 18-50414-KJC (the "WFS Adversary") against WFS Holding, seeking declaratory and injunctive relief relating to a California Superior Court action filed by WFS Holding against Comerica styled *WFS Holding Co., LLC v., Comerica Bank, et al.*, Civ. Case No. BC699929, filed on March 28, 2018 (the "WFS Superior Court Action").  Both the WFS Adversary and the WFS Superior Court Action stem from a bank account opened by WFS Holding at Comerica on November 20, 2017, in which account both WFS Holding and the Debtors have claimed an interest.  Accordingly, by the WFS Adversary, Comerica has sought declaratory relief to determine the parties' respective rights and responsibilities relative to the disputed account, injunctive relief to enjoin the WFS Superior Court Action, and interpleader to determine the rightful owner of the funds in the disputed account.  On May 23, 2018, based on a dismissal by WFS Holding of the WFS Superior Court Action, Comerica dismissed the WFS Adversary. *See* Adv. Docket No. 9.

### S.    Plan Term Sheet

Following the appointment of the New Board, the preferred path of the New Board, the Debtors, and their professionals was to build consensus with key constituencies and reach an agreement that would provide for a prompt and orderly path out of bankruptcy for the Debtors and would conserve the Estates' resources for the benefit of all Creditors.

To that end, KTBS hosted several all-day negotiating sessions at its offices in Los Angeles. First, on March 8, 2018, KTBS hosted a full-day meeting attended by counsel for the Debtors, the Unsecured Creditors' Committee, the Noteholder Committee, the Unitholder Committee, and the SEC. Then, during the week of March 19, 2018, KTBS hosted three all-day meetings attended by the parties and their professionals. At these meetings, the parties engaged in extensive debate and discussion regarding, among other things, key legal issues in the Chapter 11 Cases, including, among other things, (i) whether the Notes are secured by valid, perfected security interests, (ii) the relative rights and treatment of holders of Notes and Units, and (iii) whether substantive consolidation of the Estates is warranted under the circumstances. Certain of the parties also circulated detailed "position papers" regarding such topics.

The negotiations were ultimately fruitful, as they culminated with the signing of a *Summary Plan Term Sheet*, dated as of March 22, 2018 [Docket No. 828] (the "Plan Term Sheet"). The Plan Term Sheet memorialized a broad agreement in principle by and among the

Debtors, the Unsecured Creditors' Committee, the Noteholder Committee, and the Unitholder Committee regarding the fundamental terms of a chapter 11 plan, while providing a basis for further discussion regarding the specific details of the plan and related transaction, which details remained subject to further review, comment, and final approval by the parties.

Following execution of the Plan Term Sheet, the parties continued to extensively negotiate the open details of the potential plan. After many weeks of further discussion and negotiations with the Committees, the Debtors finalized and filed the Plan, which substantially incorporates and expands upon the Plan Term Sheet.

### T.    Noteholder Liquidity Facility

On July 12, 2018, the Unsecured Creditors' Committee and the Noteholder Committee filed that certain *Joint Motion of the Official Committee of Unsecured Creditors and the Ad Hoc Noteholder Group Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Entry of an Order Approving (A) Procedures Relating to Proposed Noteholder Liquidity Facility and (B) Related Exclusivity Provisions* [Docket No. 2162] (the "Liquidity Facility Motion"), by which the movants sought entry of an order approving, among other things, procedures relating to a proposed up to $215 million noteholder liquidity facility (the "Noteholder Liquidity Facility") that would be made available to Noteholders from AXAR Capital (the "Liquidity Lender") for the purpose of providing loans equal to 30% of each Noteholder's allowed net claim against the Debtors, pursuant to the terms, conditions, and exclusions in the term sheet for such Noteholder Liquidity Facility (which term sheet is attached to the Liquidity Facility Motion) and the definitive loan documents sent to Noteholders.  The Bankruptcy Court approved the Liquidity Facility Motion on August 8, 2018.  Docket No. 2307.

Participation by any Noteholder in the Noteholder Liquidity Facility is purely optional. The Debtors have not endorsed the Noteholder Liquidity Facility, and have not made any recommendations either for or against any Noteholder's participation in the Noteholder Liquidity Facility.  **The Noteholder Liquidity Facility is entirely separate from the Debtors' Plan process.** Any Noteholder's decision to participate in, or not participate in, the Noteholder Liquidity Facility will have no effect on such Noteholder's treatment under the Plan, except that for any Noteholder who borrows under the Noteholder Liquidity Facility, any distributions from the Debtors to such borrowing Noteholder will instead be paid directly to the Liquidity Lender pursuant to joint pay instructions until all outstanding amounts due from such borrowing Noteholder to the Liquidity Lender are paid in full.

## IV.    SUMMARY OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Equity Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein,

and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Equity Interests in the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding on all Holders of Claims against and Equity Interests in the Debtors, the Debtors' Estates, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict, inconsistency, or discrepancy between this Disclosure Statement and the Plan, the Confirmation Order, the Plan Supplement, or any other operative document, the terms of the Plan, Confirmation Order, Plan Supplement, or such other operative document, as applicable, shall govern and control; *provided* that, in any event, the terms of (1) the Confirmation Order and then (2) the Plan, inclusive of any Plan Supplement, in that order, shall govern and control over all other related documents.

## A.       Purpose and Effect of the Plan

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its constituents. Chapter 11 also specifically allows a debtor to formulate and consummate a plan of liquidation. *See* 11 U.S.C. § 1129(a)(11). A plan of liquidation sets forth the means for satisfying claims against and equity interests in a debtor. Confirmation of a plan of liquidation by a bankruptcy court makes that plan binding on the debtor and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

The Plan provides for the distribution of the proceeds of the liquidation of all Estate Assets to various Creditors as contemplated under the Plan and for the wind-up the Debtors' corporate affairs. More specifically, the Plan provides for the creation and funding of a Liquidation Trust and a Wind-Down Entity (which will be wholly owned by the Liquidation Trust) to administer and liquidate all remaining property of the Debtors, including (i) any real properties owned by the Debtors immediately prior to the Effective Date and (ii) the Liquidation Trust Actions.

Under the Plan, Claims against, and Equity Interests in, the Debtors are divided into Classes according to their relative seniority and other criteria. If the Plan is confirmed by the Bankruptcy Court and consummated, the Claims and Equity Interests of the various Classes will be treated in accordance with the provisions in the Plan for each such Class and the Liquidation Trust or Wind-Down Entity, as applicable, will make Distributions as provided in the Plan. A general description of the Classes of Claims and Equity Interests created under the Plan, the treatment of those Classes under the Plan, and the property to be distributed under the Plan are described below.

## B.       Comprehensive Compromise and Settlement Under the Plan

Pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement

01:23482975.4

of all claims and controversies relating to the rights that a Holder of a Claim or an Equity Interest may have against any Debtor with respect to any Claim, Equity Interest, or any Distribution on account thereof, as well as of all potential Intercompany Claims, Liens, and Causes of Action against any Debtor. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (i) in the best interest of the Debtors, the Estates, and their respective property and stakeholders; and (ii) fair, equitable, and reasonable.

The Debtors believe that the comprehensive compromise and settlement to be effected by the Plan is appropriate for several reasons and intend to request that the Bankruptcy Court approve that comprehensive compromise and settlement contemporaneously with the Confirmation Hearing. In particular, this comprehensive compromise and settlement is a critical component of the Plan and is designed to provide a resolution of myriad disputed intercompany and intercreditor Claims, Liens, and Causes of Action that otherwise could take years of protracted litigation to resolve, which would delay and undoubtedly reduce the Distributions that ultimately would be available for all Creditors.

Among those many disputed issues that will be resolved through the Plan are the following complex matters, any one of which could be the subject of years of expensive, complicated, and uncertain litigation.

### 1.    Nature of the Claims Asserted by the Noteholders

A significant dispute exists regarding whether the Noteholders hold, directly or indirectly, any valid and enforceable lien or other security interest on any Estate Assets, not subject to avoidance. This dispute involves complex legal issues; however, in brief, the issue involves the assertion by certain Noteholders that they hold valid and enforceable security interests, not subject to avoidance, in either or both of (i) the particular parcel of real property identified on their loan documentation provided to them by the Debtors, or (ii) the allegedly secured promissory notes from the applicable MezzCo or PropCo to the applicable FundCo. The Debtors believe there are legal problems with this assertion, as described in more detail in this section. *First*, as a technical matter, the Debtors believe the steps legally necessary to "perfect" any such security interest in favor of a Noteholder have not been taken such that any such security interest would be avoidable.[25] And *second*, as a more fundamental matter, the unfortunate reality that Shapiro did *not* use investor funds as he promised (*i.e.*, that he commingled all funds, rather than using a particular Noteholder's money for the particular property or loan to an alleged third-party borrower that was referenced on such Noteholder's documents) creates legal hurdles for the Noteholders' claim to secured status.

In contrast to Shapiro's representations, the Debtors believe that as a legal matter, the Noteholders do not have valid, enforceable security interests in the Purported Noteholder Collateral that could withstand utilization of the "strong arm" avoidance powers, described

---

[25]    A "perfected" security interest or lien is one that is enforceable, against other creditors as well as subsequent owners of the collateral, by virtue of satisfaction of the requirements of applicable state law.

below. In particular, as noted above, the Debtors believe the steps necessary to perfect any such security interests under Article 9 of the Delaware Commercial Code were not taken on behalf of the Noteholders. Specifically, (i) the Debtors have confirmed that no Noteholder is in physical possession of any Purported Noteholder Collateral, *see* DEL. CODE ANN. tit. 6, § 9-313(a), and (ii) based on the Debtors' investigation, no UCC-1 financing statement was filed in Delaware on behalf of any Noteholder with respect to any of the Purported Noteholder Collateral, *see id.* § 9-312(a). The Debtors believe these facts would ultimately allow for a determination that any asserted security interests in the Purported Noteholder Collateral or on any other Estate Assets are subject to avoidance under Bankruptcy Code section 544(a), which provides that an estate representative may utilize "strong arm" powers to avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by certain creditors under applicable nonbankruptcy law. Among other things, these "strong arm" powers permit avoidance of asserted security interests that were not properly perfected in accordance with applicable nonbankruptcy law. Although the Debtors believe they would prevail in any such avoidance litigation, so utilizing the "strong arm" powers could necessitate commencement of a separate adversary proceeding against each Noteholder who asserts a security interest, which could be detrimental to all victims of Woodbridge's fraudulent scheme by causing the additional hardships, costs and delays attendant to litigation.

Apart from the technical question whether any Noteholder has an enforceable security interest is the more fundamental question whether any of the asserted intercompany loans and related liens and security interests purportedly granted to the Fund Debtors by the MezzCo and PropCo Debtors are enforceable in the Chapter 11 Cases. This fundamental question is raised by the Unsecured Creditors' Committee's proposed Lien Avoidance Adversary and it implicates a variety of complex sub-issues that the Bankruptcy Court (and additional courts on appeal) would need to resolve, including:

- Are the promissory notes issued to the Fund Debtors enforceable obligations as a matter of applicable state law despite the facts that, in many cases, no loan proceeds whatsoever were provided directly from the Fund Debtors to the applicable MezzCo and PropCo Debtors and the amount of the obligations were not correlated with the actual funds received? If these obligations are unenforceable against the MezzCo and PropCo Debtors under applicable law for any reason other than because such claims are contingent or unmatured, then the Intercompany Claims held by the Fund Debtors would be subject to disallowance under Bankruptcy Code section 502(b)(1). The absence of allowed claims of the Fund Debtors would in turn mean that the associated Liens asserted by the Fund Debtors would be voided by Bankruptcy Code section 506(d).

- Are either the purported obligations of the applicable MezzCo and PropCo Debtors to the Fund Debtors or the associated Liens avoidable as "constructive" fraudulent transfers under Bankruptcy Code section 548(a)(1)(B) or as constructively voidable transactions under applicable nonbankruptcy law and Bankruptcy Code section 544(b)? Generally, an obligation and security interest may be avoided in bankruptcy if the debtor received less than a reasonably equivalent value in exchange for such obligation or transfer and was in one of several forms of financial distress at the relevant time. To the extent a particular

01:23482975.4

MezzCo or PropCo Debtor did not receive reasonably equivalent value in exchange for liens and obligations that it created in favor of a Fund Debtor while it was insolvent, those liens and obligations could be avoided in the Chapter 11 Cases.

- Are either the purported obligations of the applicable MezzCo and PropCo Debtors to the Fund Debtors or the associated Liens avoidable as "actual" fraudulent transfers under Bankruptcy Code section 548(a)(1)(A) or as actually voidable transactions under applicable nonbankruptcy law and Bankruptcy Code section 544(b)? Generally, an obligation and security interest may be avoided in bankruptcy if the debtor made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted. Although courts often look to certain "badges of fraud" when determining whether a given transfer or obligation was associated with the required debtor intent, the case law also recognizes a "Ponzi scheme presumption" that imputes such intent when a transfer or obligation was part of the perpetuation of a Ponzi scheme. *See, e.g., Ritchie Capital Mgmt., LLC v. Stoebner*, 779 F.3d 857, 861-62 (8th Cir. 2015); *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 9-11 (S.D.N.Y. 2007); *In re DBSI, Inc.*, 477 B.R. 504, 510 (Bankr. D. Del. 2012). As such, to the extent that the transactions between the MezzCo and PropCo Debtors and the Fund Debtors furthered a Ponzi scheme, those transactions could potentially be avoided as actual fraudulent transfers or voidable transactions.

- Are there other forms of interests between any given MezzCo and PropCo Debtor and any given Fund Debtor? For example, even though a particular Fund Debtor may contend that it is the only Person with an interest in a particular MezzCo or PropCo, other Fund Debtors could potentially assert equitable liens or other rights and remedies against that same MezzCo or PropCo on the theory that some portion of the other Fund Debtors' funds were part of the commingled pool that facilitated purchase of the underlying real property. If such interests were recognized in favor of other Fund Debtors, then there could be further disputes about the extent to which those interests are senior to or on parity with the interests of the Fund Debtor that had a more formalized relationship with the same MezzCo or PropCo.

These are all highly complex issues that could require the devotion of substantial professional and judicial resources to resolve with finality. The key point that bears emphasis is that any vulnerability in the Intercompany Claims or Intercompany Liens asserted by the Fund Debtors against the applicable MezzCos or the PropCos ultimately moots the secondary disputes about whether the associated Noteholders have perfected security interests; if the Purported Noteholder Collateral is invalid, void, or otherwise unenforceable, then it ultimately is irrelevant whether any Noteholder has a security interest regarding such an invalid, void, or unenforceable item.

The Plan's comprehensive compromise and settlement resolves this issue by providing that any Intercompany Claims that could be asserted by one Debtor against another Debtor will

be extinguished immediately before the Effective Date with no separate recovery on account of any such Claims and any Intercompany Liens that could be asserted by one Debtor regarding any Estate Assets owned by another Debtor will be deemed released and discharged on the Effective Date. As a result of this elimination of such Intercompany Claims and Intercompany Liens, there is no further need to litigate about whether any given Noteholder has a perfected security interest or not, nor about whether any given Noteholder has any specialized interest in any particular property (a very limited exception to this statement exits for the Noteholders with Non-Debtor Loan Note Claims, which will retain the ability to litigate whether they have enforceable security interests regarding the applicable non-debtor loans, although the Debtors do not believe any of these parties will ultimately prevail in such litigation).

By resolving the intercompany rights between the Fund Debtors and the Other Debtors in a fashion that recognizes that the Fund Debtors ultimately should have some economic interest in the Other Debtors (whether through unsecured Claims for reimbursement asserted against WGC or directly through asserted Claims against the PropCos and MezzCos), the Plan avoids the substantial costs and uncertainty of litigation while providing what are anticipated to be substantial recoveries for all the economic stakeholders of the Fund Debtors (*i.e.*, the Noteholders and the Unitholders).

Solely with respect to any Secured Claim of a non-debtor as to which the associated Lien would be junior to any Intercompany Lien that could be asserted by one Debtor regarding any Estate Assets owned by another Debtor, so as to retain the relative priority and seniority of such Intercompany Claim and associated Intercompany Lien, the otherwise released Intercompany Claim and associated Intercompany Lien will be preserved for the benefit of, and may be asserted by (a) the Liquidation Trust as to any Collateral that is Cash and (b) otherwise, the Wind-Down Entity. The Debtors are presently aware of only one non-debtor Lien (asserted by the IRS against the Debtors' property at 4030 Longridge Avenue, Sherman Oaks, California) as to which this issue is likely to be relevant.

## 2.    Nature of the Claims Asserted by the Unitholders

Another significant dispute exists regarding whether the Unitholders hold "claims" or "equity securities" in the Chapter 11 Cases and the extent to which, if any, any "claims" of the Unitholders are subject to subordination under Bankruptcy Code section 510(b).

Under the Bankruptcy Code, there is a fundamental distinction between a "debt," which is the liability of a debtor on a "claim" (*i.e.*, a right to payment or right to an equitable remedy for breach of performance if such breach gives rise to a right to payment), on the one hand, and an "equity" interest or "equity security," on the other hand. *See* 11 U.S.C. §§ 101(5), (12) & (17); 1129(b)(2)(B) & (C). It is not always easy to determine whether a particular instrument creates debt or equity, and the case law has developed a complex, multi-factor test to guide the analysis. *See, e.g., Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 454-59 (3d Cir. 2006); *Walnut Creek Mining Co. v. Cascade Inv., LLC (In re Optim Energy, LLC)*, 527 B.R. 169, 174-75 (D. Del. 2015); *United States v. State St. Bank & Trust Co.*, 520 B.R. 29, 72-79 (Bankr. D. Del. 2014); *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 572-23 (Bankr. D. Del. 2012).

Here, the Unitholders would maintain that they hold "claims" against, or "debt" of, the Fund Debtors based on a combination of reasons, including (i) an interpretation of the applicable governing documents whereby Units constitute convertible debt, which for the first five years gives rise to an unsecured claim and, if not repaid in full in five years, converts into equity; (ii) Unitholders received monthly interest checks, not dividends, and received from the Debtors 1099-INT tax forms characterizing these payments as interest income for each annual period prepetition; (iii) the Units were recorded on the Debtors' books and records as a liability and treated as a liability in the Debtors' tax returns; and (iv) other relevant indicia of intent support characterization of the Units as debt rather than as equity. Moreover, the Unitholders could point to other cases involving Ponzi schemes where all investors have been treated as similarly-situated victims, albeit in contexts other than distributions under a chapter 11 plan. *See, e.g.*, *Perkins v. Haines*, 661 F.3d 623, 628-29 (11th Cir. 2011); *Donell v. Kowell*, 533 F.3d 762, 771 (9th Cir. 2007); *SEC v. Infinity Grp.*, 226 Fed. App'x 217, 219 (3d Cir. 2007); *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-89 (2d Cir. 2002); *SIPC v. Bernard L. Madoff Inv. Secs.*, 496 B.R. 744, 761 (Bankr. S.D.N.Y. 2013). Other parties in interest would strenuously dispute these contentions and maintain that the Units are in fact only equity interests in the Fund Debtors. The outcome of these disputes is highly uncertain.

Moreover, even if the Unitholders do hold "claims" against the Fund Debtors, parties in interest could assert that such claims are subject to statutory subordination under Bankruptcy Code section 510(b). Section 510(b) provides that, "[f]or the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security." 11 U.S.C. § 510(b). Thus, if Unitholders have claims for fraud or similar remedies against the Fund Debtors relating to their purchase of Units, those claims could potentially be subject to subordination. Unitholders, however, would argue that section 510(b) is inapplicable to them because their claims would be based on principles of "restitution" in a Ponzi scheme scenario, rather than claims for "rescission" or "damages." *See generally, e.g.*, *In re Tribune Co.*, 464 B.R. 126, 197 (Bankr. D. Del. 2011). The Unitholders could further contend that public policy dictates that Ponzi investments be treated as restitution claims from the beginning, bestowing creditor status on the investor at the outset and entitling the investor to recover the money illegally transferred to the Ponzi operator and nothing more, which removes all such claims from the policy purpose undergirding section 510(b). There is no case law resolving similar issues in this particular context, which again raises the prospect for significant and lengthy litigation, all with a highly uncertain result.

The Plan resolves the disputes about the nature of the Unitholders' claims by affording Unitholders 72.5% of the Class A Liquidation Trust Interests that Noteholders receive for their respective net investments (for Net Unit Claims versus Net Note Claims). Put another way, a 27.5% discount is applied to Unitholders' Net Unit Claims in calculating their receipt of Class A Liquidation Trust Interests relative to the calculation of what Noteholders get for their Net Note Claims. This reduced recovery for Unitholders effectuates a compromise of all the possible disputes that could be raised about the nature and priority of the Unitholders' rights (and certain of the Noteholders' rights) in the Chapter 11 Cases. Nevertheless, Unitholders also receive for their Net Unit Claims the Class B Liquidation Trust Interests, which are to be paid next in priority in the Liquidation Trust Interests Waterfall after Class A Liquidation Trust Interests until the full 27.5% discounted portion of Unitholders' Net Unit Claims are paid in full. Thus, the

compromise preserves the prospect for Unitholders to eventually recapture the settlement discount if sufficient funds are generated through the overall liquidation of the Debtors' Assets.

### 3.    Substantive Consolidation Issues

Substantive consolidation is a construct of federal common law, emanating from equity, which treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities, save for inter-entity liabilities, which are erased. *See, e.g.*, *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005). In the Third Circuit, bankrupt entities can be substantively consolidated either on a consensual basis under a chapter 11 plan, or on a non-consensual basis if (i) prepetition they disregarded entity separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and harms all creditors. *See id.* at 210.

In these Chapter 11 Cases, a compelling argument could be made for complete substantive consolidation of all the Debtors. Although creditors generally may not have treated all of the Debtors as one legal entity, there is very substantial scrambling and commingling of assets and liabilities among the Debtors. Without limitation, the Debtors believe it is impossible to trace the flow of funds between any given Fund Debtor and any given PropCo or MezzCo since all of the proceeds received were commingled and distributed by WGC without regard to corporate formalities, which results in what would likely be just the hopeless entanglement that warrants substantive consolidation of all the Debtors. Moreover, the Chapter 11 Cases are unique and present an issue that was not present in *Owens Corning*—the perpetration of a fraudulent scheme by a common corporate enterprise, one that in the process did not keep accurate records of the thousands of intercompany transactions that have occurred, making an unscrambling of the enterprise's accounts impossible—but that has justified substantive consolidation in other cases. *See, e.g.*, *In re Bonham*, 229 F.3d 750, 764-65 (9th Cir. 2000) (consolidating entities in Ponzi scheme case); *In re DBSI, Inc.*, Case No. 08-12687, ECF No. 5924 (Bankr. D. Del. Jan. 19, 2010) (same); *In re Bernard L. Madoff Investment Securities LLC*, No. 08-01789, ECF No. 252 (Bankr. S.D.N.Y. June 10, 2009) (same). Put differently, the particular facts and circumstances of these Chapter 11 Cases present unique arguments about whether and to what extent substantive consolidation is warranted.

The Plan resolves these issues by effectuating a two-tier substantive consolidation. *First*, all of the Other Debtors will be substantively consolidated into WGC, which was essentially the hub of operations for all of the PropCos, MezzCos, and Other Debtors that were not Fund Debtors. This consolidation is warranted because of the substantial commingling of affairs and assets of the Other Debtors, but also is anticipated to be overwhelmingly if not entirely consensual insofar as all of the Persons that have direct creditor relationships with any of the Other Debtors—which includes the Fund Debtors, but *not* the Noteholders and Unitholders that are only investors in the Fund Debtors—will consent to the consolidation of the Other Debtors. *Second*, the Fund Debtors will be substantively consolidated into Fund 1, which recognizes that formalities among and between the Fund Debtors, including regarding the funding of particular PropCos and MezzCos, were not strictly observed and that the Noteholders and Unitholders have common interests among themselves as defrauded investors. Moreover, the Fund Debtors generally have a commonality of interest in respect of their rights against the Other Debtors, and

WGC in particular, insofar as funds from the Fund Debtors generally provided funding into the Other Debtors. This proposed substantive consolidation is the result of careful analysis and key stakeholder negotiation regarding ownership, operational entanglements, and creditor expectations based on creditor' prepetition dealings with two primary debtor groups (*i.e.*, the Fund Debtors and the Other Debtors), which makes it an appropriate element of a comprehensive plan settlement. *See, e.g.*, *In re Abeinsa Holding, Inc.*, 562 B.R. 265, 279-81 (Bankr. D. Del. 2016).

### 4.   Ponzi Scheme Issues

Additional disputes and possible litigation could arise regarding whether the Debtors were operating a Ponzi scheme, when that scheme began, and the implications of such conduct.

The Debtors believe the facts demonstrate that (i) beginning no later than July 2012 through December 1, 2017, Robert H. Shapiro used his web of more than 275 limited liability companies, including the Debtors, to conduct a massive Ponzi scheme raising more than $1.22 billion from over 8,400 unsuspecting investors nationwide; (ii) the Ponzi scheme involved the payment of purported returns to existing investors from funds contributed by new investors; and (iii) the Ponzi scheme was discovered in December 2017. As an integral component of the settlements embodied in the Plan, the Debtors will seek corresponding findings in the Confirmation Order.

Following a judicial determination that the Debtors were operating a Ponzi scheme, any payments of "interest" or other consideration that was transferred from any Person to a Noteholder or a Unitholder on account of its Notes or Units, as applicable, during the period before the Petition Date, including in respect of holders of Notes that were converted to Units or vice versa, but typically ***excluding*** payments representing the return of or repayment of principal owed on a Note or a Unit, could potentially be avoided and recovered as an "actual" fraudulent transfer. *See, e.g.*, *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011); *Donell v. Kowell*, 533 F.3d 762, 770-72 (9th Cir. 2008); *AFI Holding, Inc. v. Mackenzie*, 525 F.3d 700, 708-09 (9th Cir. 2008); *Geltzer v. Barish (In re Geltzer)*, 502 B.R. 760, 770 (Bankr. S.D.N.Y. 2013); *Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 871-72 (Bankr. N.D. Ill. 2000). Because avoidance litigation would be a further hardship on the victims of Woodbridge's fraudulent scheme, and to eliminate the significant litigation expense and inefficiency associated with seeking recovery from Noteholders and Unitholders of prepetition distributions on account of interest or the like (that would ultimately only reduce the aggregate amount available for distribution on account of allowable claims), the Plan incorporates a netting mechanism that will account for any Prepetition Distribution received by a Noteholder or Unitholder when calculating the Net Note Claim and Net Unit Claim amounts that will in turn drive the specific Distributions that such Noteholder or Unitholder will receive under the Plan. The Schedule of Principal Amounts and Prepetition Distributions, attached hereto as **Schedule 3**, sets forth the specific amounts that the Debtors intend to use for these purposes, subject to the possibility that a given Noteholder or Unitholder may choose to dispute those amounts and thereby become a Disputing Claimant under the Plan.

### 5.    Plan Releases

The Plan proposes to provide general releases from the Debtors, the Estates, and other Releasing Parties[26] in favor of the Released Parties (which include the Debtors, the New Board, the Committees, and certain specified Related Parties). The Debtors are unaware of any viable Causes of Action against the Released Parties. Moreover, the Debtors believe that the Released Parties have provided many valuable contributions to the progress of the Chapter 11 Cases, including stewarding the Debtors through the bankruptcy process, negotiating and implementing settlements with various parties, pursuing Confirmation of the Plan, and otherwise preserving Estate Assets for the benefit of all stakeholders. In light of these different contributions, the Debtors believe the releases and exculpations as part of the overall compromise and settlement embodied by the Plan are fair, equitable, reasonable, and well within the boundaries permitted by law. For the avoidance of doubt, the Excluded Parties—a non-exclusive list of which is included as **Schedule 1**—are *not* receiving releases under the Plan.

\*        \*        \*

In sum, the Plan is a vehicle for the near-term resolution of the myriad complex legal issues and disputes that have arisen in the Chapter 11 Cases. The proposed Plan resolves several major issues that would otherwise have to be judicially determined through lengthy, expensive, and inherently uncertain litigation. There are colorable arguments on both sides of each of the foregoing issues, and the outcome of any litigation regarding such issues is necessarily uncertain. Moreover, if such issues were litigated, it could be years before Holders of Notes, Units, and General Unsecured Claims received distributions, if any, from the Estates. In contrast, the Plan provides a mechanism for significant Distributions to be made to these Creditors in a timely and orderly fashion.

Furthermore, the Debtors are strongly of the view that all elements of the comprehensive compromise and settlement to be effected under the Plan are superior to the disorderly and uncertain alternatives. The terms of the global resolution under the Plan were heavily negotiated by the Debtors and the three Committees, each of which acted at arm's length and had the benefit of sophisticated external advisers.

Under these circumstances, the Debtors believe that the Plan's holistic treatment of the Note Claims, General Unsecured Claims, and Unit Claims, its substantive consolidation of the Debtors into a Remaining Debtor, and the various releases provided under the Plan represent a fair and reasonable result that satisfies the standards for approval under Bankruptcy Rule 9019, which approval the Debtors intend to seek contemporaneously with Plan confirmation. After all, "[t]he federal courts have a well-established policy of encouraging settlement to promote judicial economy and limit the waste of judicial resources." *Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc*., 523 F. Supp. 2d 376, 384 (S.D.N.Y. 2007); *see also,*

---

[26]    The Releasing Parties other than the Debtors and their Estates include "any Person exercising or seeking to exercise any rights of the Estates (but solely in that capacity), including each of the Committees (but not their individual members), the Wind-Down CEO, the Liquidation Trustee, the Remaining Debtors Manager, and any other successor to the Debtors or any other estate representative that is or could be appointed or selected pursuant to Bankruptcy Code section 1123(b)(3) or otherwise."

*e.g.*, *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 27-28 (1994) (discussing the general utility of settlement vis-à-vis judicial economy). The force of this established federal policy is particularly acute in the bankruptcy context, where compromises and settlements are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). Indeed, in order to "minimize litigation and expedite the administration of the bankruptcy estate 'compromises are favored in bankruptcy.'" *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. rev. 1993)); *see also In re Penn. Cent. Transp. Co.*, 596 F.2d 1102 (3d Cir. 1979); *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *In re Culmtech, Ltd.*, 118 B.R. 237, 238 (Bankr. M.D. Pa. 1990). This is particularly true when a settlement helps to timely resolve a bankruptcy case, which is a matter of significant public importance.[27]

The decision to approve a proposed settlement is committed to the discretion of the bankruptcy court, "which must determine if the compromise is fair, reasonable, and in the interest of the estate." *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997). In exercising that discretion, the Third Circuit has stated that courts should consider "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin*, 91 F.3d at 393; *see also Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006); *In re Marvel Entm't Grp., Inc.*, 222 B.R. 243 (D. Del. 1998). The proponent of a settlement is **not** required to demonstrate "that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is 'within the reasonable range of litigation possibilities.'" *In re World Health*, 344 B.R. at 296 (internal citations and quotation marks omitted); *see also, e.g., Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) (Sotomayor, J.) ("[I]n assessing the fairness of the settlement, a judge does not have to be convinced that the settlement is the best possible compromise or that the parties have maximized their recovery"); *In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004) ("[T]he court does not have to be convinced that the settlement is the best possible compromise.").

Here, the Debtors are firmly of the view that consideration of the *Martin* factors demonstrates that the terms of the comprehensive compromise and settlement to be effected by the Plan are fair and reasonable, and that its approval is in the best interests of the Estates and all stakeholders. The Debtors will provide further evidence and argument supporting approval of

---

[27]   *See, e.g., Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1694 (2015) ("[E]xpedition is always an important consideration in bankruptcy."); *Katchen v. Landy*, 382 U.S. 323, 328-29 (1966) (describing longstanding recognition "that a chief purpose of the bankruptcy laws is 'to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period'" (quoting *Ex parte Christy*, 44 U.S. (3 How.) 292, 312 (1845))); *Wiswall v. Campbell*, 93 U.S. (3 Otto) 347, 350-51 (1876) (emphasizing how "[p]rompt action is everywhere required by law," and that this principle requires quick resolutions of claims against a bankruptcy estate, as "[w]ithout it there can be no dividend"); *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 346-47 (1875) (discussing how "[i]t is obviously one of the purposes of the Bankrupt law, that there should be a speedy disposition of the bankrupt's assets," which is a goal "only second in importance to securing equality of distribution"); *Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94, 98 (3d Cir. 1988) (highlighting how "issues central to the progress of the bankruptcy petition, those likely to affect the distribution of the debtor's assets, or the relationship among the creditors, should be resolved quickly" (citation and quotation marks omitted)).

this comprehensive compromise and settlement, including the elements detailed above, at the Confirmation Hearing.

### C.    Substantive Consolidation and Its Relationship to the Plan Treatment of Claims

Although the Plan contemplates a two-tier substantive consolidation of all the Debtors into Remaining Debtors, the ultimate Distributions that will be made pursuant to the Plan will be paid by the Liquidation Trust. The Wind-Down Entity has been structured to generally be a successor to the Other Debtors by acting as the estate representative and administrator for all the Wind-Down Assets, which largely consist of the real property and Cash owned by WGC, the PropCos, and the additional Other Debtors. All residual value in the Wind-Down Entity is to be remitted to the Liquidation Trust, including through the quarterly remittance of Cash to the Liquidation Trust. In turn, the Liquidation Trust will ultimately distribute to the Holders of Liquidation Trust Interests (*i.e.*, former Noteholders, former Unitholders, and Holders of General Unsecured Claims) the remitted value from the Wind-Down Entity, along with the proceeds of the Liquidation Trust Actions and certain Cash on hand at the Liquidation Trust, net of payments to Holders of certain administrative, secured or priority claims. This structure gives effect to the substantive consolidation contemplated by the Plan but also continues to reflect the economic reality as among the Other Debtors, the Fund Debtors, and the Noteholders and Unitholders.

Consistent with the substantive consolidation contemplated by the Plan and in order to reduce administrative costs, on the Effective Date, each of the Debtors other than the Remaining Debtors will be dissolved automatically without the need for any corporate action or approval, without the need for any corporate filings, and without the need for any other or further actions to be taken on behalf of such dissolving Debtor or any other Person or any payments to be made in connection therewith, and the Chapter 11 Cases for all Debtors other than the Remaining Debtors will be deemed closed and no further fees in respect of such closed cases will thereafter accrue or be payable to any Person. Notwithstanding such substantive consolidation, however, fees payable pursuant to 28 U.S.C. § 1930 shall be due and payable by each individual Debtor through the Effective Date.

The substantive consolidation effected pursuant to the Plan shall not affect, without limitation, (i) the Debtors', the Wind-Down Entity's, or the Liquidation Trust's defenses to any Claim or Cause of Action, including the ability to assert any counterclaim; (ii) the Debtors', the Wind-Down Entity's, or the Liquidation Trust's setoff or recoupment rights; (iii) requirements for any third party to establish mutuality prior to substantive consolidation in order to assert a right of setoff against the Debtors, the Wind-Down Entity, or the Liquidation Trust; or (iv) distributions to the Debtors, the Estates, the Wind-Down Entity, or the Liquidation Trust out of any insurance policies or proceeds of such policies.

The Disclosure Statement and the Plan shall be deemed to be a motion requesting that the Bankruptcy Court approve the substantive consolidation contemplated by the Plan. Unless an objection to the proposed substantive consolidation is made in writing by any Creditor purportedly affected by such substantive consolidation on or before the deadline to object to confirmation of the Plan, or such other date as may be fixed by the Bankruptcy Court, the substantive consolidation contemplated by the Plan may be approved by the Bankruptcy Court at

the Confirmation Hearing. In the event any such objections are timely filed, a hearing with respect thereto shall be scheduled by the Bankruptcy Court, which hearing may, but need not, be the Confirmation Hearing.

If the Bankruptcy Court determines that substantive consolidation of any given Debtors in the manner requested is not appropriate, then the Debtors may request that the Bankruptcy Court otherwise confirm the Plan and approve the treatment of and Distributions to the different Classes under the Plan on an adjusted basis (including on a Debtor-by-Debtor basis), in the Debtors' reasonable discretion, after consultation with each of the Committees. Furthermore, the Debtors reserve their rights (i) to seek confirmation of the Plan without implementing substantive consolidation of any given Debtor, and, in the Debtors' reasonable discretion after consultation with each of the Committees, to request that the Bankruptcy Court approve the treatment of and Distributions to any given Class under the Plan on an adjusted, Debtor-by-Debtor basis; and (ii) after consultation with each of the Committees, to seek to substantively consolidate all Debtors into Woodbridge Group of Companies, LLC if all Impaired Classes entitled to vote on the Plan vote to accept the Plan.

### D.   The Liquidation Trust, the Wind-Down Entity, and the Liquidation Analysis

The Plan contemplates the creation of a Liquidation Trust, which will be the sole equity holder of the Wind-Down Entity. All Wind-Down Assets will vest in the Wind-Down Entity, which will be administered by the Wind-Down CEO, subject to the supervision and oversight of the Wind-Down Board and the Liquidation Trustee. The Wind-Down Board will initially consist of Richard Nevins, M. Freddie Reiss, and the Wind-Down CEO (which will be Frederick Chin or his successor). The Wind-Down CEO will proceed to liquidate the Wind-Down Assets, which consist primarily of the real property owned by the Debtors, in an orderly fashion. On a quarterly basis, the Wind-Down Entity will remit Cash to the Liquidation Trust. The Liquidation Trust will pursue, as appropriate, the Liquidation Trust Actions, consistent with the terms of the Plan and the Liquidation Trust Agreement.  In addition to receiving remittances received from the Wind-Down Entity, the Liquidation Trust also will be funded with certain other Cash for Creditors, the Liquidation Trust Seed Funding, and any Cash it may generate by prosecuting the Liquidation Trust Actions. The Liquidation Trust will make Distributions of Cash to Creditors, including an initial Distribution of Available Cash to the Liquidation Trust Beneficiaries (that is, Noteholders, Holders of General Unsecured Claims and Unitholders in respect of their Liquidation Trust Interests) pursuant to the Liquidation Trust Interest Waterfall, with such initial Distribution targeted to occur before December 31, 2018. Thereafter, the Liquidation Trust also may make, in its discretion, periodic Distributions of additional Available Cash to the Liquidation Trust Beneficiaries at any time following the Effective Date.

### 1.   Business Plan for the Wind-Down Entity

Following the Effective Date, the Wind-Down Entity will own and administer the Wind-Down Assets in accordance with the Plan and the Wind-Down Governance Agreement. The realization of proceeds from the Wind-Down Assets will be for the ultimate benefit of the Liquidation Trust (and thus the Liquidation Trust Beneficiaries) given the Liquidation Trust's 100% ownership interest in the Wind-Down Entity and the requirement that the Wind-Down Entity remit Cash on a quarterly basis to the Liquidation Trust.

Mr. Frederick Chin, who serves as the Chief Executive Officer of WGC Independent Manager LLC, manager of the Debtors, and is the proposed Wind-Down CEO, has developed a business plan regarding the Wind-Down Assets (the "Wind-Down Business Plan"), which Wind-Down Business Plan Mr. Chin anticipates continuing to effectuate after the Effective Date. A summary of the Wind-Down Business Plan is attached hereto as **Exhibit E**. It is possible that the Wind-Down Business Plan may be revised, modified, or substantially changed based on the facts and circumstances that exist after the Effective Date. Nevertheless, the Wind-Down Entity must advise the Liquidation Trust regarding any change in course of the Wind-Down Business Plan, and if there is an unresolvable dispute between the Wind-Down Entity and the Liquidation Trust regarding any change of course, no action will be taken regarding such material matter absent an order of the Bankruptcy Court.

### 2.    Liquidation Analysis and Summary Thereof

The liquidation process will be administered by the Liquidation Trust and the Wind-Down Entity. The net proceeds of this liquidation process have been estimated in the liquidation analysis attached hereto as **Exhibit B** (the "Liquidation Analysis"). As set forth in the current Liquidation Analysis:

- The Debtors estimate an ultimate range of aggregate recoveries from sales of real property and other Wind-Down Assets in the range of $521 million to $583 million, net of operating and other expenses through the end of the Liquidation Analysis projection period.

- The Debtors have not ascribed any value to recoveries that may be realized by the Liquidation Trust in respect of any Liquidation Trust Actions, but the Liquidation Trust Actions may generate significant value.

- Based on the preceding, the Debtors anticipate that the Available Cash for ultimate payment of the Allowed Class 3 Claims, Allowed Class 4 Claims, and Allowed Class 5 Claims (after paying the anticipated unpaid Allowed Administrative Claims, Wind-Down Expenses, and Liquidation Trust Expenses) will total approximately $518 million to $579 million.

It is important to emphasize that the Liquidation Analysis relies on various assumptions and is subject to material modifications from time to time. If the Liquidation Analysis is revised by the Debtors prior to the Confirmation Hearing, any such revision will be included in the Plan Supplement.

### E.    Estimated Recoveries for Holders of Note Claims, Unit Claims, and General Unsecured Claims

The Debtors, based on consultation with the Committees, estimate that (i) Holders of Allowed Note Claims and Allowed General Unsecured Claims in these Chapter 11 Cases should recover approximately 60-70% of the total amount of their Net Note Claims or General

Unsecured Claims;[28] and (ii) Holders of Allowed Unit Claims should recover approximately 40-50% of the total amount of their Net Unit Claims.

The Debtors have calculated the foregoing ranges of projected recoveries taking into account three variables: (i) the total estimated amount of Note Claims, General Unsecured Claims, and Unit Claims, in accordance with Filed Claims and the Debtors' Schedules; (ii) for Notes and Units, the Debtors' records as reflected in the Schedule of Principal Amounts and Prepetition Distributions; and (iii) the total estimated amount of value expected to be available for Distributions to Liquidation Trust Beneficiaries in accordance with the Plan and the Liquidation Analysis.

It is important to emphasize that many factors will bear on the amount of Cash available for Distributions to Liquidation Trust Beneficiaries. The Cash available for Distributions consists or will consist primarily of (i) the Cash in the Estates on the Effective Date, *less* (x) the amounts necessary to fund the Professional Fee Reserve and (y) the Liquidation Trust Seed Funding; (ii) Cash realized after the Effective Date from the sale, collection, or other disposition of the Wind-Down Assets; and (iii) Cash realized by the Liquidation Trustee from the prosecution of the Liquidation Trust Actions. However, this Cash has been or will be reduced by, among other things, (i) the Distributions to be made under the Plan with respect to Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed DIP Claims, Allowed Other Secured Claims, and Allowed Priority Claims, as well as any Non-Debtor Loan Note Claims that are ultimately Allowed as Secured Claims; (ii) certain statutory and other fees payable in connection with the Chapter 11 Cases; and (iii) the Liquidation Trust Expenses and Wind-Down Expenses. Only after these amounts have been paid or reserved will there be any Available Cash available for periodic Distributions to be made to the Liquidation Trust Beneficiaries.

Solely for illustrative purposes and using purely hypothetical numbers, the following is a demonstration of how the terms of the Plan would affect five purely hypothetical stakeholders holding Claims in Classes 3, 4, and 5. Solely for purposes of the following examples, the Debtors make the following assumptions:[29]

| | |
|---|---|
| Available Cash (for Claims in Classes 3, 4, and 5): | $550,000,000 |
| Outstanding Principal Amount of all Note Claims: | $750,000,000 |
| Total Prepetition Distributions received by Noteholders: | $50,000,000 |
| Total Net Note Claims: | $700,000,000 |
| Portion of Net Note Claims Paid with Class A Liquidation Trust Interests: | $700,000,000 |

---

[28]  This estimate assumes that Holders hold their Claims through the Effective Date and do not sell any of their Class A Liquidating Trust Interests.

[29]  The figures used in these examples are purely hypothetical and were chosen solely for simplicity and comparison sake and are not intended to be reflective of every possible scenario.

| | |
|---|---|
| Outstanding Principal Amount of all Unit Claims: | $200,000,000 |
| Total Prepetition Distributions received by Unitholders: | $ 25,000,000 |
| Total Net Unit Claims: | $175,000,000 |
| Portion of Net Unit Claim Paid: | |
| (a) with receipt of Class A Liquidation Trust Interests: | $ 126,875,000 |
| (b) with receipt of Class B Liquidation Trust Interests: | $ 48,125,000 |
| Total General Unsecured Claims | $10,000,000 |
| Portion of General Unsecured Claims Paid with Class A Liquidation Trust Interests: | $10,000,000 |
| Denominators for Distributions: | |
| (a) with respect to Class A Liquidation Trust Interests: | $836,875,000 |
| (b) with respect to Class B Liquidation Trust Interests: | $ 48,125,000 |

For purposes of this illustrative example, the hypothetical investors and their recoveries under the Plan are as follows:

| | | |
|---|---|---|
| "Noteholder A" is the Holder of a Note Claim in the Outstanding Principal Amount of $200,000. Noteholder A did not receive any Prepetition Distributions. | According to the Plan's formula for distribution of Class A Liquidation Trust Interests and the Liquidation Trust Interests Waterfall, Noteholder A would be entitled to its pro rata share of the Available Cash, calculated by multiplying Available Cash of $550,000,000 by approximately 0.024%. The 0.024% percentage is determined by dividing the $200,000 Net Note Claim of Noteholder A by the Class A Liquidation Trust Interests denominator of $836,875,000. | The resulting Distribution is $131,441, representing a recovery of 65.7% of both the Noteholder's Outstanding Principal Amount and the Noteholder's Net Note Claim. |

| "Noteholder B" is the Holder of a Note Claim in the Outstanding Principal Amount of $200,000. Noteholder B received Prepetition Distributions in the amount of $50,000. | According to the Plan's formula for distribution of Class A Liquidation Trust Interests and the Liquidation Trust Interests Waterfall, Noteholder B would be entitled to its pro rata share of the Available Cash, calculated by multiplying Available Cash of $550,000,000 by approximately 0.018%. The 0.018% percentage is determined by dividing the $150,000 Net Note Claim of Noteholder B by the Class A Liquidation Trust Interests denominator of $836,875,000. | The resulting Distribution is $98,581, representing a recovery of 49.3% of the Noteholder's Outstanding Principal Amount and 65.7% of the Noteholder's Net Note Claim. |
|---|---|---|
| "Unitholder C" is the Holder of a Unit Claim in the Outstanding Principal Amount of $200,000. Unitholder C did not receive any Prepetition Distributions. | According to the Plan's formula for distribution of Class A Liquidation Trust Interests and the Liquidation Trust Interests Waterfall, Unitholder C would be entitled to its pro rata share of the Available Cash, calculated by multiplying Available Cash of $550,000,000 by approximately 0.017%. The 0.17% amount is determined by dividing $145,000 (which is the $200,000 Net Unit Claim of Unitholder C multiplied by the 72.5% settlement discount factor that determines its Class A Liquidation Trust Interests) by the Class A Liquidation Trust Interests denominator of $836,875,000. (Nothing is to be distributed to Unitholder C with respect to the Class B Liquidation Trust Interests of Unitholder C because Available Cash of $550,000,000 was less than $836,875,000, which is the full amount (without interest) of Net Note Claims, General Unsecured Claims, and Net Unit Claims.) | The resulting Distribution is $95,295, representing a recovery of 47.6% of both the Unitholder's Outstanding Principal Amount and the Unitholder's Net Unit Claim. |

| | | |
|---|---|---|
| "Unitholder D" is the Holder of a Unit Claim in the Outstanding Principal Amount of $200,000. Unitholder D received Prepetition Distributions in the amount of $50,000. | According to the Plan's formula for distribution of Class A Liquidation Trust Interests and the Liquidation Trust Interests Waterfall, Unitholder D would be entitled to its pro rata share of the Available Cash, calculated by multiplying Available Cash of $550,000,000 by approximately 0.013%. The 0.13% amount is determined by dividing $108,750 (which is the $150,000 Net Unit Claim of Unitholder D multiplied by the 72.5% settlement discount factor that determines its Class A Liquidation Trust Interests) by the Class A Liquidation Trust Interests denominator of $836,875,000.  (Nothing is to be distributed to Unitholder D with respect to the Class B Liquidation Trust Interests of Unitholder D because Available Cash of $550,000,000 was less than $836,875,000, which is the full amount (without interest) of Net Note Claims, General Unsecured Claims, and Net Unit Claims.) | The resulting Distribution is $71,471 representing a recovery of 35.7% of the Unitholder's Outstanding Principal Amount and 47.6% of the Unitholder's Net Unit Claim. |
| "General Unsecured Creditor E" is the Holder of a General Unsecured Claim in the Allowed amount of $50,000. | According to the Plan's formula for distribution of Class A Liquidation Trust Interests and the Liquidation Trust Interests Waterfall, General Unsecured Creditor E would be entitled to its pro rata share of the Available Cash, calculated by multiplying Available Cash of $550,000,000 by approximately 0.006%.  The 0.006% percentage is determined by dividing the $50,000 General Unsecured Claim of General Unsecured Creditor E by the Class A Liquidation Trust Interests denominator of $836,875,000. | The resulting Distribution is $32,860, representing a recovery of 65.7% of the Creditors' General Unsecured Claim. |

The following chart summarizes the foregoing analysis:

| Investor | Outstanding Principal Amount | Prepetition Distributions | Net Unit Claim x 72.5% Discount Factor or Net Note Claim or General Unsecured Claim | Plan Recovery ($) | Plan Recovery (% of Outstanding Principal Amount) | Plan Recovery (% of Net Note Claim or Net Unit Claim) |
|---|---|---|---|---|---|---|
| Noteholder A | $200,000 | | $200,000 | $131,441 | 65.7% | 65.7% |
| Noteholder B | $200,000 | $50,000 | $150,000 | $98,581 | 49.3% | 65.7% |
| Unitholder C | $200,000 | | $145,000 | $95,295 | 47.6% | 47.6% |
| Unitholder D | $200,000 | $50,000 | $108,750 | $71,471 | 35.7% | 47.6% |
| General Unsecured Creditor E | $50,000 | | $50,000 | $32,860 | 65.7% | n/a |

### F. Treatment of Claims and Equity Interests

#### 1. Unclassified Claims

##### (a) Administrative Claims

Except as otherwise provided for in the Plan, and subject to the requirements of the Plan, on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) thirty (30) calendar days following the date on which an Administrative Claim becomes an Allowed Administrative Claim, the Holder of such Allowed Administrative Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim or (b) such other less favorable treatment as to which such Holder and the Liquidation Trust shall have agreed upon in writing.

##### (b) Professional Fee Claims

Professional Fee Claims shall be paid as set forth in Section 11.2 of the Plan.

##### (c) Priority Tax Claims

In full satisfaction, settlement, and release of and in exchange for such Claims, Allowed Priority Tax Claims shall be paid, at the Liquidation Trust's option, as follows: (a) Cash equal to the unpaid portion of such Allowed Priority Tax Claim on the later of the Effective Date and thirty (30) calendar days following the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim; (b) in regular installment payments in Cash over a period not exceeding five (5) years after the Petition Date, plus interest on the unpaid portion thereof at the rate determined under applicable nonbankruptcy law as of the calendar month in which the Effective Date occurs (provided that such election shall be without prejudice to the right to prepay any such Allowed Priority Tax Claim in full or in part without penalty); or (c) such other treatment as to which the Holder of an Allowed Priority Tax Claim and the Liquidation Trust shall have agreed upon in writing.

##### (d) DIP Claims

Subject to the DIP Orders, on the Effective Date, the DIP Claims shall be deemed to be Allowed in the full amount due and owing under the DIP Facility as of the Effective Date, if any. On the Effective Date, any outstanding DIP Claims shall be indefeasibly paid in full in Cash and the Debtors' rights and obligations under the DIP Facility shall be cancelled.

#### 2. Class 1: Other Secured Claims

Class 1 consists of all Other Secured Claims. Class 1 is Unimpaired under the Plan.

01:23482975.4

（空）

The legal, equitable, and contractual rights of Holders of Allowed Class 1 Claims are unaltered by the Plan, and, notwithstanding substantive consolidation of the Debtors and vesting of the Wind-Down Assets in the Wind-Down Entity, the Liens of the Holders of Allowed Class 1 Claims will continue to attach to their respective Collateral, provided that all such Claims shall remain subject to any and all defenses, counterclaims, and setoff or recoupment rights with respect thereto. Unless the Wind-Down Entity and the Holder of an Allowed Class 1 Claim agree to other treatment, on or as soon as is reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim shall receive, at the Wind-Down Entity's option: (i) Cash from the Wind-Down Entity in the Allowed amount of such Holder's Allowed Class 1 Claim; or (ii) the return by the Wind-Down Entity of the Collateral securing such Allowed Class 1 Claim, without representation or warranty by any Person (and without recourse against any Person regarding such Other Secured Claim); or (iii) (A) the cure of any default, other than a default of the kind specified in Bankruptcy Code section 365(b)(2), that Bankruptcy Code section 1124(2) requires to be cured, with respect to such Holder's Allowed Class 1 Claim, without recognition of any default rate of interest or similar penalty or charge, and upon such cure, no default shall exist; (B) the reinstatement of the maturity of such Allowed Class 1 Claim as the maturity existed before any default, without recognition of any default rate of interest or similar penalty or charge; and (C) retention of its unaltered legal, equitable, and contractual rights with respect to such Allowed Class 1 Claim, including through the retention of any associated Lien on the Collateral securing such Allowed Class 1 Claim.

The Bankruptcy Court shall retain jurisdiction and power to determine the amount necessary to satisfy any Allowed Class 1 Claim for which treatment is elected under clause (i) or clause (iii) of the immediately foregoing paragraph. With respect to any Allowed Class 1 Claim for which treatment is elected under clause (i), any Holder of such Allowed Class 1 Claim shall release (and by the Confirmation Order shall be deemed to release) all Liens against any Estate Assets. Notwithstanding anything else in the Plan, the Holders of Allowed Class 1 Claims will have no right to receive any Distribution from, or otherwise share in, any of the Liquidation Trust Assets.

### 3.    Class 2: Priority Claims

Class 2 consists of all Priority Claims. Class 2 is Unimpaired under the Plan.

On, or as soon as reasonably practicable after, the later of (i) the Effective Date and (ii) the date on which a Priority Claim becomes payable pursuant to and as specified by an order of the Bankruptcy Court, the Holder of such Allowed Priority Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Claim, either (a) Cash from the Liquidation Trust equal to the unpaid portion of such Allowed Priority Claim or (b) such other less favorable treatment from the Liquidation Trust to which such Holder and the Liquidation Trust shall have agreed upon in writing.

4.      **Class 3: Standard Note Claims**

Class 3 consists of all Standard Note Claims, as well as those Non-Debtor Loan Note Claims that are reclassified in Class 3 pursuant to Section 3.7 of the Plan. Class 3 is Impaired under the Plan.

In full satisfaction, settlement, and release of and in exchange for such Claims, the Holders of Allowed Class 3 Claims will receive on or as soon as reasonably practicable after the Effective Date, one (1) Class A Liquidation Trust Interest for each $75.00 of Net Note Claims held by the applicable Noteholder with respect to its Allowed Note Claims (any resulting fractional Class A Liquidation Trust Interests will be rounded to the nearest hundredth of such Liquidation Trust Interest with five thousandths thereof rounded up to the next hundredth). As set forth more fully in Section 5.4.10 of the Plan, subsequent Distributions of Cash on account of the Class A Liquidation Trust Interests will be made by the Liquidation Trust in accordance with the Liquidation Trust Interests Waterfall.

The treatment of the Standard Note Claims under the Plan is not intended to and will not reduce, impair, satisfy, limit, or otherwise affect any rights that any Noteholder may have against any Person that is not a Released Party (including those rights that may be included in the Contributed Claims and contributed to the Liquidation Trust by making the Ballot election described below).

Each Holder of a Standard Note Claim may agree, by electing on its Ballot, to contribute its Contributed Claims to the Liquidation Trust. By electing such option on its Ballot, the Noteholder agrees that, subject to the occurrence of the Effective Date and the formation of the Liquidation Trust, it will be deemed, without further action, (i) to have contributed its Contributed Claims to the Liquidation Trust and (ii) to have agreed to execute any documents reasonably requested to memorialize such contribution. The relative share of Liquidation Trust recoveries for any so electing Noteholder in respect of its Class 3 Claim will be enhanced by having the amount that otherwise would be its Net Note Claim increased by the Contributing Claimants Enhancement Multiplier. Noteholders also may choose to make such election because aggregating all Contributed Claims and similar Liquidation Trust Actions may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner.

5.      **Class 4: General Unsecured Claims**

Class 4 consists of all General Unsecured Claims. Class 4 is Impaired under the Plan.

In full satisfaction, settlement, and release of and in exchange for such Claims, the Holders of Allowed Class 4 Claims will receive on or as soon as reasonably practicable after the Effective Date, one (1) Class A Liquidation Trust Interest for each $75.00 of Allowed General Unsecured Claims held by the applicable Creditor (any resulting fractional Class A Liquidation Trust Interests will be rounded to the nearest hundredth of such Liquidation Trust Interest with five thousandths thereof rounded up to the next hundredth). As set forth more fully in Section 5.4.10 of the Plan, subsequent Distributions of Cash on account of the Class A Liquidation Trust Interests will be made by the Liquidation Trust in accordance with the Liquidation Trust Interests Waterfall.

### 6.    Class 5: Unit Claims

Class 5 consists of all Unit Claims. Class 5 is Impaired under the Plan.

In full satisfaction, settlement, and release of and in exchange for such Claims, the Holders of Allowed Unit Claims will receive on or as soon as reasonably practicable after the Effective Date, 0.725 Class A Liquidation Trust Interests and 0.275 Class B Liquidation Trust Interests for each $75.00 of Net Unit Claims held by the applicable Unitholder with respect to its Allowed Unit Claims (any resulting fractional Class A Liquidation Trust Interests or Class B Liquidation Trust Interests will be rounded to the nearest hundredth of such Liquidation Trust Interest with five thousandths thereof rounded up to the next hundredth). As set forth more fully in Section 5.4.10 of the Plan, subsequent Distributions of Cash on account of the Class A Liquidation Trust Interests and the Class B Liquidation Trust Interests will be made by the Liquidation Trust in accordance with the Liquidation Trust Interests Waterfall.

The treatment of the Unit Claims under the Plan is not intended to and will not reduce, impair, satisfy, limit, or otherwise affect any rights that any Unitholder may have against any Person that is not a Released Party (including those rights that may be included in the Contributed Claims and contributed to the Liquidation Trust by making the Ballot election described below).

Each Holder of a Unit Claim may agree, by electing on its Ballot, to contribute its Contributed Claims to the Liquidation Trust. By electing such option on its Ballot, the Unitholder agrees that, subject to the occurrence of the Effective Date and the formation of the Liquidation Trust, it will be deemed, without further action, (i) to have contributed its Contributed Claims to the Liquidation Trust and (ii) to have agreed to execute any documents reasonably requested to memorialize such contribution. The relative share of Liquidation Trust recoveries for any so electing Unitholder will be enhanced by having the amount that otherwise would be its Net Unit Claim increased by the Contributing Claimants Enhancement Multiplier. Unitholders also may choose to make such election because aggregating all Contributed Claims and similar Liquidation Trust Actions may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner.

### 7.    Class 6: Non-Debtor Loan Note Claims

Class 6 consists of all Non-Debtor Loan Note Claims. Class 6 is Impaired under the Plan.

The Debtors dispute that any Non-Debtor Loan Note Claim is actually secured by a perfected Lien, and no Class 6 Claim will be Allowed in any respect under the Plan. Instead, the Liquidation Trust may litigate against any Disputing Claimant holding a Non-Debtor Loan Note Claim (i) any disputes about the secured or unsecured status, amount, and priority of such Non-Debtor Loan Note Claim; (ii) any Liquidation Trust Actions that may exist against such Noteholder; and (iii) any other matters pertaining to such Noteholder's rights vis-à-vis the Debtors or the Estates. In order to settle and avoid such potential litigation, each Class 6 Ballot will provide an opportunity for the applicable Noteholder to affirmatively consent to reclassification of its Claim as a Class 3 Claim, whereupon (a) such Claim will be treated as if such Claim had always been part of Class 3 and based on the applicable amounts in the Schedule of Principal Amounts and Prepetition Distributions, to which amounts the applicable Noteholder will have agreed and be bound; and (b) the applicable Noteholder will have agreed to release (and by the Confirmation Order shall be deemed to release) all asserted Liens against any Estate Assets.

If the Bankruptcy Court determines in a Final Order that any given Holder of a Class 6 Claim holds a valid Secured Claim, then in full satisfaction, settlement, and release of and in exchange for such Claim, such Holder will receive on or as soon as is reasonably practicable after the date of such determination Cash from the Liquidation Trust in the amount of such Holder's Allowed Class 6 Claim to the extent such Allowed Claim is a Secured Claim, with post-Confirmation interest thereon at the applicable contract rate, and any Holder of such Allowed Class 6 Claim shall release (and by the Confirmation Order shall be deemed to release) all Liens against any Estate Assets.

If the Bankruptcy Court determines in a Final Order that any given Holder of a Class 6 Claim does not hold a valid Secured Claim, then in full satisfaction, settlement, and release of and in exchange for such Claim, such Claim shall automatically be reclassified as a Class 3 Claim and such Claim will be treated as if such Claim had always been part of Class 3 and based on the Outstanding Principal Amounts and Prepetition Distributions that are determined by the Bankruptcy Court regarding such Noteholder, including, if applicable, after taking into account any Liquidation Trust Actions that the Liquidation Trust may pursue against the particular Disputing Claimant (as to which all rights of the Liquidation Trust are reserved).

If the Liquidation Trust and any given Holder of a Class 6 Claim reach an agreement regarding the treatment of such Holder's Claim that eliminates the need for the Bankruptcy Court to make the determination contemplated by the preceding two paragraphs, then in full satisfaction, settlement, and release of and in exchange for such Claim, such Claim shall receive the treatment that is agreed between the Liquidation Trust and such Holder.

The treatment of the Non-Debtor Loan Note Claims under the Plan is not intended to and will not reduce, impair, satisfy, limit, or otherwise affect any rights that any Noteholder may have against any Person that is not a Released Party (including those rights that may be included in the Contributed Claims and contributed to the Liquidation Trust by making the Ballot election described below).

01:23482975.4

171456.4

Each Holder of a Non-Debtor Loan Note Claim may agree, by electing on its Ballot, to contribute its Contributed Claims to the Liquidation Trust. By electing such option on its Ballot, the Noteholder agrees that, subject to the occurrence of the Effective Date and the formation of the Liquidation Trust, it will be deemed, without further action, (i) to have contributed its Contributed Claims to the Liquidation Trust and (ii) to have agreed to execute any documents reasonably requested to memorialize such contribution. The relative share of Liquidation Trust recoveries for any so electing Noteholder, to the extent that its Claim is classified and treated as a Class 3 Claim, will be enhanced by having the amount that otherwise would be its Net Note Claim increased by the Contributing Claimants Enhancement Multiplier. Noteholders also may choose to make such election because aggregating all Contributed Claims and similar Liquidation Trust Actions may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner.

### 8.    Class 7: Subordinated Claims

Class 7 consists of all Subordinated Claims. Class 7 is Impaired under the Plan.

The Holders of Allowed Subordinated Claims will retain a residual right to receive Cash that remains in the Liquidation Trust after the final administration of all Liquidation Trust Assets and the complete satisfaction of all senior payment rights within the Liquidation Trust Interests Waterfall. The Debtors have determined not to solicit the votes of the Holders of any Class 7 Claims, and such Holders shall be deemed to have rejected the Plan and, therefore, such Holders are not entitled to vote on the Plan.

### 9.    Class 8: Equity Interests

Class 8 consists of all Equity Interests. Class 8 is Impaired under the Plan.

As of the Effective Date, all Equity Interests shall be deemed void, cancelled, and of no further force and effect. On and after the Effective Date, Holders of Equity Interests shall not be entitled to, and shall not receive or retain any property or interest in property under the Plan on account of such Equity Interests. Class 8 is deemed to have rejected the Plan and, therefore, Holders of Equity Interests are not entitled to vote on the Plan.

### 10.    Special Provisions Regarding Insured Claims

(a)    Any Allowed General Unsecured Claim with respect to an Insured Claim shall be limited to the Uninsured Portion of such Claim, provided such Claims have been timely Filed by the applicable Claims Bar Date.

(b)    If there is insurance purchased by or otherwise applicable to the Debtors, any Person with rights against or under the applicable insurance policy, including the Wind-Down Entity, the Liquidation Trust, and Holders of Insured Claims, may pursue such rights.

(c)     Nothing in Section 3.10 of the Plan shall constitute a waiver of any Causes of Action the Debtors, the Estates, the Wind-Down Entity, or the Liquidation Trust may hold against any Person, including the Debtors' insurance carriers; and nothing in Section 3.10 of the Plan is intended to, shall, or shall be deemed to preclude any Holder of an Insured Claim from seeking or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any Distribution such Holder may receive under the Plan; provided, however, that the Debtors, the Wind-Down Entity, and the Liquidation Trust do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the Estates to which they are entitled.

(d)     The Plan shall not expand the scope of, or alter in any other way, the rights and obligations of the Debtors' insurers under their policies, and the Debtors' insurers shall retain any and all defenses to coverage that such insurers may have, including the right to contest or litigate with any Person the existence, primacy, or scope of available coverage under any allegedly applicable policy. The Plan shall not operate as a waiver of any other Claims the Debtors' insurers have asserted or may assert in any proof of claim or of any objections or defenses to any such Claims.

## 11.     Comprehensive Settlement of Claims and Controversies

### (a)     Generally

Pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims and controversies relating to the rights that a Holder of a Claim or an Equity Interest may have against any Debtor with respect to any Claim, Equity Interest, or any Distribution on account thereof, as well as of all potential Intercompany Claims, Intercompany Liens, and Causes of Action against any Debtor, including the Unsecured Creditors' Committee Action. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (i) in the best interest of the Debtors, the Estates, and their respective property and stakeholders; and (ii) fair, equitable, and reasonable. This comprehensive compromise and settlement is a critical component of the Plan and is designed to provide a resolution of myriad disputed intercompany and intercreditor Claims, Liens, and Causes of Action that otherwise could take years to resolve, which would delay and undoubtedly reduce the Distributions that ultimately would be available for all Creditors.

### (b)     Implementing Settlement Elements

Pursuant to the comprehensive compromise and settlement negotiated by the Debtors and the Committees, the Plan effectuates, among other things, the following:

(a)      On the Effective Date, unless held by Excluded Parties or Disputing Claimants (in which case such Claims are Disputed Claims), all Class 3 Standard Note Claims and all Class 5 Unit Claims are deemed Allowed under the Plan as set forth in the Schedule of Principal Amounts and Prepetition Distributions;

(b)      To the extent, and only to the extent, a Claim is Allowed by subparagraph (a) above, the following Liquidation Trust Actions are waived and released as to the applicable Noteholder or Unitholder (that is not a Disputing Claimant): (i) Liquidation Trust Actions to avoid or recover a Prepetition Distribution with respect to the subject Allowed Claim and (ii) Liquidation Trust Actions to avoid or recover a Debtor's prepetition payment of consideration representing the return or repayment of the principal of any Note or any Unit (which consideration is applied as such prior to determining the Outstanding Principal Amount for the Notes or Units relevant to the applicable Allowed Claim);

(c)      In accordance with Section 5.8 of the Plan, subject to the rights of Allowed Other Secured Claims, the Fund Debtors will be substantively consolidated into Woodbridge Mortgage Investment Fund 1, LLC and the Other Debtors will be substantively consolidated into Woodbridge Group of Companies, LLC;

(d)      The Holders of Allowed Claims in Class 3 (Standard Note Claims), Class 4 (General Unsecured Claims), Class 5 (Unit Claims), and Class 6 (Non-Debtor Loan Note Claims) will receive the treatment provided for such Holders under the Plan;

(e)      The Liquidation Trust will be created to most effectively and efficiently pursue the Liquidation Trust Actions for the collective benefit of all the Liquidation Trust Beneficiaries (as well as to own the membership interests of the Wind-Down Entity, establish and hold the Distribution Reserves, and receive and distribute to Noteholders, Holders of General Unsecured Claims, and Unitholders holding Liquidation Trust Interests the net proceeds of the liquidation of Wind-Down Assets by the Wind-Down Entity remaining after payment of Wind-Down Expenses, Liquidation Trust Expenses, and certain other Claims, all in accordance with the Plan);

(f)      Findings will be sought in the Confirmation Order that (i) beginning no later than July 2012 through December 1, 2017, Robert H. Shapiro used his web of more than 275 limited liability companies, including the Debtors, to conduct a massive Ponzi scheme raising more than $1.22 billion from over 8,400 unsuspecting investors nationwide; (ii) the Ponzi scheme involved the payment of purported returns to existing investors from funds contributed by new investors; and (iii) the Ponzi scheme was discovered in December 2017; and

(g)     Any Intercompany Claims that could be asserted by one Debtor against another Debtor will be extinguished immediately before the Effective Date with no separate recovery on account of any such Claims and any Intercompany Liens that could be asserted by one Debtor regarding any Estate Assets owned by another Debtor will be deemed released and discharged on the Effective Date; provided, however, that solely with respect to any Secured Claim of a non-debtor as to which the associated Lien would be junior to any Intercompany Lien, the otherwise released Intercompany Claim and associated Intercompany Lien will be preserved for the benefit of, and may be asserted by, the Liquidation Trust as to any Collateral that is Cash and, otherwise, the Wind-Down Entity so as to retain the relative priority and seniority of such Intercompany Claim and associated Intercompany Lien.

### G.     Acceptance or Rejection of Plan

#### 1.     Impaired Class of Claims Entitled to Vote

Only the votes of Holders of Allowed Claims in Class 3, Class 4, Class 5, and Class 6 shall be solicited with respect to the Plan.

#### 2.     Acceptance by an Impaired Class

In accordance with Bankruptcy Code section 1126(c), and except as provided in Bankruptcy Code section 1126(e), the Holders of Claims in any Class entitled to vote on the Plan shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.

#### 3.     Presumed Acceptances by Unimpaired Classes

Class 1 and Class 2 are Unimpaired under the Plan. Under Bankruptcy Code section 1126(f), the Holders of Claims in such Unimpaired Classes are conclusively presumed to have accepted the Plan, and, therefore, the votes of such Holders shall not be solicited.

#### 4.     Impaired Classes Deemed to Reject Plan

The Debtors have determined not to solicit the votes of Holders of any Claims in Class 7, and such Holders shall be deemed to have rejected the Plan and, therefore, such Holders are not entitled to vote on the Plan. Holders of Equity Interests in Class 8 are not entitled to receive or retain any property or interests in property under the Plan. Under Bankruptcy Code section 1126(g), such Holders are deemed to have rejected the Plan, and, therefore, the votes of such Holders shall not be solicited.

#### 5.     Modifications of Votes

Following the Voting Deadline, no Creditors entitled to vote on the Plan will be able to change their votes cast on the Plan or any attendant elections or preferences without the written consent of the Debtors, which consent may be given or withheld in the Debtors' reasonable discretion after consultation with each of the Committees.

01:23482975.4

### 6.    Confirmation Pursuant to Bankruptcy Code Section 1129(b)

Because at least one Impaired Class is deemed to have rejected the Plan, the Debtors will and hereby request confirmation of the Plan under Bankruptcy Code section 1129(b). The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

### 7.    Elimination of Vacant Classes

Any Class of Claims or Equity Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for purposes of determining acceptance of the Plan by such Class under Bankruptcy Code section 1129(a)(8).

### 8.    Severability of Joint Plan

The Plan represents a joint plan comprised of individual plans for each of the Debtors. As further discussed in Section 11.6 of the Plan, the Debtors may alter, amend, or modify the Plan at or before the Confirmation Hearing, including to remove one or more Debtors from the Plan, in the Debtors' reasonable discretion after consultation with each of the Committees.

### H.    Implementation of the Plan

### 1.    Implementation of the Plan

The Plan will be implemented by various acts and transactions as set forth in the Plan, including, among other things, the establishment of the Wind-Down Entity and the Liquidation Trust, the appointment of the Wind-Down CEO, the Liquidation Trustee, and the Remaining Debtors Manager, and the making of Distributions by the Liquidation Trust and, as applicable, the Wind-Down Entity in accordance with the Plan.

### 2.    Streamlining of the Debtors' Corporate Affairs

### (a)    Debtors' Existing Directors, Officers, and Managers

On the Effective Date, each of the Debtors' existing directors, officers, and managers shall be terminated automatically without the need for any Corporate Action and without the need for any corporate or limited liability company filings, and shall have no ongoing rights against or obligations to the Debtors or the Estates, including under any applicable prepetition agreements (all of which will be deemed terminated). On the Effective Date, the Wind-Down CEO shall succeed to all such powers as would have been applicable to the Debtors' officers and managers in respect of all Wind-Down Assets and the Liquidation Trustee shall succeed to all such powers as would have been applicable to the Debtors' officers and managers in respect of all Liquidation Trust Assets; *provided, however*, that the Wind-Down CEO and the Liquidation Trustee may continue to consult with or employ the Debtors' former directors, officers,

employees, and managers to the extent required to comply with applicable law or contractual provisions regarding the Debtors.

**(b)    The Remaining Debtors Pending the Closing of the Cases**

Each Remaining Debtor shall continue in existence after the Effective Date as a post-Effective-Date entity for the purposes of ensuring, among other things, that Creditors will obtain the benefits of any allegedly transfer-restricted assets. Without the need for any Corporate Action and without the need for any corporate or limited liability company filings, (a) all Equity Interests of the Remaining Debtors issued and outstanding immediately before the Effective Date shall be automatically cancelled and extinguished on the Effective Date and (b) as of the Effective Date, new membership interests of each Remaining Debtor, representing all of the issued and outstanding membership interests of each such Remaining Debtor, shall be issued to the Liquidation Trust, which new membership interests so issued shall be deemed to have been offered and sold to the Liquidation Trust in reliance on the exemption from registration under the Securities Act afforded by section 4(a)(2) thereof. On and after the Effective Date, each Remaining Debtor will be a wholly-owned subsidiary of the Liquidation Trust, and the Liquidation Trust may expend with respect to such Remaining Debtor such amounts as the Liquidation Trust determines is appropriate, in its discretion. The sole manager of each Remaining Debtor shall be the Remaining Debtors Manager. The Remaining Debtors Manager's rights and powers with respect to operations, employment, compensation, indemnity, and exculpation as to each Remaining Debtor shall, to the greatest extent possible, be the same as its rights and powers as Liquidation Trustee in connection with the Liquidation Trust, and the Remaining Debtors Manager may take such steps as appropriate to maintain the good standing of the applicable Remaining Debtor. Until a Remaining Debtor is dissolved, all cash or property received by the Remaining Debtor, gross or net of any expenses of the Remaining Debtor incurred after the Effective Date, shall be transferred to the Liquidation Trust. Each Remaining Debtor (a) shall have the Liquidation Trust as its sole member and the Liquidation Trust shall be deemed to be admitted as a member of each Remaining Debtor on the Effective Date, (b) shall be treated as a disregarded entity for income tax purposes, (c) shall have a purpose consistent with the purpose of the Liquidation Trust as set forth in Section 5.4.4 of the Plan, and (d) shall be subject to the same limitations imposed on the Liquidation Trustee under the terms of the Plan and the Liquidation Trust Agreement.

**(c)    Dissolution of the Debtors**

On the Effective Date, each of the Debtors other than the Remaining Debtors will be dissolved automatically without the need for any Corporate Action, without the need for any corporate or limited liability company filings, and without the need for any other or further actions to be taken by or on behalf of such dissolving Debtor or any other Person or any payments to be made in connection therewith; provided, however, that the Liquidation Trust may in its discretion file any certificates of cancellation as may be appropriate in connection with dissolution of any Debtors other than the Remaining Debtors. On and as of the earlier of the Closing Date and the date on which the Remaining Debtors Manager Files with the Bankruptcy Court a notice of dissolution as to a Remaining Debtor, such Remaining Debtor will be dissolved automatically without the need for any Corporate Action, without the need for any corporate or limited liability company filings, and without the need for any other or further actions to be taken

by or on behalf of such dissolving Remaining Debtor or any other Person or any payments to be made in connection therewith; provided, however, that the Liquidation Trust may in its discretion file any certificates of cancellation as may be appropriate in connection with dissolution of any Remaining Debtors.

### (d)     Corporate Documents and Corporate Authority

On the Effective Date, the certificates of incorporation, bylaws, operating agreements, and articles of organization, as applicable, of all the Debtors shall be deemed amended to the extent necessary to carry out the provisions of the Plan. The entry of the Confirmation Order shall constitute authorization for the Debtors, the Wind-Down CEO, the Liquidation Trustee, and the Remaining Debtors Manager, as applicable, to take or cause to be taken all actions (including, if applicable, Corporate Actions) necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on, and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act, or action under any applicable law, order, rule, or regulation.

### 3.     The Wind-Down Entity

### (a)     Appointments

(a)     On and after the Effective Date, the initial Wind-Down CEO shall become and serve as Wind-Down CEO. The compensation terms for the Wind-Down CEO will be set forth in a separate document to be Filed as part of the Plan Supplement.

(b)     On and after the Effective Date, the initial Wind-Down Board shall become and serve as Wind-Down Board. The compensation of the non-CEO members of the Wind-Down Board will be $20,000 per month for each calendar month of service during the first year after the Effective Date and $15,000 per month for each calendar month of service commencing after the first anniversary of the Effective Date.

### (b)     Creation and Governance of the Wind-Down Entity

On the Effective Date, the Wind-Down Entity and the Liquidation Trustee shall execute the Wind-Down Governance Agreement and shall take any other steps necessary to establish the Wind-Down Entity in accordance with the Plan. The Wind-Down Entity shall be governed by the Wind-Down Governance Agreement and administered by the Wind-Down CEO and the Wind-Down Board. The powers, rights, duties, and responsibilities of the Wind-Down CEO and the Wind-Down Board shall be specified in the Wind-Down Governance Agreement. The Wind-Down Entity shall hold, administer, and distribute the Wind-Down Assets in accordance with the provisions of the Plan and the Wind-Down Governance Agreement. The Wind-Down Entity (a) shall have the Liquidation Trust as its sole member and the Liquidation Trust shall be deemed to be admitted as a member of the Wind-Down Entity on the Effective Date, (b) shall be treated as a disregarded entity for income tax purposes, (c) shall have a purpose consistent with the purpose of the Liquidation Trust as set forth in Section 5.4.4 of the Plan, and (d) shall be subject to the same limitations imposed on the Liquidation Trustee under the terms of the Plan and the Liquidation Trust Agreement.

**(c)      Vesting of Wind-Down Assets**

On the Effective Date, the Wind-Down Entity will be automatically vested with all of the Debtors' and the Estates' respective rights, title, and interest in and to all Wind-Down Assets, including any Debtor's or any Estate's associated rights, including any such rights to exercise and enforce rights and remedies of Holders of Non-Debtor Loan Note Claims regarding any loans or related interests as to which the lender was a Debtor and the underlying borrower actually is or actually was a Person that is not a Debtor as more fully set forth in Section 5.3.4(g) of the Plan. Except as specifically provided in the Plan or the Confirmation Order, the Wind-Down Assets shall automatically vest in the Wind-Down Entity free and clear of all Claims, Liens, or interests, and such vesting shall be exempt from any stamp, real estate transfer, other transfer, mortgage reporting, sales, use, or other similar tax. The Wind-Down Entity shall be the exclusive representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3)(B) regarding all Wind-Down Assets.

**(d)      Authority**

Subject to the supervision of the Wind-Down Board and the provisions of the Wind-Down Governance Agreement, the Wind-Down CEO shall have the authority and right on behalf of each of the Debtors and their respective Estates, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all applicable provisions of the Plan for the ultimate benefit of the Liquidation Trust, including to:

(a)      retain, compensate, and employ professionals and other Persons to represent the Wind-Down Entity with respect to and in connection with its rights and responsibilities;

(b)      establish, maintain, and administer accounts of the Debtors as appropriate;

(c)      maintain, develop, improve, administer, operate, conserve, supervise, collect, settle, and protect the Wind-Down Assets (subject to the limitations described in the Plan or in the Wind-Down Governance Agreement);

(d)      sell, liquidate, transfer, assign, distribute, abandon, or otherwise dispose of the Wind-Down Assets or any part thereof or any interest therein, including through the formation on or after the Effective Date of any new or additional legal entities to be owned by the Wind-Down Entity to own and hold particular Wind-Down Assets separate and apart from any other Wind-Down Assets, upon such terms as the Wind-Down CEO determines to be necessary, appropriate, or desirable (subject to the limitations described in the Plan or in the Wind-Down Governance Agreement), including the consummation of any sale transaction for any Wind-Down Assets as to which an approval order was entered by the Bankruptcy Court before the Effective Date;

(e)      invest Cash of the Debtors and the Estates, including any Cash realized from the liquidation of the Wind-Down Assets, which investments, for the avoidance of doubt, will not be required to comply with Bankruptcy Code section 345(b);

(f)      negotiate, incur, and pay the Wind-Down Expenses, including in connection with the resolution and satisfaction of any Wind-Down Claim Expenses;

(g)      exercise and enforce all rights and remedies regarding any loans or related interests as to which the lender was a Debtor and the underlying borrower actually is or actually was a Person that is not a Debtor, including any such rights or remedies that any Debtor or any Estate was entitled to exercise or enforce prior to the Effective Date on behalf of a Holder of a Non-Debtor Loan Note Claim, and including rights of collection, foreclosure, and all other rights and remedies arising under any promissory note, mortgage, deed of trust, or other document with such underlying borrower or under applicable law;

(h)      comply with the Plan, exercise the Wind-Down CEO's rights, and perform the Wind-Down CEO's obligations; and

(i)      exercise such other powers as deemed by the Wind-Down CEO to be necessary and proper to implement the provisions of the Plan.

To the extent necessary to give full effect to its administrative rights and duties under the Plan, the Wind-Down CEO shall be deemed to be vested with all rights, powers, privileges, and authorities of (i) an appropriate corporate or limited liability company officer or manager of each of the Debtors under any applicable nonbankruptcy law and (ii) a "trustee" of each of the Debtors under Bankruptcy Code sections 704 and 1106.

## (e)      Relationship With the Liquidation Trust

(a)      On the Effective Date, all of the membership interests in the Wind-Down Entity will be issued to the Liquidation Trust. The Liquidation Trust will at all times be the sole and exclusive owner of the Wind-Down Entity, and the Wind-Down Entity will not issue any equity interests to any other Person.

(b)      Commencing on the first Business Day that is no longer than thirty (30) calendar days after the quarter-end of the first full calendar quarter following the Effective Date and continuing on the first Business Day that is no longer than thirty (30) calendar days after each calendar quarter-end thereafter, the Wind-Down Entity will remit to the Liquidation Trust as of such quarter-end any Cash in excess of its budgeted reserve for ongoing operations, other anticipated Wind-Down Expenses, and its other Plan obligations (subject to more specific provisions as may be set forth in the Wind-Down Governance Agreement).

(c)      The Wind-Down Entity shall advise the Liquidation Trust regarding the status of the affairs of the Wind-Down Entity on at least a monthly basis and shall reasonably make available to the Liquidation Trust such information as is necessary for any reporting by the Liquidation Trust.

(d)      The Wind-Down Entity shall advise the Liquidation Trust regarding any material actions by the Wind-Down Board, including the sale of any property prior to entering into a contract of sale or the change in course of the business plan agreed to as part of the Plan. If there is any disagreement between the Wind-Down Entity and the Liquidation Trust as to a material matter, in the first instance the Wind-Down Entity and the Liquidation Trust shall seek to resolve their dispute regarding such material matter. In the event the Wind-Down Entity and the Liquidation Trust cannot resolve the dispute, then no action will be taken regarding such material matter absent an order of the Bankruptcy Court.

(e)     The Liquidation Trust will have all additional rights regarding the Wind-Down Entity as are set forth in the Wind-Down Governance Agreement, including that the Wind-Down Entity shall not be entitled to encumber, invest, or gift any of its assets or make asset acquisitions except as and to the extent permitted by the Wind-Down Governance Agreement.

(f)     **Removal or Resignation of the Wind-Down CEO**

The Wind-Down CEO may be removed for cause by the Wind-Down Board. The Wind-Down CEO may resign by giving not less than thirty (30) calendar days' prior notice thereof in a notice Filed in the Chapter 11 Cases.

(g)     **Successor Wind-Down CEO**

At any time that Frederick Chin is no longer the Wind-Down CEO, the Wind-Down Board will select a replacement Wind-Down CEO, subject to the approval of such replacement by the Liquidation Trust.

(h)     **Removal or Resignation of Wind-Down Board Members**

A member of the Wind-Down Board may be removed for cause by the Liquidation Trust. A member of the Wind-Down Board may resign by giving not less than thirty (30) calendar days' prior notice thereof to the other members of the Wind-Down Board.

(i)     **Successor Wind-Down Board Members**

At any time that there is a vacancy on the Wind-Down Board, the Liquidation Trust will select a replacement Wind-Down Board member.

(j)     **Termination of the Wind-Down CEO and Dissolution of the Wind-Down Entity**

Following the sale or other disposition of all the Wind-Down Assets, the Wind-Down CEO's role as Wind-Down CEO shall be terminated, the Wind-Down Entity shall be dissolved, and the Wind-Down Board shall authorize and direct that the Wind-Down CEO file a certificate of cancellation to terminate the existence of the Wind-Down Entity.

(k)     **Indemnification**

The Wind-Down Entity and the Liquidation Trust shall indemnify the Wind-Down Indemnified Parties for, and shall defend and hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost, or expense (including the reasonable fees and expenses of their respective professionals) incurred without gross negligence or willful misconduct on the part of the Wind-Down Indemnified Parties (which gross negligence or willful misconduct, if any, must be determined by a final, non-appealable order of a court of competent jurisdiction) for any action taken, suffered, or omitted to be taken by the Wind-Down Indemnified Parties in connection with the acceptance, administration, exercise, and performance of their duties under the Plan or the Wind-Down Governance Agreement, as applicable. An act or omission taken with the approval of the Bankruptcy Court, and not

inconsistent therewith, will be conclusively deemed not to constitute gross negligence or willful misconduct. In addition, the Wind-Down Entity and the Liquidation Trust shall, to the fullest extent permitted by law, indemnify, defend, and hold harmless the Wind-Down Indemnified Parties, from and against and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Wind-Down Entity or the implementation or administration of the Plan if the Wind-Down Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Wind-Down Entity. To the extent the Liquidation Trust indemnifies, defends, and holds harmless any Wind-Down Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Liquidation Trust in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as Liquidation Trust Expenses. The costs and expenses incurred in enforcing the right of indemnification in Section 5.3.11 of the Plan shall be paid by the Wind-Down Entity or Liquidation Trust, as applicable.

**(l)    Insurance**

The Wind-Down Entity shall be authorized, but not required, to obtain any insurance coverages deemed to be reasonably necessary, as a Wind-Down Expense and after taking into account any insurance that may have separately been obtained by the Liquidation Trust, for itself and its respective agents, including coverage with respect to the liabilities, duties, and obligations of the Wind-Down Board and the Wind-Down CEO, which insurance coverage may, at the sole discretion of the Wind-Down Board, be extended for a reasonable period after the termination of the Wind-Down Governance Agreement.

**(m)    Control Provision**

To the extent there is any inconsistency between the Plan as it relates to the Wind-Down Entity and the Wind-Down Governance Agreement, the Plan shall control.

**4.    Liquidation Trust**

**(a)    Appointments**

(a)    On and after the Effective Date, the initial Liquidation Trustee shall become and serve as Liquidation Trustee. The Liquidation Trustee will receive (i) base compensation at an hourly rate of $550 per hour for 2018, with 10% rate raises commencing at the beginning of calendar years 2019 and 2020; (ii) incentive compensation as determined by the Liquidation Trust Supervisory Board; and (iii) reimbursement of reasonable expenses, as may be more specifically set forth in the Liquidation Trust Agreement.

(b)    On and after the Effective Date, the initial Liquidation Trust Supervisory Board shall begin to serve without further action. As may be more specifically set forth in the Liquidation Trust Agreement, the compensation payable to each member of the Liquidation Trust Supervisory Board for each calendar month of service shall be $10,000 monthly for the first twelve months from and after the Effective Date (counting the month of the Effective Date as the first calendar month even if it is a partial calendar month), $7,500 monthly for the thirteenth through twenty-fourth calendar months after the Effective Date, $5,000 monthly for

the twenty-fifth through thirty-sixth calendar months after the Effective Date, and $2,500 monthly for each calendar month thereafter until termination of the Liquidation Trust in accordance with the Plan (prorated as appropriate if a member commences his or her service other than on the first day of a month or terminates his or her service other than on the last day of a month), plus, in all instances, reimbursement of reasonable expenses.

**(b)    Creation and Governance of the Liquidation Trust**

On the Effective Date, the Liquidation Trustee shall execute the Liquidation Trust Agreement and shall take any other steps necessary to establish the Liquidation Trust in accordance with the Plan and the beneficial interests therein. For federal income tax purposes, the transfer of the assets to the Liquidation Trust will be treated as a sale or other disposition of assets (except for the assets transferred to the Disputed Ownership Fund as provided in Section 7.10 of the Plan) to the Liquidation Trust Beneficiaries in exchange for their claims in the Chapter 11 Cases. Any income or loss from the transfer of assets to the Liquidation Trust shall flow through to the ultimate taxpaying member of each Debtor who will be responsible to pay the tax liability, if any. For federal income tax purposes, the Liquidation Trust Beneficiaries shall be treated as the grantors of the Liquidation Trust and deemed to be the owners of the assets of the Liquidation Trust. The transfer of the Liquidation Trust Assets to the Liquidation Trust shall be deemed a transfer to the Liquidation Trust Beneficiaries by the Debtors, followed by a deemed transfer by such Liquidation Trust Beneficiaries to the Liquidation Trust. The Debtors, the Liquidation Trust Beneficiaries, and the Liquidation Trust will consistently report the valuation of the assets transferred to the Liquidation Trust. Such consistent valuations and revised reporting will be used for all federal income tax purposes. Income deductions, gain, or loss from the Liquidation Trust shall be reported to the beneficiaries of the Liquidation Trust in conjunction with the filing of the Liquidation Trust's income tax returns. Each Liquidation Trust Beneficiary shall report income, deductions, gain, or loss on such Liquidation Trust Beneficiary's income tax returns. The Liquidation Trust shall be governed by the Liquidation Trust Agreement and administered by the Liquidation Trustee. The powers, rights, and responsibilities of the Liquidation Trustee shall be specified in the Liquidation Trust Agreement. After an objection to a Disputed Claim is resolved or a Contingent Claim or Unliquidated Claim has been determined in whole or in part by a Final Order or by agreement, the Liquidation Trust Interests and/or Cash held in the Disputed Ownership Fund shall be transferred as described in Section 7.11 of the Plan.

**(c)    Vesting of Liquidation Trust Assets**

On the Effective Date, the Liquidation Trust will be automatically vested with all of the Debtors' and the Estates' respective rights, title, and interest in and to all Liquidation Trust Assets. Except as specifically provided in the Plan or the Confirmation Order, the Liquidation Trust Assets shall automatically vest in the Liquidation Trust free and clear of all Claims, Liens, or interests subject only to the Liquidation Trust Interests and the Liquidation Trust Expenses, as provided for in the Liquidation Trust Agreement, and such vesting shall be exempt from any stamp, real estate transfer, other transfer, mortgage reporting, sales, use, or other similar tax. The Liquidation Trustee shall be the exclusive trustee of the Liquidation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3) regarding all Liquidation Trust

Assets. The Liquidation Trust shall hold and distribute the Liquidation Trust Assets in accordance with the provisions of the Plan and the Liquidation Trust Agreement.

### (d)    Purpose of the Liquidation Trust

The Liquidation Trust shall be established for the purpose of pursuing or liquidating the Liquidation Trust Assets and making Distributions to the Liquidation Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

### (e)    Authority

Subject to the supervision of the Liquidation Trust Supervisory Board, the Liquidation Trustee shall have the authority and right on behalf of the Debtors and the Estates and without the need for Bankruptcy Court approval (in each case, unless otherwise provided in the Plan) to carry out and implement all applicable provisions of the Plan, including to:

(a)    review, reconcile, compromise, settle, or object to Claims and resolve such objections as set forth in the Plan, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules;

(b)    calculate and make Distributions and calculate and establish reserves under and in accordance with the Plan;

(c)    retain, compensate, and employ professionals and other Persons to represent the Liquidation Trustee with respect to and in connection with its rights and responsibilities;

(d)    establish, maintain, and administer documents and accounts of the Debtors as appropriate, which shall be segregated to the extent appropriate in accordance with the Plan;

(e)    maintain, conserve, collect, settle, and protect the Liquidation Trust Assets (subject to the limitations described in the Plan);

(f)    sell, liquidate, transfer, assign, distribute, abandon, or otherwise dispose of the Liquidation Trust Assets or any part thereof or interest therein upon such terms as the Liquidation Trustee determines to be necessary, appropriate, or desirable; provided, however, that the Liquidation Trustee shall not sell, transfer, or otherwise dispose of the Liquidation Trust's membership interests in the Wind-Down Entity without further approval of the Bankruptcy Court;

(g)    negotiate, incur, and pay the Liquidation Trust Expenses;

(h)    prepare and file any and all informational returns, reports, statements, returns, and other documents or disclosures relating to the Debtors that are required under the Plan, by any governmental unit, or by applicable law;

(i)    compile and maintain the official claims register, including for purposes of making initial and subsequent Distributions under the Plan;

01:23482975.4

(j)       take such actions as are necessary or appropriate to wind-down and dissolve the Remaining Debtors;

(k)       comply with the Plan, exercise the Liquidation Trustee's rights, and perform the Liquidation Trustee's obligations; and

(l)       exercise such other powers as deemed by the Liquidation Trustee to be necessary and proper to implement the Plan.

To the extent necessary to give full effect to its administrative rights and duties under the Plan, the Liquidation Trustee shall be deemed to be vested with all rights, powers, privileges, and authorities of (i) an appropriate corporate or limited liability company officer or manager of each of the Debtors under any applicable nonbankruptcy law and (ii) a "trustee" of each of the Debtors under Bankruptcy Code sections 704 and 1106. The Liquidation Trust Supervisory Board will have all rights and powers of a corporate board appointed under Delaware law.

## (f)       Limitation of Liability

The Liquidation Trustee shall enjoy all of the rights, powers, immunities, and privileges applicable to a Bankruptcy Code chapter 7 trustee with respect to limitations of liability. The Liquidation Trustee may, in connection with the performance of its functions, in its sole and absolute discretion, consult with its attorneys, accountants, advisors, and agents, and shall not be liable for any act taken, or omitted to be taken, or suggested to be done in accordance with advice or opinions rendered by such Persons, regardless of whether such advice or opinions were in writing. Notwithstanding such authority, the Liquidation Trustee shall be under no obligation to consult with any such attorneys, accountants, advisors, or agents, and its determination not to do so shall not result in the imposition of liability on the Liquidation Trustee unless such determination is based on willful misconduct, gross negligence, or fraud. Persons dealing with the Liquidation Trustee shall look only to the Liquidation Trust Assets to satisfy any liability incurred by the Liquidation Trustee to such Person in carrying out the terms of the Plan or the Liquidation Trust Agreement, and the Liquidation Trustee shall have no personal obligation to satisfy such liability.

## (g)       Indemnification

The Wind-Down Entity and the Liquidation Trust shall indemnify the Liquidation Trust Indemnified Parties for, and shall defend and hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost, or expense (including the reasonable fees and expenses of their respective professionals) incurred without gross negligence or willful misconduct on the part of the Liquidation Trust Indemnified Parties (which gross negligence or willful misconduct, if any, must be determined by a final, non-appealable order of a court of competent jurisdiction) for any action taken, suffered, or omitted to be taken by the Liquidation Trust Indemnified Parties in connection with the acceptance, administration, exercise, and performance of their duties under the Plan or the Liquidation Trust Agreement, as applicable. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute gross negligence or willful misconduct. In addition, the Wind-Down Entity and the Liquidation Trust shall, to the fullest

extent permitted by law, indemnify, defend, and hold harmless the Liquidation Trust Indemnified Parties, from and against and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidation Trust, the Remaining Debtors, or the implementation or administration of the Plan if the Liquidation Trust Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Liquidation Trust or the Remaining Debtors. To the extent the Wind-Down Entity or the Liquidation Trust indemnifies, defends, and holds harmless any Liquidation Trust Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Liquidation Trustee or the Remaining Debtors Manager in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as Liquidation Trust Expenses. The costs and expenses incurred in enforcing the right of indemnification in Section 5.4.7 of the Plan shall be paid by the Wind-Down Entity or the Liquidation Trust, as applicable.

### (h)    Insurance

The Liquidation Trustee shall be authorized, but not required, to obtain any insurance coverages deemed to be reasonably necessary, at the Liquidation Trust's sole expense, for itself, the Remaining Debtors Manager, and their respective agents, including coverage with respect to the liabilities, duties, and obligations of the Liquidation Trustee and the Remaining Debtors Manager, which insurance coverage may, at the sole discretion of the Liquidation Trustee, be extended for a reasonable period after the termination of the Liquidation Trust.

### (i)    Tax Reporting

(a)    The Liquidation Trust shall timely file tax returns for the Liquidation Trust treating the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).

(b)    The Liquidation Trust shall be responsible for timely payment of all taxes (if any) imposed on and payable by the Liquidation Trust, the Remaining Debtors, or any Liquidation Trust Assets.

(c)    The Liquidation Trust shall distribute such tax-related notices, beneficiary statements, and information returns, as applicable, to the applicable Holders of Allowed Claims as are required by applicable law or that the Liquidation Trustee determines are otherwise necessary or desirable.

(d)    The Liquidation Trust is authorized to file a request for expedited determination under Bankruptcy Code section 505(b) for any tax returns filed with respect to the Debtors.

### (j)    Distributions to Liquidation Trust Beneficiaries

(a)    The Liquidation Trust will make an initial Distribution of Available Cash from the Initial Distribution Fund to the Liquidation Trust Beneficiaries pursuant to the Liquidation Trust Interests Waterfall, with such initial Distribution targeted to occur before December 31, 2018.

(b)     The Liquidation Trust, in the Liquidation Trustee's discretion, may make periodic Distributions of additional Cash to the Liquidation Trust Beneficiaries at any time following the Effective Date, provided that such Distributions are otherwise permitted under, and not inconsistent with, the Liquidation Trust Interests Waterfall, the other terms of the Plan, the Liquidation Trust Agreement, and applicable law.

(c)     No later than (i) the first Business Day that is at least 180 calendar days after the Effective Date and (ii) the last Business Day of each subsequent 180-calendar-day period after the Effective Date until the Closing Date, the Liquidation Trustee shall calculate the Distributions that could potentially be made to the Liquidation Trust Beneficiaries based on the amount of then-available Available Cash and, based on such calculation, promptly thereafter may make Distributions, if any, of the amount so determined.

### (k)     Cash Investments

The Liquidation Trustee may invest Cash of the Liquidation Trust, including any earnings thereon or proceeds therefrom, any Cash realized from the liquidation of the Liquidation Trust Assets, or any Cash that is remitted to the Liquidation Trust from the Wind-Down Entity, which investments, for the avoidance of doubt, will not be required to comply with Bankruptcy Code section 345(b); provided, however, that such investments must be investments that are permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable guidelines, rulings, or other controlling authorities.

### (l)     Registration and Transfer of the Liquidation Trust Interests

(a)     The record holders of the Liquidation Trust Interests shall be recorded and set forth in a registry maintained by, or at the direction of, the Liquidation Trustee expressly for such purpose. Such obligation may be satisfied by the Liquidation Trust's retention of an institutional transfer agent for the maintenance of such registry, and notwithstanding anything to the contrary contained in this paragraph, the Liquidation Trust may, in connection with any Exchange Act Registration with respect to the Class A Liquidation Trust Interests, in its discretion cause the Class A Liquidation Trust Interests to be issued in book entry form.

(b)     Upon their issuance as of the Effective Date, and thereafter until the effectiveness of an Exchange Act Registration of the Class A Liquidation Trust Interests, the Class A Liquidation Trust Interests will be subject to restrictions on transfer under the Liquidation Trust Agreement, which restrictions shall prohibit the Class A Liquidation Trust Interests from being certificated or transferable except by operation of law or by will or the laws of descent and distribution, in each case following written notice to the Liquidation Trust. Upon the effectiveness of an Exchange Act Registration of the Class A Liquidation Trust Interests, such transfer restrictions under the Liquidation Trust Agreement shall terminate and the Class A Liquidation Trust Interests may be transferable by the Holders thereof to the extent otherwise permissible under applicable law. The Liquidation Trust shall use its commercially reasonable best efforts to cause an Exchange Act Registration of the Class A Liquidation Trust Interests to become effective, and for the Class A Liquidation Trust Interests to be quoted with an OTC ticker symbol, as soon as reasonably practicable after the Effective Date, but in no event shall the

Liquidation Trust file an Exchange Act registration statement any later than may be required under section 12(g) of the Exchange Act or the rules and regulations promulgated thereunder.

(c)     Upon their issuance as of the Effective Date, and thereafter until (i) the effectiveness of an Exchange Act Registration of the Class B Liquidation Trust Interests or (ii) the good faith determination by the Liquidation Trustee, in its discretion, that termination of the transfer restrictions under the Liquidation Trust Agreement would not require the Class B Liquidation Trust Interests to be registered under section 12(g) of the Exchange Act, the Class B Liquidation Trust Interests will be subject to restrictions on transfer under the Liquidation Trust Agreement, which restrictions shall prohibit the Class B Liquidation Trust Interests from being certificated or transferable except by operation of law or by will or the laws of descent and distribution, in each case following written notice to the Liquidation Trust. Upon (i) the effectiveness of an Exchange Act Registration of the Class B Liquidation Trust Interests or (ii) the good faith determination by the Liquidation Trustee, in its discretion, that termination of the transfer restrictions under the Liquidation Trust Agreement would not require the Class B Liquidation Trust Interests to be registered under section 12(g) of the Exchange Act, such transfer restrictions under the Liquidation Trust Agreement shall terminate and the Class B Liquidation Trust Interests may be transferable by the Holders thereof to the extent otherwise permissible under applicable law; provided, however, that the Liquidation Trust shall not be under any obligation (and does not currently intend) to make any effort to cause the Class B Liquidation Trust Interests to be registered under the Exchange Act or otherwise to facilitate the trading of, or the development of any trading market for, the Class B Liquidation Trust Interests.

### (m)     Exemption

To the extent the Liquidation Trust Interests are deemed to be "securities," the issuance of such interests under the Plan are exempt, pursuant to Bankruptcy Code section 1145, from registration under the Securities Act and any applicable state and local laws requiring registration of securities.

### (n)     Contribution of Contributed Claims

On the Effective Date, all Contributed Claims will be irrevocably contributed to the Liquidation Trust and shall thereafter be Liquidation Trust Actions for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or the Disclosure Statement to any Contributed Claims against such Person as any indication that the Liquidation Trust will not pursue any and all available Contributed Claims against such Person. The objection to the Allowance of any Claims will not in any way limit the ability or the right of the Liquidation Trust to assert, commence, or prosecute any Contributed Claims. Nothing contained in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or the Disclosure Statement will be deemed to be a waiver, release, or relinquishment of any Contributed Claims that the Contributing Claimants had immediately prior to the Effective Date. The Liquidation Trust shall have, retain, reserve, and be entitled to assert all Contributed Claims fully as if the Contributed Claims had not been contributed to the Liquidation Trust in accordance with the Plan and the Liquidation Trust Agreement. For the avoidance of doubt, (a) the Contributed Claims shall not include the rights of any of the Contributing Claimants to receive the Distributions, if any, to which they are entitled

under the Plan; (b) the Contributed Claims shall not include any Causes of Action against any of the Released Parties; and (c) in the exercise of its reasonable discretion and in accordance with the Liquidation Trust Agreement, the Liquidation Trust shall not be obligated to pursue all or any given Contributed Claims.

(o)    <strong>Pursuit and Resolution of Liquidation Trust Actions</strong>

The Liquidation Trust, as a successor in interest to the Debtors, the Estates, and the Contributing Claimants, may, and will have the exclusive right, power, and interest on behalf of itself, the Debtors, the Estates, and the Contributing Claimants to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw any and all Liquidation Trust Actions without any further order of the Bankruptcy Court, except as otherwise provided in the Liquidation Trust Agreement. From and after the Effective Date, the Liquidation Trust, in accordance with Bankruptcy Code section 1123(b)(3), shall serve as a representative of the Estates with respect to any and all Liquidation Trust Actions that were Estate Assets and shall retain and possess the right to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all Liquidation Trust Actions in any court or other tribunal.

(p)    <strong>Termination of the Liquidation Trust</strong>

The Liquidation Trustee and the Liquidation Trust shall be discharged or terminated, as the case may be, at such time as: (a) the Liquidation Trustee determines that the pursuit of additional Liquidation Trust Actions is not likely to yield sufficient additional proceeds to justify further pursuit of such Liquidation Trust Actions and (b) all Distributions required to be made by the Liquidation Trust to the Holders of Allowed Claims and to the Liquidation Trust Beneficiaries under the Plan and the Liquidation Trust Agreement have been made, but in no event shall the Liquidation Trust be terminated later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six (6) months before the end of the preceding extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, unless a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Liquidation Trust Assets. Upon termination of the Liquidation Trust, any remaining Liquidation Trust Assets that exceed the amounts required to be paid under the Plan may be transferred by the Liquidation Trustee to the American Bankruptcy Institute Endowment Fund.

(q)    <strong>Control Provision</strong>

To the extent there is any inconsistency between the Plan as it relates to the Liquidation Trust and the Liquidation Trust Agreement, the Plan shall control.

5.    <strong>Preservation of Privileges and Defenses</strong>

The actions taken by the Debtors, the Wind-Down Entity, the Liquidation Trust, the Remaining Debtors, or any of their respective Related Parties in connection with the Plan shall

not be (or be deemed to be) a waiver of any privilege or defense of the Debtors, the Wind-Down Entity, the Liquidation Trust, or the Remaining Debtors, as applicable, including any attorney-client privilege or work-product doctrine. Notwithstanding any Debtors providing any privileged information related to any Liquidation Trust Actions to the Liquidation Trustee, the Liquidation Trust, the Wind-Down CEO, the Wind-Down Entity, the Remaining Debtors Manager, the Remaining Debtors, or any Person associated with any of the foregoing, such privileged information shall be without waiver in recognition of the joint, common, or successor interest in prosecuting the Liquidation Trust Actions and shall remain privileged. The Wind-Down Entity and the Liquidation Trust each shall retain the right to waive its own privileges. Only the Liquidation Trustee shall have the right to waive the attorney-client privilege, work-product doctrine, or other protections as to the Debtors, the Remaining Debtors, and the Liquidation Trust.

## 6.    Preservation of Rights of Action

### (a)    Maintenance of Avoidance Actions and Causes of Action

Except as otherwise provided in the Plan or the Confirmation Order, from and after the Effective Date, the Liquidation Trust will retain all rights to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all of the Debtors' or Estates' Causes of Action and Causes of Action that are Contributed Claims (whether existing as of the Petition Date or thereafter arising), and all Avoidance Actions, all as Liquidation Trust Actions, in each case in any court or other tribunal, including in an adversary proceeding Filed in the Chapter 11 Cases. The Liquidation Trust, as a successor in interest to the Debtors, the Estates, and the Contributing Claimants, may, and will have the exclusive right, power, and interest on behalf of itself, the Debtors, the Estates, and the Contributing Claimants to, enforce, sue on, settle, compromise, transfer, or assign (or decline to do any of the foregoing) any or all of the Liquidation Trust Actions without notice to or approval from the Bankruptcy Court. In accordance with the Plan, and pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, from and after the Effective Date, the Liquidation Trust may compromise and settle Liquidation Trust Actions.

### (b)    Preservation of All Liquidation Trust Actions Not Expressly Settled or Released

The failure to specifically identify in the Disclosure Statement or the Plan any potential or existing Avoidance Actions or Causes of Action as a Liquidation Trust Action is not intended to and shall not limit the rights of the Liquidation Trust to pursue any such Avoidance Actions or Causes of Action. Unless a Liquidation Trust Action is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors expressly reserve such Liquidation Trust Action for later resolution by the Liquidation Trust (including any Avoidance Actions or Causes of Action not specifically identified or of which the Debtors may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist). As such, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim

preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches will apply to any such Avoidance Actions or Causes of Action upon or after Confirmation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except when such Avoidance Actions or Causes of Action have been expressly released. In addition, the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor, the Liquidation Trust, or the Wind-Down Entity is a plaintiff, defendant, or an interested party is fully reserved as against any Person that is not a Released Party, including the plaintiffs or co-defendants in such lawsuits

### 7.      Cancellation of Instruments

Except to the extent necessary to give effect to the treatment of any Holder of an Allowed Class 1 Claim pursuant to Section 3.2 of the Plan and except with respect to any executory contracts and unexpired leases that are assumed and assigned to the Wind-Down Entity under the Plan or otherwise assumed and assigned pursuant to a Final Order, any agreement, bond, certificate, contract, indenture, lease, note, security, warrant, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors shall be deemed cancelled on the Effective Date, and all Liens, mortgages, pledges, grants, trusts, and other interests relating thereto shall be automatically cancelled, and all obligations of the Debtors thereunder or in any way related thereto shall be discharged.

### 8.      Substantive Consolidation

(a)      Entry of the Confirmation Order shall constitute the approval, pursuant to Bankruptcy Code sections 105(a), 541, 1123, and 1129, of the substantive consolidation of the Debtors in the manner set forth in Section 3.11.2(c) of the Plan. Notwithstanding such substantive consolidation, however, fees payable pursuant to 28 U.S.C. § 1930 shall be due and payable by each individual Debtor through the Effective Date.

(b)      The substantive consolidation effected pursuant to the Plan shall not affect, without limitation, (i) the Debtors', the Wind-Down Entity's, or the Liquidation Trust's defenses to any Claim or Cause of Action, including the ability to assert any counterclaim; (ii) the Debtors', the Wind-Down Entity's, or the Liquidation Trust's setoff or recoupment rights; (iii) requirements for any third party to establish mutuality prior to substantive consolidation in order to assert a right of setoff against the Debtors, the Wind-Down Entity, or the Liquidation Trust; or (iv) distributions to the Debtors, the Estates, the Wind-Down Entity, or the Liquidation Trust out of any insurance policies or proceeds of such policies.

(c)      The Disclosure Statement and the Plan shall be deemed to be a motion requesting that the Bankruptcy Court approve the substantive consolidation contemplated by the Plan. Unless an objection to the proposed substantive consolidation is made in writing by any Creditor purportedly affected by such substantive consolidation on or before the deadline to object to confirmation of the Plan, or such other date as may be fixed by the Bankruptcy Court, the substantive consolidation contemplated by the Plan may be approved by the Bankruptcy Court at the Confirmation Hearing. In the event any such objections are timely filed, a hearing with respect thereto shall be scheduled by the Bankruptcy Court, which hearing may, but need not, be the Confirmation Hearing.

01:23482975.4

171456.4

(d)    If the Bankruptcy Court determines that substantive consolidation of any given Debtors is not appropriate, then the Debtors may request that the Bankruptcy Court otherwise confirm the Plan and approve the treatment of and Distributions to the different Classes under the Plan on an adjusted, Debtor-by-Debtor basis. Furthermore, the Debtors reserve their rights (i) to seek confirmation of the Plan without implementing substantive consolidation of any given Debtor, and, in the Debtors' reasonable discretion after consultation with each of the Committees, to request that the Bankruptcy Court approve the treatment of and Distributions to any given Class under the Plan on an adjusted, Debtor-by-Debtor basis; and (ii) after consultation with each of the Committees, to seek to substantively consolidate all Debtors into Woodbridge Group of Companies, LLC if all Impaired Classes entitled to vote on the Plan vote to accept the Plan.

## I.    Executory Contracts and Unexpired Leases

### 1.    Assumption of Certain Executory Contracts and Unexpired Leases

#### (a)    Assumption of Agreements

On the Effective Date, the Debtors shall assume all executory contracts and unexpired leases that are listed on the Schedule of Assumed Agreements and shall assign such contracts and leases to the Wind-Down Entity.

The Debtors reserve the right to amend the Schedule of Assumed Agreements at any time prior to the Effective Date, in the Debtors' reasonable discretion after consultation with each of the Committees, (i) to delete any executory contract or unexpired lease and provide for its rejection under the Plan or otherwise, or (ii) to add any executory contract or unexpired lease and provide for its assumption and assignment under the Plan. The Debtors will provide notice of any amendment to the Schedule of Assumed Agreements to the party or parties to those agreements affected by the amendment.

Unless otherwise specified on the Schedule of Assumed Agreements, each executory contract and unexpired lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is also listed on the Schedule of Assumed Agreements.

The Confirmation Order will constitute a Bankruptcy Court order approving the assumption and assignment, on the Effective Date, of all executory contracts and unexpired leases identified on the Schedule of Assumed Agreements.

#### (b)    Cure Payments

Any amount that must be paid under Bankruptcy Code section 365(b)(1) to cure a default under and compensate the non-debtor party to an executory contract or unexpired lease to be assumed under the Plan is identified as the "Cure Payment" on the Schedule of Assumed Agreements. Unless the parties mutually agree to a different date, such payment shall be made in Cash within ten (10) Business Days following the later of: (i) the Effective Date and (ii) entry of

a Final Order resolving any disputes regarding (A) the amount of any Cure Payment, (B) the ability of the Wind-Down Entity to provide "adequate assurance of future performance" within the meaning of Bankruptcy Code section 365 with respect to a contract or lease to be assumed, to the extent required, or (C) any other matter pertaining to assumption and assignment.

Pending the Bankruptcy Court's ruling on any such dispute, the executory contract or unexpired lease at issue shall be deemed assumed by the Debtors and assigned to the Wind-Down Entity, unless otherwise agreed by the parties or ordered by the Bankruptcy Court.

### (c)    Objections to Assumption/Cure Payment Amounts

Any Person that is a party to an executory contract or unexpired lease that will be assumed and assigned under the Plan and that objects to such assumption or assignment (including the proposed Cure Payment) must File with the Bankruptcy Court and serve on parties entitled to notice a written statement and, if applicable, a supporting declaration stating the basis for its objection. This statement and, if applicable, declaration must be Filed and served on or before the deadline established by the Disclosure Statement Order. Any Person that fails to timely File and serve such a statement and, if applicable, a declaration shall be deemed to waive any and all objections to the proposed assumption and assignment (including the proposed Cure Payment) of its contract or lease.

In the absence of a timely objection by a Person that is a party to an executory contract or unexpired lease, the Confirmation Order shall constitute a conclusive determination regarding the amount of any cure and compensation due under the applicable executory contract or unexpired lease, as well as a conclusive finding that the Wind-Down Entity has demonstrated adequate assurance of future performance with respect to such executory contract or unexpired lease, to the extent required.

### (d)    Resolution of Claims Relating to Assumed Contracts and Leases

Payment of the Cure Payment established under the Plan, by the Confirmation Order, or by any other order of the Bankruptcy Court, with respect to an assumed and assigned executory contract or unexpired lease, shall be deemed to satisfy, in full, any prepetition or postpetition arrearage or other Claim (including any Claim asserted in a Filed proof of claim or listed on the Schedules) with respect to such contract or lease (irrespective of whether the Cure Payment is less than the amount set forth in such proof of claim or the Schedules). Upon the tendering of the Cure Payment, any such Filed or Scheduled Claim shall be disallowed with prejudice, without further order of the Bankruptcy Court or action by any Person.

### 2.    Rejection of Executory Contracts and Unexpired Leases

### (a)    Rejected Agreements

On the Effective Date all executory contracts and unexpired leases of the Debtors shall be rejected except for (i) executory contracts and unexpired leases that have been previously assumed or rejected by the Debtors, (ii) executory contracts and unexpired leases that are set forth in the Schedule of Assumed Agreements, and (iii) any agreement, obligation, security

01:23482975.4

interest, transaction, or similar undertaking that the Debtors believe is not executory or a lease, but that is later determined by the Bankruptcy Court to be an executory contract or unexpired lease that is subject to assumption or rejection under Bankruptcy Code section 365. For the avoidance of doubt, executory contracts and unexpired leases that have been previously assumed or assumed and assigned pursuant to an order of the Bankruptcy Court shall not be affected by the Plan. The Confirmation Order will constitute a Bankruptcy Court order approving the rejection, on the Effective Date, of the executory contracts and unexpired leases to be rejected under the Plan.

### (b)     Rejection Claims Bar Date

Any Rejection Claim or other Claim for damages arising from the rejection under the Plan of an executory contract or unexpired lease must be Filed and served no later than the Rejection Claims Bar Date. Any such Rejection Claims that are not timely Filed and served will be forever disallowed, barred, and unenforceable, and Persons holding such Claims will not receive and be barred from receiving any Distributions on account of such untimely Claims. If one or more Rejection Claims are timely Filed pursuant to the Plan, the Liquidation Trust may object to any Rejection Claim on or prior to the Claim Objection Deadline. For the avoidance of doubt, the Rejection Claims Bar Date established by the Plan does not alter any rejection claims bar date established by a prior order of the Bankruptcy Court with respect to any executory contract or unexpired leases that was previously rejected in these Chapter 11 Cases.

### J.     Conditions Precedent to the Effective Date

### 1.     Conditions to the Effective Date

The occurrence of the Effective Date shall not occur and the Plan shall not be consummated unless and until each of the following conditions has been satisfied or duly waived pursuant to Section 9.2 of the Plan:

(i)     the Bankruptcy Court shall have entered the Confirmation Order;

(ii)     the Confirmation Order shall not be subject to any stay;

(iii)     all governmental and material third-party approvals and consents necessary in connection with the transactions contemplated by the Plan, if any, shall have been obtained and be in full force and effect;

(iv)     all actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable; and

(v)     the Professional Fee Reserve is funded pursuant to Section 11.2 of the Plan.

### 2.    Waiver of Conditions to the Effective Date

The conditions to the Effective Date set forth in clauses (iii) and (iv) above may be waived in writing by the Debtors, in the Debtors' reasonable discretion after consultation with each of the Committees, at any time without further order.

### 3.    Effect of Non-Occurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Sections 9.1 and 9.2 of the Plan, upon notification Filed by the Debtors with the Bankruptcy Court, (i) the Confirmation Order shall be vacated; (ii) no Distributions shall be made; (iii) the Debtors, the Estates, and all Creditors shall be restored to the status quo as of the day immediately preceding the Confirmation Hearing as though the Confirmation Order was not entered; and (iv) all of the Debtors' and the Estates' obligations with respect to Claims shall remain unchanged and nothing contained in the Plan shall constitute a waiver or release of any Causes of Action by or against the Debtors, the Estates, or any other Person or prejudice in any manner the rights, claims, or defenses of the Debtors, the Estates, or any other Person.

### 4.    Notice of the Effective Date

Promptly after the occurrence of the Effective Date, the Liquidation Trust or its agents shall mail or cause to be mailed to all Creditors a notice that informs such Creditors of (i) entry of the Confirmation Order and the resulting confirmation of the Plan; (ii) the occurrence of the Effective Date; (iii) the assumption, assignment, and rejection of executory contracts and unexpired leases pursuant to the Plan, as well as the deadline for the filing of resulting Rejection Claims; (iv) the deadline established under the Plan for the filing of Administrative Claims; and (v) such other matters as the Liquidation Trustee finds appropriate.

### K.    Certain Miscellaneous Provisions

### 1.    Administrative Claims

**Subject to the last sentence of this paragraph, all requests for payment of an Administrative Claim must be Filed with the Bankruptcy Court no later than the Administrative Claims Bar Date. In the event of an objection to Allowance of an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. THE FAILURE TO FILE A MOTION REQUESTING ALLOWANCE OF AN ADMINISTRATIVE CLAIM ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE, OR THE FAILURE TO SERVE SUCH MOTION TIMELY AND PROPERLY, SHALL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND DISALLOWED WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT. IF FOR ANY REASON ANY SUCH ADMINISTRATIVE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN. Postpetition statutory tax claims shall not be subject to any Administrative Claims Bar Date.**

## 2.    Professional Fee Claims

All final requests for payment of Professional Fee Claims pursuant to Bankruptcy Code sections 327, 328, 330, 331, 363, 503(b), or 1103 must be made by application Filed with the Bankruptcy Court and served on counsel to the Liquidation Trust and counsel to the U.S. Trustee no later than forty-five (45) calendar days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to such applications must be Filed and served on counsel to the Liquidation Trust, counsel to the U.S. Trustee, and the requesting Professional on or before the date that is twenty-one (21) calendar days after the date on which the applicable application was served (or such longer period as may be allowed by order of the Bankruptcy Court or by agreement with the requesting Professional). All Professional Fee Claims shall be paid by the Liquidation Trust to the extent approved by order of the Bankruptcy Court within five (5) Business Days after entry of such order. On the Effective Date, the Liquidation Trust shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Liquidation Trust and shall be maintained by the Liquidation Trust in accordance with the Plan. The Liquidation Trust shall fully fund the Professional Fee Reserve on the Effective Date in an amount that is agreed upon by the Debtors and each of the Committees prior to the Confirmation Hearing and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. If the Debtors and the Committees are unable to agree on an amount by which the Professional Fee Reserve is to be funded, then any of those parties may submit the issue to the Bankruptcy Court, which, following notice and a hearing, shall fix the amount of the required funding. All Professional Fee Claims that have not previously been paid, otherwise satisfied, or withdrawn shall be paid from the Professional Fee Reserve. Any excess funds in the Professional Fee Reserve shall be released to the Liquidation Trust to be used for other purposes consistent with the Plan. For the avoidance of doubt, the Professional Fee Reserve is an estimate and shall not be construed as a cap on the Liquidation Trust's obligation to pay in full Allowed Professional Fee Claims.

## 3.    Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date. All such fees that arise after the Effective Date shall be paid by the Liquidation Trust. Notwithstanding the foregoing: (i) for the Remaining Debtors, quarterly fees for the quarter in which the Effective Date occurs will be calculated on the basis of all Estate Assets being distributed to the Liquidation Trust and the Wind-Down Entity on the Effective Date in the Chapter 11 Cases of the Remaining Debtors; (ii) for all other Debtors, quarterly fees for the quarter in which the Effective Date occurs will be calculated on the basis of disbursements (if any) made by such Debtors prior to the Effective Date; and (iii) quarterly fees for each quarter after the quarter in which the Effective Date occurs will be $325.00 for any Remaining Debtors through the entry of the Final Decree for any of the Remaining Debtors or the dismissal or conversion of the Chapter 11 Cases regarding the Remaining Debtors. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

4.      **Post-Effective Date Reporting**

(a)      Beginning the first quarter-end following the Effective Date and continuing on each quarter-end thereafter until the Closing Date, within thirty (30) calendar days after the end of such period, the Liquidation Trust shall File quarterly reports with the Bankruptcy Court. Each quarterly report shall contain a cash flow statement which shall show Distributions by Class during the prior quarter, an unaudited balance sheet, the terms of any settlement of an individual Claim in an amount greater than $100,000, the terms of any litigation settlement where the Cause of Action or the Liquidation Trust Action was greater than $100,000 or the settlement is for more than $100,000, the terms of any sale of Estate Assets where the proceeds of such sale are $100,000 or greater, and such other information as the Liquidation Trust determines is material.

(b)      Until the effectiveness of an Exchange Act Registration for the Class A Liquidation Trust Interests, the Liquidation Trust shall, as soon as practicable after the end of each calendar year and upon termination of the Liquidation Trust, provide or make available a written report and account to the Holders of Liquidation Trust Interests, which report and account sets forth (i) the assets and liabilities of the Liquidation Trust at the end of such calendar year or upon termination and the receipts and disbursements of the Liquidation Trust for such calendar year or period, and (ii) changes in the Liquidation Trust Assets and actions taken by the Liquidation Trustee in the performance of its duties under the Plan or the Liquidation Trust Agreement that the Liquidation Trustee determines in its discretion may be relevant to Holders of Liquidation Trust Interests, such as material changes or actions that, in the opinion of the Liquidation Trustee, may have a material effect on the Liquidation Trust Assets that were not previously reported. The Liquidation Trust may provide or make available to Holders of Liquidation Trust Interests similar reports for such interim periods during the calendar year as the Liquidation Trustee deems advisable. So long as no Exchange Act Registration for the Class A Liquidation Trust Interests shall have become effective, such reports may be provided or made available to the Holders of Liquidation Trust Interests, in the discretion of the Liquidation Trustee, by any reasonable means, including U.S. mail, electronic transmission, display on IntraLinks or a similar virtual data room to which Holders shall have access, or publication to a publicly-available website or by press release distributed via a generally recognized business news service.

(c)      Following the effectiveness of an Exchange Act Registration for the Class A Liquidation Trust Interests, the Liquidation Trust shall provide or make available to the Holders of Liquidation Trust Interests, either by publication to a publicly-available website or by press release distributed via a generally recognized business news service, copies of all current reports on Form 8-K, quarterly reports on Form 10-Q, and annual reports on Form 10-K that may be required to be filed by the Liquidation Trust with the SEC under the Exchange Act, which copies are to be so provided or made available promptly after such filing.

5.      **Dissolution of the Committees**

Each of the Committees shall be automatically dissolved on the Effective Date and, on the Effective Date, each member of the Committees (including each Related Party thereof) and each Professional retained by any of the Committees shall be released and discharged from all rights, duties, responsibilities, and obligations arising from, or related to, the Debtors, their

membership on any of the Committees, the Plan, or the Chapter 11 Cases, except with respect to (a) any matters concerning any Professional Fee Claims held or asserted by any Professional retained by any of the Committees; and (b) the right of former Noteholder Committee and Unitholder Committee members to select a successor Noteholder Committee or Unitholder Committee designee, respectively, on the Liquidation Trust Supervisory Board.

### 6. Modifications and Amendments

(a)     In the Debtors' reasonable discretion after consultation with each of the Committees, the Debtors may alter, amend, or modify the Plan under Bankruptcy Code section 1127(a) at any time at or prior to the conclusion of the Confirmation Hearing. All alterations, amendments, or modifications to the Plan must comply with Bankruptcy Code section 1127. The Debtors shall provide parties in interest with notice of such amendments or modifications as may be required by the Bankruptcy Rules or order of the Bankruptcy Court. A Creditor that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Creditor.

(b)     After entry of the Confirmation Order and prior to substantial consummation (as defined in Bankruptcy Code section 1101(2)) of the Plan, the Debtors or the Liquidation Trust, as applicable, may, under Bankruptcy Code section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Plan. Such proceedings must comply with Bankruptcy Code section 1127. To the extent required, prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or an order of the Bankruptcy Court. A Creditor that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Creditor.

### 7. Severability of Plan Provisions

If, at or before the Confirmation Hearing, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated. The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with Section 11.7 of the Plan, is valid and enforceable under its terms.

8.      **Compromises and Settlements**

From and after the Effective Date, the Liquidation Trust may compromise and settle disputes about any Claims or about any Liquidation Trust Actions, without any further approval by the Bankruptcy Court. Until the Effective Date, the Debtors expressly reserve the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against them or any Avoidance Actions and Causes of Action belonging to the Estates.

9.      **Binding Effect of Plan**

Upon the Effective Date, Bankruptcy Code section 1141 shall become applicable with respect to the Plan and the Plan shall be binding on all Persons to the fullest extent permitted by Bankruptcy Code section 1141(a). Confirmation of the Plan binds each Holder of a Claim or Equity Interest to all the terms and conditions of the Plan, whether or not such Holder's Claim or Equity Interest is Allowed, whether or not such Holder holds a Claim or Equity Interest that is in a Class that is Impaired under the Plan, and whether or not such Holder has accepted the Plan.

10.      **Non-Discharge of the Debtors; Injunction**

**In accordance with Bankruptcy Code section 1141(d)(3)(A), the Plan does not discharge the Debtors. Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Equity Interests against the Debtors. As such, no Person holding a Claim or an Equity Interest may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Person under the Plan. As of the Effective Date, all Persons are precluded and barred from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, Equity Interests, or other action or remedy based on any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.**

11.      **Releases and Related Matters**

**(a)      On the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Releasing Parties shall be deemed to have forever released, waived, and discharged each of the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whatsoever, whether known or unknown, whether foreseen or unforeseen, whether liquidated or unliquidated, whether fixed or contingent, whether matured or unmatured, existing or hereafter arising, at law, in equity, or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan, except for acts or omissions that are determined in a Final Order to have constituted actual fraud or willful misconduct; provided, however, that nothing in Section 11.11 of the Plan shall release or otherwise affect any Person's rights under the Plan or the Confirmation Order.**

(b)     Entry of the Confirmation Order shall constitute (i) the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Section 11.11 of the Plan; and (ii) the Bankruptcy Court's findings that such releases are (1) in exchange for good and valuable consideration provided by the Released Parties (including performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (2) in the best interests of the Debtors, the Estates, and any Holders of Claims that are Releasing Parties, (3) fair, equitable, and reasonable, (4) given and made after due notice and opportunity for hearing, and (5) a bar to any of the Releasing Parties asserting any released claim against any of the Released Parties.

(c)     Notwithstanding any provision in the Plan to the contrary or an abstention from voting on the Plan, no provision of the Plan, or any order confirming the Plan, (i) releases any non-debtor Person from any Cause of Action of the SEC; or (ii) enjoins, limits, impairs, or delays the SEC from commencing or continuing any Causes of Action, proceedings, or investigations against any non-debtor Person in any forum.

## 12.     Exculpation and Limitation of Liability

On the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, to the maximum extent permitted by law, none of the Exculpated Parties shall have or incur any liability to any Person, including to any Holder of a Claim or an Equity Interest, for any prepetition or postpetition act or omission in connection with, relating to, or arising out of the Debtors, the Chapter 11 Cases, the formulation, negotiation, preparation, dissemination, solicitation of acceptances, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created, executed, or contemplated in connection with the Plan, or the administration of the Plan or the property to be distributed under the Plan; provided, however, that nothing in Section 11.12 of the Plan shall release or otherwise affect any Person's rights under the Plan or the Confirmation Order; and provided, further, that the exculpation provisions of Section 11.12 of the Plan shall not apply to acts or omissions constituting actual fraud or willful misconduct by such Exculpated Party as determined by a Final Order. For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute actual fraud or willful misconduct unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation, and in all respects, the Exculpated Parties shall be entitled to rely on the written advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and administration thereof. The Confirmation Order shall serve as a permanent injunction against any Person seeking to enforce any Causes of Action against the Exculpated Parties that are encompassed by the exculpation provided by Section 11.12 of the Plan.

## 13.     Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362 or otherwise, and extant as of the Confirmation Hearing (excluding any injunctions or stays contained in or arising

from the Plan or the Confirmation Order), shall remain in full force and effect through and inclusive of the Effective Date.

### 14.    Revocation, Withdrawal, or Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Hearing and to File subsequent plans. If the Debtors revoke or withdraw the Plan prior to the Confirmation Hearing, or if the Effective Date does not occur, then (a) the Plan shall be null and void in all respects; and (b) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims against, or any Equity Interests in, any Debtor, or any Causes of Action by or against any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any other Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

### 15.    Exemption From Transfer Taxes

Pursuant to Bankruptcy Code section 1146, the vesting of the Liquidation Trust Assets in the Liquidation Trust, the vesting of the Wind-Down Assets in the Wind-Down Entity, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge, or other security interest, or the making or assignment of any lease or sublease, or making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### 16.    Good Faith

Confirmation of the Plan shall constitute a conclusive determination that: (a) the Plan, and all the transactions and settlements contemplated thereby, have been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; and (b) the solicitation of acceptances or rejections of the Plan has been in good faith and in compliance with all applicable provisions of the Bankruptcy Code, and the Bankruptcy Rules, and, in each case, that the Debtors and all Related Parties have acted in good faith in connection therewith.

### 17.    Conflicts

In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, any other order entered in the Chapter 11 Cases, or any other agreement to be executed by any Person pursuant to the Plan, the provisions of the Plan shall control and take precedence; provided, however, that the Confirmation Order shall control and take precedence in the event of any inconsistency between the Confirmation Order, any provision of the Plan, and any of the foregoing documents.

# V.     RISK FACTORS

Prior to voting on the Plan, each Holder of a Claim entitled to vote should consider carefully the risk factors described below, as well as all other information contained in this Disclosure Statement, including the exhibits hereto. These risk factors should not be regarded as the only risks involved in connection with the Plan and its implementation.

## A.     Parties May Object to the Plan's Classification of Claims and Equity Interests

Bankruptcy Code section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Equity Interests under the Plan complies with this requirement. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

## B.     The Debtors May Not Be Able to Obtain Confirmation of the Plan

With regard to any proposed plan, the Debtors may not receive the requisite acceptances to confirm a plan. In the event that votes with respect to Claims in the Classes entitled to vote are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors may not be able to obtain Confirmation of the Plan. Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court still might not confirm the Plan as proposed if the Bankruptcy Court finds that any of the statutory requirements for confirmation under Bankruptcy Code section 1129 have not been met.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan would be on terms as favorable to any Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtors' creditors.

## C.     The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in the Plan, the Effective Date is subject to several conditions precedent. There can be no assurance that any or all of such conditions will be satisfied (or waived). If such conditions precedent are not met or waived, the Effective Date will not occur. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Effective Date will occur.

## D.     Claims Estimation and Allowance of Claims

There can be no assurance that the estimated Claim amounts set forth in this Disclosure Statement are correct, and the actual amount of Allowed Claims may differ significantly from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

01:23482975.4

171456.4                                    114

Distributions to Holders of Allowed Class 3, Class 4, and Class 5 Claims will be affected by the pool of Allowed Claims in each respective Class. Upon completion of further analysis of Filed Claims, which will likely lead to Claims objection litigation and related matters, the total amount of Claims that ultimately become Allowed Claims in each of the foregoing Classes may differ from the Debtors' estimates, which are reflected in this Disclosure Statement, and such difference could be material. As a result, the amount of Distributions that may be received by a particular Holder of an Allowed Claim may be either adversely or favorably affected by the aggregate amount of Class 3, Class 4, or Class 5 Claims ultimately Allowed.

### E.    Potential Pursuit of Liquidation Trust Actions Against Creditors and Others

In accordance with Bankruptcy Code section 1123(b), after the Effective Date, the Liquidation Trustee shall have and retain and may enforce any Liquidation Trust Actions. Accordingly, a Holder of a Claim may be subject to one or more such Liquidation Trust Actions being asserted against it.

The failure to specifically identify in the Disclosure Statement or the Plan any potential or existing Avoidance Actions or Causes of Action as a Liquidation Trust Action is not intended to and shall not limit the rights of the Liquidation Trust to pursue any such Avoidance Actions or Causes of Action. The Debtors expressly reserve all Avoidance Actions and Causes of Action, other than those Avoidance Actions and Causes of Action that are expressly waived, relinquished, released, compromised, or settled in the Plan, pursuant to the Confirmation Order, or pursuant to any other order of the Bankruptcy Court, as Liquidation Trust Actions for later adjudication, and no preclusion doctrine (including the doctrines of res judicata, collateral estoppel, judicial estoppel, equitable estoppel, issue preclusion, claim preclusion, and laches) shall apply to such Avoidance Actions or Causes of Action as Liquidation Trust Actions on or after the Effective Date.

Moreover, no Person may rely on the absence of a specific reference in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or the Disclosure Statement to any Contributed Claims against such Person as any indication that the Liquidation Trust will not pursue any and all available Contributed Claims against such Person. The objection to the Allowance of any Claims will not in any way limit the ability or the right of the Liquidation Trust to assert, commence, or prosecute any Contributed Claims. Nothing contained in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or the Disclosure Statement will be deemed to be a waiver, release, or relinquishment of any Contributed Claims which the Contributing Claimants had immediately prior to the Effective Date. The Liquidation Trust shall have, retain, reserve, and be entitled to assert all Contributed Claims fully as if the Contributed Claims had not been contributed to the Liquidation Trust in accordance with the Plan and the Liquidation Trust Agreement.

Without limiting the generality of the preceding two paragraphs and associated reservations, the Debtors note that all parties in interest should review **Exhibit D**, which is a non-exclusive analysis of the Liquidation Trust Actions that are being preserved under the Plan.

### F.    Risks Regarding Real Estate

The Plan relies, in large part, on the Wind-Down Entity generating proceeds from real estate sales to produce Cash for remittance to the Liquidation Trust for distribution to creditors. In the event that sales are delayed, costs incurred with respect to real property prior to sale exceed estimates, or markets decline due to economic conditions or other constraints, payments may be correspondingly delayed.

The Wind-Down Entity's ability to monetize the Wind-Down Assets is subject to certain risks associated with the real estate industry in general, including: local, national, and international economic conditions; the supply and demand for properties, particularly high-end properties of the sort owned by the Debtors; the financial conditions for tenants, buyers, and sellers of properties; changes in interest rates; changes in environmental laws or regulations, planning laws and other governmental roles and fiscal and monetary policies; changes in real property tax rates and related tax deductions; negative developments in the economy that depress travel and retail activity; uninsured casualties; force majeure acts, terrorist events, under-insured or uninsurable losses; and other factors that are beyond the reasonable control of the Wind-Down Entity. In addition, real estate assets are subject to long-term cyclical trends that can give rise to significant volatility in values. Real estate investing and development may be subject to a higher degree of market risk because of concentration in a specific industry, sector, or geographic sector; here, most of the Wind-Down Assets are located in the greater Los Angeles area. Real estate investments may be subject to other general and specific risks, including declines in the value of real estate generally, risks related to general and economic conditions, changes in the value of the comparable properties, and defaults by real estate borrowers within the particular market or the broader economy.

Also, a variety of work is projected to be undertaken with respect to the real estate to be sold, the cost of which is not susceptible to precise determination.  Unexpected conditions at the properties, weather, labor issues and a variety of other variables may affect the actual cost of the projected work being undertaken and thus affect, potentially adversely, the net proceeds of the sales of the real estate.

### G.    Securities Law Considerations

There are several material securities law considerations, risks, and uncertainties associated with consummation of the Plan. Holders of Claims, Holders of Equity Interests, and other interested parties should read carefully the discussion set forth in Article VII for a discussion of certain U.S. federal income tax consequences of the transactions contemplated under the Plan.

Holders of Claims or Equity Interests should consult their own advisors regarding any securities law consequences of the treatment of their Claims or Equity Interests under the Plan.

Under the terms of the Liquidation Trust Agreement, the Liquidation Trust Interests initially will be uncertificated and subject to the Transfer Restrictions as set forth in the Liquidation Trust Agreement.  Under the Transfer Restrictions, the Liquidation Trust Interests cannot be assigned or transferred by any holder thereof other than by will or intestate succession

upon the death of such holder or otherwise by operation of law.  Accordingly, unless and until the Transfer Restrictions lapse or are terminated, Holders of Allowed Class 3 Claims, Allowed Class 4 Claims, or Allowed Class 5 Claims will be subject to substantial restrictions on their ability to sell or otherwise dispose of their Liquidation Trust Interests and should be prepared to retain their Liquidation Trust Interests.

The Transfer Restrictions applicable to Class A Liquidation Trust Interests are not expected to lapse or be terminated until such time as such Class A Liquidation Trust Interests are effectively registered under the Exchange Act.  Although the Liquidation Trust is required to use its commercially reasonable best efforts to register, and under the Exchange Act may become required to register, the Class A Liquidation Trust Interests, no assurance can be given that the Liquidation Trust will be able to satisfy all applicable requirements for such Exchange Act registration.  The Transfer Restrictions applicable to the Class B Liquidation Trust Interests are not expected to lapse or be terminated.

The Liquidation Trust may, by reason of the amount of its total assets and the number of the holders of record of its Liquidation Trust Interests as of the last day of its first fiscal year, become subject to the registration requirements of the Exchange Act.  It is likely that the Liquidation Trust will need to seek relief from or modification of certain technical requirements of the Exchange Act (such as the filing of pre-Effective Date financial information of the Debtors), which the Liquidation Trust intends to do in connecion with such registration.  While the Debtors have been advised that such relief and modifications have been granted by the SEC in the past with respect to other liquidation trusts formed in connection with chapter 11 bankruptcies, such relief and modification have not yet been obtained with respect to the Liquidation Trust and no assurance can be given that such relief or modification will become available.  If the Liquidation Trust becomes required to register and fails to do so in accordance with the requirements of the Exchange Act, it may become subject to civil fines, injunctive relief or other disciplinary action on the part of the SEC.

In the event that the Liquidation Trust successfully registers the Class A Liquidation Trust Interests or other class of equity securities under Section 12(g) of the Exchange Act, the Liquidation Trust is expected to become a reporting issuer under such act.  Accordingly, at such time the Liquidation Trust will be required to prepare and timely file, as and when required, quarterly reports on Form 10-Q, annual reports on Form 10-K, and current report on Form 8-K.  Additionally, at such time the Liquidation Trust is expected to become subject to all other requirements applicable to an issuer with a class of equity securities registered under Section 12(g).  Although such registration of the Class A Liquidation Trust Interests and the following termination or modification of the Transfer Restrictions may increase the liquidity of such Liquidation Trust Interests, such registration and the Liquidation Trust's compliance with such regulations will impose substantial costs on the Liquidation Trust, and thereby may reduce Distributions made in respect of Beneficial Interests to the holders thereof.

## H.    Tax Considerations

There are several material income tax considerations, risks, and uncertainties associated with consummation of the Plan. Holders of Claims, Holders of Equity Interests, and other

interested parties should read carefully the discussion set forth in Article VIII for a discussion of certain U.S. federal income tax consequences of the transactions contemplated under the Plan.

## VI.    CONFIRMATION OF THE PLAN

### A.    The Confirmation Hearing

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing regarding Confirmation of the Plan. Bankruptcy Code section 1128(b) provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to commence on **October 24, 2018, at 10:00 a.m.** (prevailing Eastern Time), before the Honorable Kevin J. Carey, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801. The Confirmation Hearing Notice, which sets forth the time and date of the Confirmation Hearing, has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be Filed and served so that they are actually received by no later than **October 8, 2018, at 4:00 p.m.** (prevailing Eastern Time). **Unless objections to Confirmation of the Plan are timely served and Filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court**.

### B.    Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan is that the Plan (i) is accepted by all Impaired Classes of Claims, or, if rejected by an Impaired Class of Claims, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Impaired Class of Claims; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Bankruptcy Code section 1129. The Debtors believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. More specifically, the Debtors believe that the Plan satisfies or will satisfy the following applicable Confirmation requirements of Bankruptcy Code section 1129:

•    The Plan complies with the applicable provisions of the Bankruptcy Code.

•    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

•    The Plan has been proposed in good faith and not by any means forbidden by law.

•    Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident

01:23482975.4

to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

• Either each Holder of a Claim in an Impaired Class of Claims has accepted the Plan, or each such Holder will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code.

• The Classes of Claims that are entitled to vote on the Plan will have accepted the Plan, or at least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class, and the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims that is impaired under, and has not accepted, the Plan.

• Except to the extent a different treatment is agreed to, the Plan provides that all Allowed Administrative Claims and Allowed Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

• All accrued and unpaid fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid through the Effective Date.

## C.     Best Interests of Creditors

Often called the "best interests of creditors" test, Bankruptcy Code section 1129(a)(7) requires that a bankruptcy court find, as a condition to confirmation of a chapter 11 plan, that the plan provides, with respect to each impaired class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 on the effective date of the plan.

The Plan is a plan of liquidation. The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage.

Conversion to chapter 7 of the Bankruptcy Code would mean the establishment of a new claims bar date, which could result in new General Unsecured Claims, Note Claims, or Unit Claims being asserted against the Estates, thereby diluting the recoveries of other Holders of Allowed Claims.

Significantly, the benefits of the Plan Term Sheet, the terms of which are substantially incorporated into the Plan, are available only under the Plan. The Plan embodies a comprehensive, extensively negotiated settlement and compromise of myriad novel and complex legal and factual issues, including, among other things, (i) whether the Notes are unsecured claims or are secured by valid, perfected security interests in property of the Estates, (ii) whether the Units are debt or equity interests, (iii) whether any of the Debtors have valid or enforceable

01:23482975.4

Intercompany Claims or Intercompany Liens against Estate Assets owned by other Debtors, and (iv) whether substantive consolidation of the Debtors' Estates is warranted under the circumstances. In the event of conversion, the chapter 7 trustee, Noteholders, Unitholders, and Holders of General Unsecured Claims would have to confront the pursuit of extensive litigation to resolve these and other issues, or would need to try to negotiate an alternative settlement, all without the benefit of committee representation for Creditors. This process would be extremely time-consuming and costly, and would reduce and delay any recoveries available for Creditors of the Estates.

In addition, a chapter 7 trustee likely would act quickly to sell or otherwise monetize the Wind-Down Assets, including because (i) a chapter 7 trustee probably would not have adequate staffing or funding to dispose of the Debtors' real property over an extended period of time, and (ii) a chapter 7 trustee would need to seek authorization to operate the Debtors' remaining business, which is relief that should be granted only "for a limited period" in any event, *see* 11 U.S.C. § 721. In light of, among other things, the limited universe of potential buyers for luxury residential properties, such a forced sale by a chapter 7 trustee would likely ultimately result in significantly lower recoveries from the sale of the Wind-Down Assets, as set forth in the Liquidation Analysis.

On balance, the Debtors believe that a chapter 7 trustee would be less likely to maximize the value available from all the Estate Assets and would be unable to obtain the benefits of the compromises and settlements available under the Plan. Therefore, the Debtors believe that confirmation of the Plan will provide each Holder of a General Unsecured Claim, Note Claim, or Unit Claim with an equal or greater recovery than such Holder would receive pursuant to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## D.    Feasibility

Bankruptcy Code section 1129(a)(11) requires that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors, or any successor to the Debtors (unless such liquidation or reorganization is proposed in the plan). This requirement is satisfied as the Plan specifically proposes a liquidation and the Debtors believe the Debtors' Cash and any additional proceeds from the Wind-Down Assets and the Liquidation Trust Assets will be sufficient to allow the Wind-Down Entity and the Liquidation Trustee, as applicable, to make all payments required to be made under the Plan. Accordingly, the Debtors believe that the Plan is feasible.

## E.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless a plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder

for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims held by creditors that actually voted to accept or reject the plan. Thus, a Class of Impaired Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

## F.      Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted that plan, *provided* that the plan has been accepted by at least one impaired class of claims, determined without including the acceptance of the plan by any insider. Notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan under Bankruptcy Code section 1129(b). The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

### 1.      No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that reject or are deemed to have rejected a plan and that are of equal priority with another class of claims or interests that is receiving different treatment under such plan. The test does not require that the treatment of such classes of claims or interests be the same or equivalent, but that such treatment be "fair" under the circumstances. In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account various factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. The Debtors submit that if the Debtors are required to "cramdown" the Plan pursuant to Bankruptcy Code section 1129(b), the Plan is structured such that it does not "discriminate unfairly" against any rejecting Class.

### 2.      Fair and Equitable Test

The "fair and equitable" test applies to classes that reject or are deemed to have rejected a plan and are of different priority and status vis-à-vis another class (*e.g.*, secured versus unsecured claims, or unsecured claims versus equity interests), and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class, including interest. As to the rejecting class, the test sets different standards depending on the type

of claims or interests in such rejecting class. The Debtors submit that if the Debtors are required to "cramdown" the Plan pursuant to Bankruptcy Code section 1129(b), the Plan is structured such that the applicable "fair and equitable" standards are met.

### G.    Alternatives to Confirmation and Consummation of the Plan

The Debtors believe that the Plan affords Holders of Claims the potential for a materially better realization on the Estate Assets than a chapter 7 liquidation, and, therefore, is in the best interests of all such Holders. If, however, the requisite acceptances of the voting Classes of Claims are not received, or no Plan is confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative chapter 11 plan or plans, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors or another party in interest could attempt to formulate and propose a different plan or plans. The Debtors believe that the Plan enables Creditors to realize the greatest possible value under the circumstances, and, as compared to any alternative plan, has the greatest chance to be confirmed and consummated.

The Chapter 11 Cases may also be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a statutory trustee would be elected or appointed to complete the liquidation of the Estate Assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. As described above, the Debtors believe that the Plan will provide each Holder of an Allowed Note Claim, Allowed Unit Claim, or Allowed General Unsecured Claim with an equal or greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## VII.    CERTAIN SECURITIES LAW CONSEQUENCES OF THE PLAN

### A.    General

#### 1.    Status as Securities

The Plan provides for the establishment of the Liquidating Trust and for the issuance of beneficial interests therein issued in respect of Allowed Class 3 Note Claims and Allowed Class 5 Unit Claims.  In general, beneficial interests in trusts may sometimes be subject to regulation under applicable non-bankruptcy law, including federal and state securities laws.  As discussed below, the Debtors believe that the beneficial interests in the Liquidation Trust (the "Beneficial Interests") will either (a) not constitute "securities" or (b) will be issued in compliance with such federal and state securities laws.

#### 2.    Transfer Restrictions on Beneficial Interests

Under the terms of the Liquidation Trust Agreement, the Beneficial Interests initially will be uncertificated and subject to transfer restrictions set forth in the Liquidation Trust Agreement (the "Transfer Restrictions").  Under the Transfer Restrictions, the Beneficial Interests cannot be assigned or transferred by any holder thereof other than by will or intestate succession upon the death of such holder or otherwise by operation of law.

The Transfer Restrictions will be effective upon issuance of the Beneficial Interests on the Effective Date of the Plan and will remain in effect during the initial and any renewal term of the Liquidation Trust unless sooner terminated or modified by the Liquidation Trustee in accordance with the Liquidation Trust Agreement.  Under the Liquidation Trust Agreement, the Liquidation Trustee will use its commercially reasonable best efforts to file with the SEC, as soon as reasonably practicable following the Effective Date of the Plan, but in no event later than may be required under section 12(g) of the Exchange Act or the rules and regulations promulgated thereunder, a registration statement on Form 10 for the purpose of registering the Beneficial Interests under Section 12(g) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and to cause the Beneficial Interests to be accepted for trading on the Over-the-Counter Bulletin Board (OTCBB) or other organized trading market in the United States.  Upon the effectiveness of the Form 10 and the acceptance of the Beneficial Interests for trading on such a market, the Liquidation Trustee shall amend the Liquidation Trust Agreement to terminate or modify the Transfer Restrictions as necessary to permit trading of the Beneficial Interests and shall promptly give notice of such amendment to the holders of record of the Beneficial Interests as of the effective date thereof, which notice will include a copy of the amendment and a summary description of the termination or modification of the Transfer Restrictions effected thereby and the terms, conditions, and effective date of such termination or modification.  Under the Liquidation Trust Agreement, the Liquidation Trustee will give any such notice of termination or modification of the Transfer Restrictions reasonably promptly after the effectiveness of the Form 10 and the acceptance of the Beneficial Interests for trading on the Over-the-Counter Bulletin Board (OTCBB).

## B.     Exemption From Offer and Sale of Securities Act and Blue Sky Laws

### 1.     Issuance of Beneficial Interests under Plan

Unless an exemption is available, the offer and sale of a security generally is subject to registration with the SEC under Section 5 of the Securities Act of 1933, as amended (the "Securities Act").  The Debtors have been informally advised by the SEC that the Beneficial Interests, regardless of whether they are certificated and/or non-transferable, may be considered "securities" within the definition of Section 2(11) of the Securities Act at the time of their issuance.

In the event that the Beneficial Interests are deemed to constitute securities, section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state securities laws and regulations ("Blue Sky Laws") if three principal requirements are satisfied:

1.     the securities are offered and sold under a plan of reorganization and are securities of the debtor, of an affiliate of the debtor participating in a joint plan with the debtor, or of a successor to the debtor under the plan;

2.     the recipients of the securities hold a pre-petition or administrative claim against the debtor or an interest in the debtor; and

3.      the securities are issued entirely in exchange for recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property.

If and to the extent that the Beneficial Interests may constitute securities, the Debtors believe that the Beneficial Interests, which are being issued in respect of Allowed Class 3 Note Claims and Allowed Class 5 Unit Claims, will qualify as securities "of the debtor . . . or of a successor to the debtor" pursuant to section 1145(a)(1).  In addition, the Beneficial Interests will be issued entirely in exchange for such Claims and Interests.  Thus, the Debtors believe that the issuance of the Beneficial Interests pursuant to the Plan will satisfy the applicable requirements of section 1145(a)(1) of the Bankruptcy Code, and that such issuance should be exempt from registration under the Securities Act and any applicable Blue Sky Law.

The Debtors believe that its reliance upon the foregoing exemption in respect of the issuance of the Beneficial Interests is consistent with positions taken by the SEC with respect to similar transactions and arrangements by other debtors in possession.  However, the Debtors have not sought any "no-action" letter by the SEC with respect to any such matters, and therefore no assurance can be given regarding the availability of any exemptions from registration with respect to any securities, if any, issued pursuant to the Plan.

## 2.      Resale of Beneficial Interests After Plan Effective Date

As discussed above, during the continuation of the Transfer Restrictions, the Beneficial Interests cannot be assigned or transferred by any holder thereof other than by will or intestate succession upon the death of such holder or otherwise by operation of law.   Under the Liquidation Trust Agreement, the Liquidation Trustee will terminate or modify the Transfer Restrictions as necessary following the effectiveness of the registration of the Beneficial Interests under Section 12(g) of the Exchange Act and the acceptance of the Beneficial Interests for quotation on the Over-the-Counter Bulletin Board (OTCBB) or other organized over-the-counter trading market in the United States.  If the Transfer Restrictions are so terminated or modified, the Beneficial Interests may become transferable to the extent otherwise permissible under applicable law.   However, no assurance can be given that the Liquidation Trustee will be successful in causing the registration of the Beneficial Interests or their acceptance for trading on any such organized trading market.  None of the Debtors, the Liquidation Trust, or Wind-Down Entity will be obliged to, and it is expected that none of them will, seek the listing of any Beneficial Interest on any national stock exchange such as the NYSE, NASDAQ Stock Market, or NASDAQ National Market.

## C.      Exchange Act and other securities law compliance

## 1.      Exchange Act Compliance

Section 12(g) of the Exchange Act, and the Exchange Act rules and regulations promulgated thereunder, requires a company to register a class of equity securities pursuant to the Exchange Act unless, on the last day of such company's most recent fiscal year, (i) the company had total assets not exceeding $10.0 million and (ii) the class of equity securities was held of record by fewer than 2,000 persons and fewer than 500 of those persons were not "accredited investors" as defined under the securities laws.  Such registration must be effected by

the filing of a registration statement within 120 days after the last day of the company's most recent fiscal year in which both such conditions (i) and (ii) are satisfied.The Debtors have been informally advised by the SEC that the Class A Liquidation Trust Interests, regardless of whether they are certificated and/or non-transferable, constitute equity securities subject to the registration requirement of Section 12(g) of the Exchange Act provided that the total assets of the Liquidation Trust and the number of its holders of record exceed the specified limits. Accordingly, based on the Liquidation Trust's anticipated total assets and number of holders of record of Class A Liquidation Trust Interests as of the last day of its first (partial) fiscal year, the Debtors currently expect that the Liquidation Trust, will be required to register the Class A Liquidation Trust Interests under the Exchange Act within 120 days thereafter. It is anticipated that there will be fewer than 2,000 holders of record of Class B Liquidation Trust Interests and, as such, the Liquidation Trust currently does not intend to make any effort to cause the Class B Liquidation Trust Interests to be registered under the Exchange Act.  To the extent that the total assets of the Liquidation Trust and the number of the holders of record of Class B Liquidation Trust Interests as of the last day of the Liquidation Trust's fiscal year exceeds the specified limits under the Exchange Act, the Liquidation Trust shall take any and all steps as may be necessary to comply with the Exchange Act and the rules and regulations promulgated thereunder.

As discussed above, during the continuation of the Transfer Restrictions, the Beneficial Interests cannot be assigned or transferred by any holder thereof other than by will or intestate succession upon the death of such holder or otherwise by operation of law.   Under the Liquidation Trust Agreement, the Liquidation Trustee will terminate or modify the Transfer Restrictions as necessary following the effectiveness of the registration of the Beneficial Interests under Section 12(g) of the Exchange Act and the acceptance of the Beneficial Interests for trading on the Over-the-Counter Bulletin Board (OTCBB) or other organized trading market in the United States.  If the Transfer Restrictions are so terminated or modified, the Beneficial Interests may become transferable under the Liquidation Trust Agreement to the extent otherwise permissible under applicable law.  In such case, the Beneficial Interests may be permitted to be represented by certificates and/or may become transferable.  However, no assurance can be given regarding these matters.

If the Beneficial Interests are successfully registered as one or more classes of equity securities under Section 12(g) of the Exchange Act, the Liquidation Trust will become subject to regulation under the Exchange Act.  Such regulation will include periodic reporting such as the filing of annual reports on Form 10-K and quarterly reports on Form 10-Q, current reporting of certain material events on Form 8-K, proxy statements, and disclosures regarding various other events affecting the Liquidation Trust, such as mergers, acquisitions, tender offers, and changes in beneficial ownership.  Although such registration of the Beneficial Interests and the following termination or modification of the Transfer Restrictions may benefit Noteholders and Unitholders by increasing the liquidity of their Liquidation Trust Interests, such registration and the Liquidiation Trust's compliance with such regulations will impose substantial costs on the Liquidation Trust, and thereby may reduce Distributions made in respect of Beneficial Interests to the holders thereof.

## VIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

This discussion is provided for informational purposes only, and is based on provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect on the date hereof. Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims (including Claims within the same Class) and Equity Interests, the holder's status and method of accounting (including holders within the same Class) and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are subject to significant uncertainties. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Further, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the holders of Claims and Equity Interests. Any such changes or interpretations may be retroactive and could significantly, and adversely, affect the United States federal income tax consequences of the Plan.

The following summary does not address the U.S. federal income tax consequences to the Holders of Claims not entitled to vote to accept or reject the Plan. In addition, to the extent that the following discussion relates to the consequences to Holders of Claims entitled to vote to accept or reject the Plan, it is limited to Holders that are United States persons within the meaning of the IRC. For purposes of the following discussion, a "United States person" is any of the following:

• An individual who is a citizen or resident of the United States;

• A corporation created or organized under the laws of the United States or any state or political subdivision thereof;

• An estate, the income of which is subject to federal income taxation regardless of its source; or

• A trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of its particular facts and circumstances, or to certain types

of Holders subject to special treatment under the IRC. Examples of Holders subject to special treatment under the IRC are governmental entities and entities exercising governmental authority, foreign companies, persons who are not citizens or residents of the United States, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, small business investment companies, regulated investment companies, persons that have a functional currency other than the U.S. dollar, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction. This discussion does not address the tax consequences to holders of Claims who did not acquire such Claims at the issue price on original issue.  No aspect of foreign, state, local or estate and gift taxation is addressed.

The tax treatment of Holders of Claims and the character, amount, and timing of income, gain, or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary, depending upon the following factors, among others: (i) whether the Claim or portion thereof constitutes a Claim for principal or interest; (ii) the type of consideration, if any, received by the Holder in exchange for the Claim, and whether the Holder receives Distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction or a worthless securities deduction with respect to the Claim or any portion thereof in the current or prior taxable years; (viii) whether the Holder has previously included in gross income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules apply to the Holder. Therefore, each Holder should consult such Holder's own tax advisor for tax advice with respect to that Holder's particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

A significant amount of time may elapse between the date of the Disclosure Statement and the receipt of a final Distribution under the Plan. Events occurring after the date of the Disclosure Statement, such as new or additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Holder of a Claim. This discussion is not binding upon the IRS or other taxing authorities. No assurance can be given that the IRS or another authority would not assert, or that a court would not sustain, a different position from any discussed herein.

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes, and that all Distributions to Holders of Claims will be taxed accordingly.

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX**

01:23482975.4

PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT SUCH HOLDER'S INDEPENDENT TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN.

### A. Certain U.S. Federal Income Tax Consequences of the Liquidation Trust

Under the terms of the Plan, the Liquidation Trust Assets will be transferred to the Liquidation Trust in a taxable disposition. Any income or gain from the transfer of assets to the Liquidation Trust shall flow through to the ultimate taxpaying owner or member of the transferring Debtor who will be responsible to pay any resulting tax liability. The tax consequences of the Plan, however, are subject to many uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law. Uncertainties with regard to federal income tax consequences of the Plan also arise due to the inherent nature of estimates of value that will impact the determination of the amount of income or gain from the transfer of assets to the Liquidation Trust. As of the Effective Date, the Liquidation Trust shall be established for the benefit of all Liquidation Trust Beneficiaries. The Liquidation Trustee will make a good faith valuation of the Liquidation Trust Assets. All parties (including, without limitation, the Liquidation Trustee and the Liquidation Trust Beneficiaries) must consistently use such valuation for all federal income tax purposes. Allocations of taxable income of the Liquidation Trust (other than taxable income allocable to a Distribution Reserve) among Liquidation Trust Beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all of its assets (valued at their tax book value, and other than assets allocable to a Distribution Reserve) to the holders of the beneficial interests in the Liquidation Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidation Trust. Similarly, taxable loss of the Liquidation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a distribution in liquidation of the remaining Liquidation Trust Assets. The tax book value of the Liquidation Trust Assets for this purpose shall be equal to the fair market value of the Liquidation Trust Assets on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidation Trustee of an IRS private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee will (a) elect to treat any Liquidation Trust Assets allocable to a Distribution Reserve (a reserve for amounts and Liquidation Trust Interests retained on account of, Contingent Claims, Disputed Claims or Unliquidated Claims) as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, the Distribution Reserves will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidation Trust Assets in such reserves, and all distributions

from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Liquidation Trustee and the holders of beneficial interests in the Liquidation Trust) will be required to report for tax purposes consistently with the foregoing.

The Liquidation Trust is intended to qualify as a liquidation trust for federal income tax purposes. In general, a Liquidation Trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidation trust under a chapter 11 plan. The Liquidation Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Liquidation Trustee and the holders of beneficial interests in the Liquidation Trust) are required to treat for federal income tax purposes, the Liquidation Trust as a grantor trust of which the holders of Liquidation Trust Interests are the owners and grantors. Although the following discussion assumes that the Liquidation Trust would be so treated for federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Liquidation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidation Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidation Trust and the holders of Liquidation Trust Interests could vary from those discussed herein, and, thus, there could be less Available Cash than projected, resulting in lower recoveries for holders of Liquidation Trust Interests (Noteholders, Holders of General Unsecured Claims, and Unitholders).

The Liquidation Trust will create a single member Delaware limited liability company (the Wind-Down Entity) to facilitate administration of the assets to be liquidated. The Wind-Down Entity (a) shall have the Liquidation Trust as its sole member, (b) shall be treated as a disregarded entity for income tax purposes, (c) shall have a purpose consistent with the purpose of the Liquidation Trust as set forth in Section 5.4.4 of the Plan, and (d) shall be subject to the same limitations imposed on the Liquidation Trustee under the terms of the Plan and the Liquidation Trust Agreement. Consequently, the existence of, and the activities conducted by, the Wind-Down Entity should not alter the federal income tax treatment of the Liquidation Trust or the Liquidation Trust Beneficiaries.

## B.        Consequences to Holders of Claims Generally

In general, each holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such holder in satisfaction of its Claim, and (ii) such holder's adjusted tax basis in such Claim (which, for certain Liquidation Trust Beneficiaries, could be impacted by the Debtors' filing of amended IRS Forms 1099 for the Liquidation Trust Beneficiaries with respect to the 2017 calendar year in accordance with a determination that the Debtors were operating a Ponzi scheme and any amounts paid by the Debtors to such Liquidation Trust Beneficiaries in 2017 were not in fact taxable income). The "amount realized" by a holder will equal the sum of cash and the aggregate fair market value of the property received by such holder pursuant to the Plan (such as a holder's undivided beneficial interest in the assets transferred to the Liquidation Trust). Where gain or loss is

recognized by a holder in respect of its Allowed Claim, the character of such gain or loss (*i.e.*, long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the holder, whether the Claim constituted a capital asset in the hands of the holder and how long it had been held, whether the Claim was originally issued at a discount or acquired at a market discount and whether and to what extent the holder had previously claimed a bad debt deduction or theft loss in respect of the Claim.

Generally, a Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for Cash or other property, in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the Holder, and (ii) the adjusted tax basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income). It is possible that any loss, or a portion of any gain, realized by a Holder of a Claim may have to be deferred until all of the Distributions to such Holder are received.

When gain or loss is recognized by a Holder, such gain or loss may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the Holder and has been held for more than one year. Each Holder of an Allowed Claim should consult its own tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

A Holder of an Allowed Claim who receives, in respect of the Holder's Allowed Claim, an amount that is less than that Holder's tax basis in such Allowed Claim may be entitled to a bad debt deduction under IRC section 166(a). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their own tax advisors with respect to the ability to take a bad debt deduction. A Holder that has previously recognized a loss or deduction in respect of that Holder's Allowed Claim may be required to include in gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Allowed Claim.

Holders of Allowed Claims who were not previously required to include any accrued but unpaid interest with respect to an Allowed Claim may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. A Holder previously required to include in gross income any accrued but unpaid interest with respect to an Allowed Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

A Holder of an Allowed Claim constituting an installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than at face value or distributed, transmitted, sold or otherwise disposed of within the meaning of IRC section 453B.

Holders of Disallowed Claims will not receive any Distribution as part of the Plan. Accordingly, because such a Holder may receive an amount that is less than that Holder's tax

basis in such Claim, such Holder may be entitled to a bad debt deduction under IRC section 166(a). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a bad debt deduction is claimed. Holders of Disallowed Claims, therefore, are urged to consult their own tax advisors with respect to the ability to take a bad debt deduction.

### C.    Consequences to Liquidation Trust Beneficiaries

After the Effective Date, any amount that a Liquidation Trust Beneficiary (as a Holder of a Liquidation Trust Interest) receives as a distribution from the Liquidation Trust in respect of its beneficial interest in the Liquidation Trust should not be included, for federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim but should be separately treated as a distribution received in respect of such Holder's beneficial interest in the Liquidation Trust. In general, a Holder's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Liquidation Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the Holder's holding period in such assets will begin the day following the Effective Date. Distributions to any Holder of an Allowed Claim will be allocated first to the original principal portion of such Claim as determined for federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

For all federal income tax purposes, all parties (including the Liquidation Trustee and the holders of beneficial interests in the Liquidation Trust) shall treat the transfer of the Liquidation Trust Assets to the Liquidation Trust, in accordance with the terms of the Plan, as a transfer of those assets directly to the Holders of Allowed Claims (and, with respect to the Contingent Claims, Disputed Claims and Unliquidated Claims, to the Distribution Reserve) followed by the transfer of such assets by such Holders to the Liquidation Trust. Consistent therewith, all parties shall treat the Liquidation Trust as a grantor trust of which such Holders are to be the owners and grantors. Thus, such Holders (and any subsequent Holders of interests in the Liquidation Trust) shall be treated as the direct owners of an undivided beneficial interest in the assets of the Liquidation Trust. Accordingly, each Holder of a beneficial interest in the Liquidation Trust will be required to report on its federal income tax return(s) the Holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Liquidation Trust. The Liquidation Trust's taxable income will be allocated to the Holders of beneficial interests in the Liquidation Trust in accordance with each such Holder's pro rata share of the beneficial interests in the Liquidation Trust Assets. The character of items of income, deduction and credit to any Holder and the ability of such Holder to benefit from any deductions or losses may depend on the particular situation of such Holder. The federal income tax reporting obligation of a Holder of a beneficial interest in the Liquidation Trust is not dependent upon the Liquidation Trust distributing any cash or other proceeds. Therefore, a Holder of a beneficial interest in the Liquidation Trust may incur a federal income tax liability regardless of the fact that the Liquidation Trust has not made, or will not make, any concurrent or subsequent distributions to the Holder. If a Holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the Liquidation Trust, the Holder may be allowed a subsequent or offsetting loss.

The Liquidation Trustee will file with the IRS returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a).  The Liquidation Trustee will also send to each Holder of a beneficial interest in the Liquidation Trust a separate statement setting forth the Holder's share of items of income, gain, loss, deduction or credit and will instruct the Holder to report such items on its federal income tax return.  Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the federal income tax consequences of the Plan and the transactions contemplated thereunder.

A Liquidation Trust Beneficiary who is a victim of a Ponzi scheme might be entitled to claim a loss dependent on its individual circumstances.  Such losses that arise out of property used in a trade or business or a transaction entered into for profit are deductible in the year in which the loss is sustained and in an amount not to exceed the adjusted tax basis of the property involved.  A theft loss generally cannot be deducted in a tax year to the extent that there are reasonable prospects of a recovery of some or all of the loss.  In that event, the deduction is postponed until it can be ascertained with reasonable certainty the likelihood and amount of any reimbursement that will be received.  The loss generally must be deducted in the first year a reasonable prospect of recovery no longer exists, and cannot be claimed in any subsequent year.  The reasonable prospect of reimbursement rule applies only to that part of the loss for which reimbursement is available.  However, in 2009, the IRS issued Rev. Proc. 2009-20, 2009-14 I.R.B. 735, to provide an optional safe harbor treatment for taxpayers that experienced losses in certain investment arrangements discovered to be fraudulent and in which a lead figure has been charged with a crime.  Under these safe harbor provisions, a qualified investor may deduct 95% of qualified investment in the discovery year if the qualified investor does not pursue any potential third-party recovery.  A 75% deduction is available in the discovery year if a qualified investor is pursuing or intends to pursue any potential third-party recovery.  The details for qualification for the safe harbor deduction are set forth in Rev. Proc. 2009-20.

In 2011, the IRS issued Rev. Proc. 2011-58, 2011-58 I.R.B. 849, which modified the provisions of Rev. Proc. 2009-20.  Under Rev. Proc. 2011-58, the safe harbor provisions of Rev. Proc. 2009-20 may be utilized if a lead figure, or an associated entity involved in the specified fraudulent arrangement, was the subject of one or more civil complaints or similar documents that a state or federal governmental entity filed with a court or in an administrative agency enforcement proceeding, and:

(a)    The civil complaint or similar documents together allege facts that comprise substantially all of the elements of a specified fraudulent arrangement conducted by the lead figure;

(b)    The death of the lead figure precludes a charge by indictment, information, or criminal complaint against that lead figure; and

(c)    A receiver or trustee was appointed with respect to the arrangement or assets of the arrangement were frozen.

A strict reading of Rev. Proc. 2011-58 would require that, unless the lead figure's death precludes the filing of a criminal indictment or criminal complaint, there must be an indictment

or criminal complaint filed against the lead figure in order for safe harbor rules of Rev. Proc. 2009-20 to be available to victims of a Ponzi scheme.  To date, no lead figure has been charged with a crime or is deceased, so the necessary prerequisites for the safe harbor for a deduction in 2017 do not appear to have been satisfied. The Revenue Procedures simply provide a safe harbor, however, and there might be individual circumstances outside the safe harbor that warrant a Liquidation Trust Beneficiary taking a position that the theft loss occurred with respect to the 2017 taxable year.  Liquidation Trust Beneficiaries should consult with their own tax advisors to determine if a theft loss deduction is permissible, as well as the timing, amount, and applicable limitations for any such theft loss deduction.

### D.    Withholding on Distributions, and Information Reporting

All Distributions to Holders of Allowed Claims under the Plan and any Distributions to the holders of beneficial interests in the Liquidation Trust are subject to any applicable tax withholding, including employment tax withholding. *See* Plan Section 7.14.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 30%). Backup withholding generally applies if the payment recipient (i) fails to furnish the recipient's social security number or other taxpayer identification number; (ii) furnishes an incorrect taxpayer identification number; (iii) fails to properly report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the taxpayer's identification number provided is the recipient's correct taxpayer identification number and that such recipient is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain Persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, a Holder of an Allowed Claim that is a not a U.S. entity may be subject to additional withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. As to certain Claims, it is possible that withholding may be required with respect to distributions by the Debtor making such Distribution or by the Liquidation Trust, as applicable, even if no withholding would have been required if payment was made prior to the Chapter 11 Cases. A non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders. Non-U.S. Holders are urged to consult their own tax advisors regarding potential withholding on Distributions under the Plan.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their own tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

## IX.    <u>RECOMMENDATION</u>

The Debtors believe that confirmation and implementation of the Plan are the best alternative under the circumstances and urge all Impaired Creditors entitled to vote on the Plan to vote in favor of and support confirmation of the Plan.


Dated: August 21, 2018                    Respectfully submitted,


                              **WOODBRIDGE GROUP OF COMPANIES, LLC, ET AL.**


                    By:    */s/ Bradley D. Sharp*
                             Name:  Bradley D. Sharp
                             Title:   Chief Restructuring Officer
                                        WGC Independent Manager, LLC